**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re<br><br>Dr. R.C. Samanta Roy Institute of Science and Technology, Inc.,<br><br>        Debtor. | Chapter 11<br><br>Case No. 11- 10504 (KJC)<br><br>**Hearing Date: June 16, 2011 at 10 a.m.**<br>**Objections Due: June 9, 2011 at 4 p.m.** |
| In re<br><br>  Midwest Properties of Shawano, LLC,<br><br>        Debtor. | Chapter 11<br><br>Case No. 11-10407 (KJC)<br><br>**Hearing Date: June 16, 2011 at 10 a.m.**<br>**Objections Due: June 9, 2011 at 4 p.m.** |
| In re<br><br>  U. S. Acquisitions & Oil, Inc.,<br><br>        Debtor. | Chapter 11<br><br>Case No. 10-14121 (KJC)<br><br>**Hearing Date: June 16, 2011 at 10 a.m.**<br>**Objections Due: June 9, 2011 at 4 p.m.** |

**MOTION OF UNITED STATES TRUSTEE FOR AN ORDER**
**APPOINTING A CHAPTER 11 TRUSTEE OR EXAMINER,**
**OR IN THE ALTERNATIVE, CONVERTING OR DISMISSING**
**THE CHAPTER 11 CASES WITH PREJUDICE**

Roberta A. DeAngelis, the United States Trustee for Region 3 ("U.S.

Trustee"), by and through her undersigned counsel, hereby moves for entry of an order

appointing a chapter 11 trustee or examiner in the above-captioned chapter 11 cases, or in

the alternative, converting the cases or dismissing the cases with prejudice for at least one

year, and in support of that motion states as follows:

# I.     PRELIMINARY STATEMENT

1.      The Debtors, Dr. R.C. Samanta Roy Institute of Science and

Technology, Inc. ("SIST"), Midwest Properties of Shawano, LLC ("Midwest

Properties"), and U. S. Acquisitions & Oil, Inc. ("USA&O"), are repeat filers that, along

with their affiliates, have taxed the resources of this Court and other bankruptcy courts

repetitively since March of 2009.  Despite having their cases dismissed a number of

times, the Debtors and their affiliates continue to file new cases, usually on the eve of

foreclosure or a sheriff's sale.   This cycle of filings must end, and there is more than

sufficient grounds to do so.

2.      There is strong cause to appoint a chapter 11 trustee in the

Debtors' cases, pursuant to section 1104 (a) of the Bankruptcy Code, due to the lack of

honesty and gross mismanagement of the affairs of the Debtors by their current

management, both before and after the commencement of the case.  The lack of honesty

is apparent from the Debtors' failure to comply with the U.S. Trustee's requests to

produce basic documents, such as SIST's rent log and documents concerning SIST's

bank account in India (the "India Account"), and the evasive and conflicting testimony of

the Debtors' principal, Ms. Naomi Isaacson, on issues such as the ownership of a bank

account in India, where contributions to SIST are deposited, which affiliates pay Midwest

Properties' real estate taxes, and the amount of the mortgage payment owed by Midwest

Properties on 635 S. Main Street.

3.      The Debtors' lack of honesty can also been seen in the steps that

SIST's management took to avoid the effect of the order of the Minnesota Bankruptcy

Court dated March 9, 2011, which dismissed with prejudice the fourth bankruptcy case of

SIST subsidiary Midwest Oil of Minnesota LLC ("Midwest Oil").[1]  After the entry of

that order, Midwest Oil was merged into another SIST subsidiary, Yehud-Monosson

USA, Inc. ("Yehud"), which then filed a new bankruptcy case, this time in the

Bankruptcy Court for the Southern District of New York, undoubtedly in an attempt to

avoid the effect of the Minnesota Bankruptcy Court's order.

    4.  Cause to appoint a chapter 11 trustee is also found in the gross

mismanagement of the affairs of the Debtors by their current management, which

includes: (i) depositing contributions to SIST into the personal bank accounts of SIST

directors; (ii) failing to maintain adequate records of all contributions made to SIST; (iii)

failing to maintain adequate records of intercompany transactions, including payment of

Midwest Properties' real estate taxes by one or more of its sister companies; (iv) failing

to maintain adequate records of SIST's transfers to the account in India that were made

by means other than through SIST's U.S. bank account; (v) failing to maintain adequate

records of SIST's overseas assets, including the India Account; (vi) failing to retain

approximately $1 million in positive cash flow a year, and/or failing to cause SIST's

subsidiaries to upstream such cash flow to SIST, thereby causing SIST to be so cash-

starved as to be  unable to timely pay its secured and unsecured obligations; and (vii)

failing to file federal income tax returns or pay federal taxes for tax years 2005 through

2008.

    5.  Alternatively, there are numerous of grounds under 11 U.S.C. §

1112(b)(4) to convert the cases or dismiss them with prejudice:

      (a)  There is a "continuing loss to or diminution of the estate
         and the absence of a reasonable likelihood of

---

[1]  That case was filed shortly after this Court dismissed Midwest Oil's third
bankruptcy case, by order dated December 20, 2010 in Case No. 10-12771.

rehabilitation." 11 U.S.C. § 1112(b)(4)(A). Both SIST and Midwest Properties reported negative cash flow for the month of April, 2011, and USA&O has reported no cash flow for any month;

(b)     As noted above, there has been gross mismanagement of the Debtors' estates by their current management. 11 U.S.C. § 1112(b)(4)(B) );

(c)     SIST and Midwest Properties may not have appropriate insurance on all of their properties. 11 U.S.C. § 1112(b)(4)(C);

(d)     The Debtors have failed to timely amend their schedules and statements of financial affairs, as well as SIST's Official Form 26, to correct errors and provide all required disclosures. 11 U.S.C. § 1112(b)(4)(F);

(e)     The Debtors have failed to provide documents and other information reasonably requested by the U.S. Trustee. 11 U.S.C. § 1112(b)(4)(H);

(f)     The Debtors have failed to pay fees to the U.S. Trustee for the first quarter of 2011. 11 U.S.C. § 1112(b)(4)(K);

(g)     Midwest Properties' current bankruptcy case was filed in bad faith, as it was commenced less than two months after this Court dismissed its prior case, and there have been no substantive changes in its financial condition since that time; and

(h)     USA&O's bankruptcy case was also filed in bad faith, because it is a single asset real estate case, the main purpose of which appears to be to stay a state court foreclosure and receivership action and to remove the issues addressed in that action to this Court.

6.     Given the status of the Debtors as repeat filers, the U.S. Trustee submits that appointment of a chapter 11 trustee would be the most beneficial alternative for the Debtors' estates and their creditors. SIST has a number of non-debtor subsidiaries which, upon information and belief, are profitable. SIST also appears to have equity in certain parcels of real property. A trustee may be able to use such assets to fund a reorganization. A chapter 11 trustee also would have access to all the Debtors' books

and records, including those that have not been produced to the U.S. Trustee, which could lead to the discovery of other assets available to fund a plan of reorganization.

7.     Appointment of a chapter 11 trustee is also preferable over dismissal, even one with prejudice, as it will prevent the Debtors from restructuring their companies to avoid orders of dismissal, as Debtors' management did with Midwest Oil.

8.     Although conversion is also an option, the Debtors take the position that their cases cannot be converted because SIST is a not-for-profit corporation, although that is not true for its subsidiaries, including Midwest Properties and USA&O.

9.     If dismissal is granted, the U.S. Trustee requests that it be with prejudice for a period of at least one year, in the hope that it will prevent, or at least discourage, further repetitive bankruptcy filings, in this Court or in other bankruptcy courts.

## II.     JURISDICTION

10.     Under (i) 28 U.S.C. § 1334, (ii) (an) applicable order(s) of the United States District Court for the District of Delaware issued pursuant to 28 U.S.C. § 157(a) and (iii) 28 U.S.C. § 157(b)(2)(A), this Court has jurisdiction to hear and determine the Motion.

11.     Under 28 U.S.C. § 586, the U.S. Trustee is generally charged with monitoring the federal bankruptcy system. *See United States Trustee v. Columbia Gas Sys., Inc. (In re Columbia Gas Sys., Inc.)*, 33 F.3d 294, 295-96 (3d Cir. 1994) (noting that U.S. Trustee has "public interest standing" under 11 U.S.C. § 307 which goes beyond mere pecuniary interest); *Morgenstern v. Revco D.S., Inc. (In re Revco D.S., Inc.)*, 898 F.2d 498, 500 (6th Cir. 1990) (describing the U.S. Trustee as a "watchdog"). "[I]n any case in which the United States trustee finds material grounds for any relief under section

1112 of [the Bankruptcy Code]," the U.S. Trustee is obligated to apply promptly after making that finding to the court for relief." 28 U.S.C. § 586(a)(8).

12. Under 11 U.S.C. § 307, the U.S. Trustee has standing to be heard on this Motion.

### III. PROCEDURAL HISTORY

13. On March 16, 2009, the three Debtors herein, and four other subsidiaries of SIST,[2] filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in this Court (the "2009 Case"). By Order dated March 20, 2009, the 2009 Case was jointly administered with those of its affiliates under case no. 09-10876 (KG).

14. On September 16, 2009, this Court issued an Order for Rule to Show Cause, setting a hearing on September 21, 2009, at which the Debtor and its affiliates were required to show cause why the Court should not dismiss the cases or appoint a chapter 11 trustee. *See* Case No. 09-10876, Dkt. No. 283.

15. On September 22, 2009, this Court entered an Order dismissing the Debtor's 2009 Case, along with those of its affiliates (the "2009 Dismissal Order"). *See* Bankr. Ct. Case No. 09-10876, Dkt. No. 291. The grounds for dismissal set forth in this Court's 2009 Dismissal Order included that:

    (a)    the debtors had not filed federal tax returns since 2004, including a return for 2008 that was due after the Petition Date;

    (b)    that the debtors' Monthly Operating Reports revealed that they were suffering continuing losses, and that the debtors

---

[2] The other four subsidiaries were Midwest Oil of Minnesota, LLC, Midwest Oil of Wisconsin, LLC, Midwest Oil of Shawano, LLC and Midwest Hotels & Motels of Shawano, LLC. *See* Case No. 09-10876.

did not have a business plan and therefore were unable to meet their burden of proving a reasonable likelihood of rehabilitation;

(c)     the Debtors belatedly responded to an offer to purchase property by an interested purchaser, but only in the face of this Court's Show Cause Order;

(d)     Six months into the cases, the Debtors had not been able to obtain necessary financing without a business plan; and

(e)     The Debtors' principal (Ms. Isaacson) testified that the debtors were holding in a gas station safe nearly $60,000 in cash from other business operations, without having disclosed this information to the creditors, the Court or the Office of the U.S. Trustee prior to the hearing on the Order for Rule to Show Cause. *Id.*, pp. 2-3.[3]

16.     In the 2009 Dismissal Order, this Court found that "[d]ebtors have, beyond cavil, abused the bankruptcy process." *Id*. p. 4.

17.     The Debtors and their affiliates appealed this Court's 2009 Dismissal Order to the District Court for the District of Delaware.  By Order entered May 25, 2010, the District Court affirmed the Dismissal Order.  *See* District Court Case No. 09-789, Dkt. No. 45.

18.     The Debtors and their affiliates appealed the District Court's order to the Court of Appeals for the Third Circuit.  That appeal is currently pending.

19.     In the summer of 2010, after the stay of this Court's Dismissal Order was lifted,[4] Midwest Properties and its affiliate, Midwest Oil, filed their second

---

[3]     It appears from the transcript of the September 21, 2009 hearing that the cash was associated with the race track/amusement park that is owned by USA&O.  See 9/21/09 Tr., Case No. 09-10876, pp. 57-62.

[4]     Upon the applications of the appellants, the Dismissal Order was stayed through June 7, 2010.  *See* Bankr. Ct. Case No. 09-10876, Dt. No. 306 (order granting stay through Oct. 26, 2009); District Court Case No.09-CV-00789 (GMS), Dkt. No. 12 (extending the stay indefinitely).   On June 7, 2010, the District Court denied the

bankruptcy cases, in two different bankruptcy courts, approximately two weeks apart. Midwest Properties filed on July 13, 2010 in the Bankruptcy Court for the Eastern District of Wisconsin (the "Wisconsin Bankruptcy Court"), Case No. 10-31515-pp. Midwest Oil filed on July 26, 2010 in the Bankruptcy Court for the District of Minnesota (the "Minnesota Bankruptcy Court"), Case No. 10-35450. [5]

20.    On August 2, 2010, the Wisconsin Bankruptcy Court signed an order transferring venue of Midwest Properties' case to this Court. *See* Dkt. No. 23 Eastern District of Wisconsin Bankruptcy Case No. 10-31515-pp. That case was initially assigned to Judge Gross of this Court, and later was transferred to Judge Carey. *See* Case No. 10-12481.

21.    On August 18, 2010, upon the motion of the U.S. Trustee for Region 12, the Minnesota Bankruptcy Court dismissed Midwest Oil's case, pursuant to 11 U.S.C. § 1112(b)(1). See Case No. 10-35450, Dkt No. 21 (Bankr. D. Minn.).

22.    On September 1, 2010, Midwest Oil filed its third bankruptcy case, in this Court, Case No. 10-12771. That case was initially assigned to Judge Gross of this Court, and later was transferred to Judge Carey.

23.    The U.S. Trustee moved to dismiss or convert the bankruptcy cases of Midwest Properties and Midwest Oil, or in the alternative to appoint a trustee. A hearing on such motion was held on November 8, 2010 (the "November 8, 2010 Dismissal Hearing").

---

appellants' motion to extend the stay pending their appeal to the Court of Appeals. *See id.,* Dkt. No. 50. On July 1, 2010, the Court of Appeals also denied the appellants' motion to stay the Dismissal Order. *See* Court of Appeals Case No. 10-2535.

[5]    The Debtors herein, as well as Midwest Oil, withdrew their appeal to the Court of Appeals. *See* Court of Appeals Case No. 10-2535.

24.    On December 20, 2010, this Court entered an order (the "2010 Dismissal Order") dismissing the bankruptcy cases of Midwest Properties and Midwest Oil. *See* Case No. 10-12481, Dkt No. 151, and Case No. 10-12771, Dkt. No. 161. The grounds for dismissal set forth in the 2010 Dismissal Order included:

(a)    Midwest Properties was operating at a net loss and therefore unable pay its expenses unless the real properties located at 463 N. Humphrey Circle, Shawano, Wisconsin and 1024 East 5th Street, Shawano Wisconsin (collectively, the "Midwest Receivership Properties") were include in the income/expense calculations. The Court held that the Midwest Receivership Properties should not be included in the calculation because, among other reasons, "[t]here was no evidence presented at the hearing on the UST's Motions that the debtors had either asserted or exhausted any remedies available to them in state court."[6] 2010 Dismissal Order, p. 10.

(b)    Midwest Properties and Midwest Oil had failed to provide any evidence that a realistic plan of reorganization could be proposed within a reasonable time frame.

_____

[6]    In the 2010 Dismissal Order, the Court set forth the following income and expense totals, from in Midwest Properties' exhibits, corrected to include the 635 S. Main Street mortgage obligation that had been omitted:

|  | Exhibit 2 – includes Receivership Properties | Exhibit 3 – excludes Receivership Properties |
|---|---|---|
| total monthly rental income | $25,058.34 | $17,258.34 |
| total monthly mortgage obligations (corrected) | $20,223.26 | $15,223.26 |
| Net amount available to Midwest Properties | $4,722.08 | $2,035.08 |

Using the figures from the far right column above, which excluded the Midwest Receivership Properties, the Court then subtracted out the average monthly utility and insurance expenses of $2,194.12. Based on that calculations, the Court found that Midwest Properties was operating at net loss of $159.04 a month. *See* 2010 Dismissal Order, p. 9.

(c)     Midwest Properties lacked candor, based on its failure to respond to the U.S. Trustee's document requests, which provided further reason to question Midwest Properties' ability to reorganize within a chapter 11 framework.

25.     The day after the 2010 Dismissal Order was filed, on December 21, 2010, USA&O filed its second bankruptcy case, in this Court, Case No. 10-14121 (KJC).

26.     On January 19, 2011, Midwest Oil filed its fourth bankruptcy case, this time in the Minnesota Bankruptcy Court, Case No. 11-30319 (RJK). On March 9, 2011, the Minnesota Bankruptcy Court dismissed Midwest Oil's case with prejudice for one year.

27.     On February 8, 2011, Midwest Properties filed its third bankruptcy case, in this Court, Case No. 11-10407 (KJC).

28.     On February 21, 2011, SIST filed its second bankruptcy case, in this Court, Case No. 11-10504 (KJC).

29.     On March 23, 2011, another wholly owned subsidiary of SIST, Yehud, filed for bankruptcy in the Bankruptcy Court for the Southern District of New York, Case No. 11-11278 (ALG)(the "Yehud Case"). Yehud is a recently created New York corporation that purchased the assets of Midwest Oil, and merged that entity into it. The merger appears to have taken place after Midwest Oil's bankruptcy case was dismissed with prejudice by the Minnesota Bankruptcy Court on March 9, 2011. *See* transcript of 341 meeting of creditors of SIST, March 31, 2011, Exhibit ("Ex.") A to declaration of Karen Starr, Bankruptcy Analyst with the Office of the U.S. Trustee ("Starr Dec."), Tr. 39:1-10. (Hereinafter all references to "Tr." shall be to this transcript,

unless otherwise indicated.)   The merger was presumably for the purpose of avoiding the effect of the Minnesota Bankruptcy Court's dismissal order.

30.      Upon the motion of the U.S. Trustee for Region 2, the New York Bankruptcy Court entered an order on or about April 3, 2011 transferring venue of the Yehud Case to the Minnesota Bankruptcy Court.  A motion to convert that cases was filed by the U.S. Trustee for Region 12, and is currently is pending in Case No. 11-42834 (Bankr. D. Minn.).

31.      No official committee of unsecured creditors has been formed in the Debtors' current bankruptcy cases, due to insufficient interest.

32.      To date, the Court has not directed the appointment of a trustee or an examiner in any of the Debtors' cases.


IV.      **STATEMENT OF FACTS**

A.          **General Background**

33.      SIST is a not-for-profit corporation which was created in or around 1992.  Tr. 131:14-19.   Its primary purpose is to fund a tuition-free school in India (the "SIST School").  SIST owns a number of properties, and derives income from rentals of certain of those properties.   SIST also receives contributions.   SIST currently has at least twelve wholly owned subsidiaries, six of which are limited liability companies that share SIST's tax identification number (which group includes Midwest Properties), and six of which are corporations that have separate tax identification numbers (which group include USA&O).  All of SIST's subsidiaries are for-profit companies.  Some, such as Midwest's Properties, are primarily real estate holding companies.  Other subsidiaries operate gas stations/convenience stores, others operate hotels, and others run retail

businesses such as a fudge shop and home furnishings. USA&O owns a race track/amusement park. *See* Tr. 40:1-9; 55:8-10; Ex. C to Official Form 26, attached as Ex. E to the Starr Dec.[7]

34. Neither SIST nor any of its subsidiaries have any paid employees. Rather, all officers and other persons who do work for the companies are volunteers. Tr. 46:14-17; 134:5-136:4. Ms. Isaacson has been the Chief Executive Officer of SIST since 2000, Chairman of SIST's Board of Directors since 2005, and has acted as its Chief Financial Officer since 2006 or 2007. Tr. 131:8-10; 133:18 – 134:1; 137:12- 138:24; and 157, lines 17 – 23. Ms. Isaacson is also the managing member of Midwest Properties and of the other SIST subsidiaries that are limited liability companies. Ms. Isaacson is the President of those subsidiaries that are corporations, including USA&O.

35. Despite having been in and out of chapter 11 bankruptcy since March of 2009, the Debtors have yet to file any plan of reorganization. In addition, in none of their bankruptcy cases have the Debtors sought or obtained any debtor-in-possession financing, nor have they sought to refinance their existing debt. Even through certain of the Debtors' loans are in default, and a number of foreclosure actions have been brought against them, Ms. Isaacson testified that she did not believe that refinancing was necessary. Tr. 142:14-19; Tr. 57:9-21.

36. This is the second bankruptcy case for SIST and USA&O, and the third for Midwest Properties. Upon information and belief, each of the bankruptcies of Midwest Properties and USA&O were filed on the eve of a judgment of foreclosure or of

---

[7]     SIST was required to file Form 26 with the Court, but it appears from the docket that it was not. A copy was served on the Office of the U.S. Trustee.

a sheriff's sale.[8]  SIST's current bankruptcy case was filed shortly after one of its secured

lenders, M&I Bank, filed a foreclosure action.

B.          SIST'S Revenue and Profits

37.     SIST's cash flow projections attached to its initial Monthly

Operating Report ("MOR") estimates SIST's monthly post-petition revenue at

approximately $880,000 a month, and net positive cash flow of between $80,000 and

$86,000 a month.    Ms. Isaacson explained that these figures include revenue and profits

from all SIST's subsidiaries, and are based on the average monthly gross revenues

generated by SIST and its subsidiaries in 2010.  Tr. 55:17-56:7; *see also* SIST Statement

of Financial Affairs (listing approximately $10 million in revenue for 2010).  Presumably

the net cash flow projected for 2011, which totals approximately $1 million for the year,

is also based on the 2010 net cash flow of SIST and its subsidiaries.

38.     Despite having $10 million in revenues, $1 million net cash flow

for 2010, and more than $80,000 a month in net cash flow thereafter, SIST's sole U.S.

bank account had on average only $ 1,481 at the end of each month since January 2010.

*See* Starr Dec., ¶ 9.

39.     When asked why SIST's bank statements did not reflect balances

anywhere near the estimated $80,000 a month, Ms. Isaacson testified that the bulk of

these funds are kept in the accounts of the subsidiaries (including non-debtor

subsidiaries), and are not routinely up-streamed to SIST.   Tr. 17:23 – 18:19.  However,

---

[8]      *See, e.g.,* Fox Communities Credit Union's Renewed Motion for Relief from the
Automatic Stay and Abandonment to Resume Foreclosure Proceedings, in
Midwest Properties' 2010 bankruptcy Case, No. 10-12481, Dkt. No. 53, ¶ 9
(asserting that Midwest Properties' 2010 bankruptcy case was filed one day
before a schedule sheriff's sale was to take place).

SIST's Official Form 26 shows the combined balance of the bank accounts of SIST and all of its subsidiaries as of December 31, 2010 to be only $127,099, which is far less than the approximately $1 million in net cash flow for 2010.

40. Ms. Isaacson testified that the operations of SIST alone (not including those of its subsidiaries), generates net income of only a few thousand dollars a month, which comes from rents. Tr. 59:2-5. In fact, the cash flow projections included in SIST's Initial MOR projected that SIST would have a negative cash flow for March and April, 2011, once the cash flow of its subsidiaries are omitted. SIST's MOR for April, 2011 reported a negative net cash flow of $86.76.

41. The cash flow projections in SIST's Initial MOR project SIST to have a modest positive cash flow starting in May, 2011, but this is based on an assumption that there will be an increase in rental income, which is speculative. *See* Tr. 54:8-23.

C.          **Funding of the SIST School and Tracing SIST's Contributions**

42. SIST and its subsidiaries may be using a portion of the net cash flow to fund the SIST School in India, but if so, such portion is very small. Ms. Isaacson testified that SIST sends money every month to India to fund the SIST School. Tr. 18:20 –19:13. However, in the sixteen month period from December 1, 2009 through April 30, 2011, SIST's bank statements show only four international wire transfers, each for $6,000. [9] *See* Starr Dec., ¶ 10. SIST's check register, which at the time it was produced to the U.S. Trustee covered December 1, 2009 through February 16, 2011, did not show any other transfers to India. *See* Tr., 19:14 - 21:9. Therefore, the total amount of SIST's

---

[9]          Ms. Isaacson testified that all international wire transfers from SIST's account are transfers to India. Tr. 23:3-6.

funding of the SIST School for the sixteen month period from December 1, 2009 through April 30, 2011 was a mere $24,000.

43.     When asked about the mechanics of transferring funds from SIST to India, and the source of those funds, Ms.  Isaacson first testified that up until the March 2009 bankruptcy, SIST transferred funds to India through check or wire transfer.  Since that time, however, such funding only "sometimes" comes out of SIST's bank account. Tr. 18:20 –19:13.  When asked what other sources SIST uses to send money to India, Ms. Isaacson testified that SIST's subsidiaries do not make transfers to India, ever.  Tr. 23:17-20; 60:7-19.  She further testified that SIST board members sometimes transfer money to India, which transfers Ms. Isaacson described as being made on behalf of SIST.  Tr. 23:21-24:19; 27:23 – 28:5.  Ms. Isaacson asserted that the reason transfers have been made from board members' accounts, instead of from SIST's account, is that there are a limited number of banks that can send money overseas, and there have been issues with tracing wire transfers from SIST's bank account.  *See id.*

44.     On one occasion Ms. Isaacson wired funds from her personal bank account to India.  The account she used to wire such funds was her account at Commerce Bank, which is the same bank in which SIST's account is held.  When asked why a wire from her personal account at Commerce could be traced more easily than a wire from SIST's account at Commerce, Ms. Isaacson could not provide an adequate explanation. *See* Tr. 24:16 – 25:19.  Moreover, although Ms. Isaacson described the wire transfers made by herself and other board members as being on behalf of SIST, she testified that the funds were the personal funds of board members, and SIST neither fronted those

funds, nor reimbursed the board members for such transfers. Tr. 26:22-28:8. Thus, such transfers cannot be viewed as transfers of SIST's funds.

D.      **Additional Facts Concerning Midwest Properties**

45.      Midwest Properties is a holding company that owns twenty-one pieces of real property located in Shawano, Wisconsin, some of which produce rental income. Two such properties are controlled by a receiver, who was appointed in connection with a foreclosure action brought by Fox Communities Credit Union in state court in Wisconsin. These properties are also the subject of a turnover motion filed by Midwest Properties in its Bankruptcy case, which is scheduled to be heard by this Court on June 16, 2011.

46.      Midwest Properties' financial circumstances are unchanged from what they were during its prior bankruptcy case, which this Court dismissed on December 20, 2010. This can be seen from the cash flow projections included in Midwest Properties' Initial MOR in this case:

(a)      The amount listed under "Cash Sales (Rental)" on the MOR's cash flow projections is $17,000, which is slightly less than the $17,258.34 listed by Midwest Properties for its total rental income on its Exhibit 3 submitted at the November 8, 2010 Dismissal Hearing. *See* December 2010 Dismissal Order, p. 9.

(b)      The amount listed in the cash flow projections of the MOR for "Secured/Rental/Leases" is $13,223.26. This is the same amount, to the penny, that Midwest Properties listed as its total mortgage payments on its Exhibit 3 at the November 8, 2010 Dismissal Hearing.

47.     In its December 2010 Dismissal Order, this Court found, based on Ms. Isaacson's testimony, that the figure of $13,223.26 for Midwest Properties' monthly mortgage obligations failed to include any mortgage payment on 635 S. Main Street, which Ms. Isaacson testified had been lowered to $2,000 a month.  *See* December 2010 Dismissal Order, p. 8.  When the $2,000 was added, it brought Midwest Property's total monthly mortgage payments up to $15,223.26.  *Id*. at 9.   Similarly, when the $2,000 for the mortgage payment on 635 S. Main Street is added into the cash flow projections on Midwest Properties' Initial MOR in the present case, it shows that Midwest Properties will be incurring a net operating loss each month.

48.     At the 341 meeting in Midwest Properties' current case, on March 17, 2010, Ms. Isaacson testified that the mortgage payment on 635 S. Main Street had been further reduced to $1,500 a month.  However, even if that is true, Midwest Properties would have a positive net cash flow of $79 for only eight months of the year, and a negative cash flow of $571 for the four months in which it has to pay quarterly U.S. Trustee fees.  *See* Midwest Properties Initial MOR, p. 2.  The result on a yearly basis is a net cash loss of $1,652.

49.     The fact that Midwest Properties' financial circumstances have not improved since the dismissal of its last case is confirmed by the fact that it reported a net operating loss of $4,251.02 for April, 2011, and a net operating loss of $8,426.10 for the partial month of February 9-28, 2011.   Midwest Properties reported a net operating gain for March, 2011 of $3,527.

**E.          Additional Facts Concerning USA&O**

50.     USA&O's bankruptcy case is a "single asset real estate" case as defined in 11 U.S.C. § 101(51B).  The property is located at W5901 County Road BE,

Shawano, Wisconsin (the "USA&O Property"). *See* USA&O's Schedules and Statement of Financial Affairs, Case No. 10-12141, Dkt. No. 5. The USA&O Property consists of commercial buildings and one or more race tracks.

51.     As a result of a state foreclosure action in Wisconsin by Southwest Guaranty, Ltd. ("Southwest Guaranty") against USA&O and SIST, the USA&O Property is currently in receivership and being managed and maintained by a receiver. *Id.* The USA&O Property is also the subject of a turnover motion filed by USA&O in its Bankruptcy case, and is scheduled for hearing before this Court on June 16, 2011.

52.     USA&O's Schedules and Statement of Financial Affairs indicate that USA&O has no cash on hand, no bank accounts, no employees, and essentially no operations. *See* Case No. 10-12141, Dkt. No. 5. The lack of income and bank accounts is further supported by USA&O's monthly operating reports. *See* Case No. 10-12141, Dkt. Nos. 7, 11, 13, 17 and 51. USA&O's schedules list eight unsecured creditors and one secured creditor, Southwest Guaranty. *See* Case No. 10-12141, Dkt. No. 5.

**F.          Pre-Petition Failure To File Tax Returns or Pay Taxes**

53.     SIST and those of its subsidiaries that file jointly with it, including Midwest Properties, have not filed any federal returns, or paid federal tax, for the tax years 2005 through 2008. Those entities did recently file a 2009 federal return, and Ms. Isaacson testified that they intend to file 2005 through 2008, in reverse chronological order, at some point in the future. According to Ms. Isaacson, SIST has not filed its 2010 return yet, because it has gotten an extension.

54.     Despite having been in operation since at least 2009, USA&O, has yet to file any tax return, or paid any federal taxes. *See* Tr. 49:3 – 50:5.

55.     Despite the fact that the SIST subsidiaries that file joint tax returns with SIST are for-profit enterprises, some of which operate profitable gas stations,[10] SIST takes the position that those subsidiaries, as well as SIST itself, have no, or next to no, tax liability.   However, the Internal Revenue Service filed a proof of claim in SIST's bankruptcy case for almost $1 million, most of which relates to 2003 and 2004, with estimates for later years in which no return has yet been filed.   If there is tax liability, the longer the Debtors take to file their returns and pay those taxes, the larger the claim may be for late fees and other penalties.

**G.          Lack of Candor and Failure to Produce Documents**

56.     In the current bankruptcy cases, as well as the bankruptcy cases of Midwest Properties and Midwest Oil last fall, there have been a number of instances in which the debtors have been less than candid, both in the testimony of their principal, Ms. Isaacson, and in the failure to produce documents that were reasonably requested by the U.S. Trustee.  A number of those instances are set forth below.

1.     Information about Ownership of a Bank Account in India.

57.     At SIST's 341 meeting, Ms. Isaacson was evasive in her testimony concerning the ownership of the India Account, into which SIST wires funds for the operations of the SIST School.  Information about the India Account is especially important because, upon information and belief, funding of the SIST School is the stated purpose of SIST's existence, and the basis of its not-for-profit status.   Ms. Isaacson testified that she was unsure whether the India Account was SIST's account.  When it

---

[10]     Ms. Isaacson testified that increases in the price of gas are at least part of the reason that SIST's revenues from 2009 to 2010 doubled from approximately $5 million to approximately $10 million.  *See* Tr. 128:17 – 130:2; SIST Statement of Financial Affairs, p. 1.

was pointed out that SIST's 2009 tax return, which Ms. Isaacson signed, listed the India

Account as belonging to SIST, Ms. Isaacson erroneously asserted that the tax return

merely reported that "SIST has the *potential* of having an account overseas" (emphasis

added).  Ms. Isaacson then testified that she was not sure of the name on the account, that

she has never seen a bank statement on the account, and that it may be in the name of the

"Samanta Roy Trust."  When asked about the relationship between the Samanta Roy

Trust and SIST, Ms. Isaacson first testified that it was a part of SIST, then that is was just

another name SIST used in India. *See* Tr. 158:13 – 161:13; Tr. 169: 9-19.

   58. Despite being SIST's Chief Executive Officer, Chairperson of

SIST's Board, and acting Chief Financial Officer, Ms. Isaacson claimed that matters

concerning the India Account, and the relationship between the Samanta Roy Trust and

SIST were "way out of [her] realm of knowledge."  Tr. 160:18 – 161:13.

   59. At SIST's 341 Meeting on March 31, 2011, the U.S. Trustee's

counsel asked for production of the bank statements from the India Account.  *See* Ex. D

to Starr Dec., p. 2.  That request was followed up by a number of emails from counsel to

the U.S. Trustee to the Debtors' counsel, but SIST has yet to produce any records relating

to the India account.  *See* Ex.  D to Starr Dec.[11]

 2. Records Concerning Funds Contributed to SIST

   60. Ms. Isaacson testified that SIST receives charitable contributions

on a regular basis.  Tr. 150:16-151:4.   However, it appears that SIST does not keep

complete records of all such contributions.  Ms. Isaacson testified that during the times

---

[11] The April 28, 2011 email from Debtors' counsel that appears at the top of the first
page of the email chain that is attached as Exhibit D to the Starr Declaration states
that the information requested will be provided ASAP.  However, nothing has
been provided, despite the passage of nearly a month since that email.

SIST has been in bankruptcy, all contributions it receives have been deposited into SIST's debtor-in-possession account.  When SIST has not been in bankruptcy, however, all contributions are not necessarily deposited into SIST's  account.  When asked where else contributions might be deposited,  Ms. Isaacson's testimony was again evasive, although she ultimately identified the personal accounts of SIST board members as one such place.  Tr. 150:23 – 154:4.   When asked how SIST kept track of the funds contributed to SIST but not deposited into SIST's account, Ms. Isaacson did not answer the question.  *See*  Tr. 154: 5-15.

3.      Payment of Real Estate Taxes of Debtor Midwest Properties

61.      Throughout Midwest Properties' 2010 bankruptcy case, as well as in its current bankruptcy case, its managing member, Ms. Isaacson, has given conflicting testimony regarding which entity pays its real estate taxes:

-          Ms. Isaacson testified at the 341 meeting in the 2010 Midwest Properties case that, although the checks used to pay Midwest Property's real estate taxes were issued by its counsel, Rebekah Nett, the funds for such payment came from Midwest Properties. *See* Ex. B to Starr Dec., transcript of 341 meeting of Midwest Properties on 9/28/10, Tr. 26:8 – 27:15 ("Q. Where did the money come from to pay the bills?  A. *This debtor*.")(emphasis added); *see also* 9/28/10 Tr. 76:19 – 77:14.

-          At the evidentiary hearing in November 2010 on the U.S. Trustee's motion to dismiss or convert the case, after it became clear that payment of its real estate tax obligation would give Midwest Properties a negative cash flow of over $7,000 a month, Ms. Isaacson testified that it was SIST that paid Midwest Properties' taxes, pursuant to a tax sharing agreement.  *See* excerpt from Nov.

8, 2010 hearing transcript, Ex. C to Starr Dec., Tr. 54:8-56:22, and Midwest Properties' Trial Ex. 16.

- In the current case, when it was pointed out to Ms. Isaacson that SIST's check register showed no checks or other transfers to pay Midwest Properties' real estate taxes, she testified that SIST did not pay Midwest Properties' taxes with SIST's own funds, but rather used funds from one or more of its other subsidiaries' bank accounts, which SIST treats as its own. She further testified that SIST does not keep track of which affiliates pays the expenses of other affiliates, and its records are such that it would be difficult to make such a determination. *See* 341 Tr. (Ex. A to Starr Dec.) 9:1–17:17; 144:1-145:13.

4. Midwest Properties' Mortgage Payment on 635 S. Main Street

62. As discussed above, at the November 8, 2010 Dismissal Hearing in Midwest Properties' last bankruptcy case in this Court, Midwest Properties introduced an Exhibit (Debtor's Ex. 3) that purported to list its rental income and mortgage payment. No mortgage payment was listed for 635 S. Main Street. On cross-examination, Ms. Isaacson testified that the mortgage payment on that property had been $4,000 a month, but the mortgage holder, Bayview Bank, had agreed to reduce the payment to $2,000 a month. She further testified that the mortgage payment might be less than $2,000 if the rents received on the property were less than $2,000, but that the rents currently being received on the property were $1,950. *See* Nov. 8, 2010 Tr., Ex. C to Starr Dec., pp. 37-39.

63. In the present case, Midwest Properties again omitted any mortgage payment for 635 S. Main Street on the cash flow projections included in

Midwest Properties' Initial MOR.[12]  Without the inclusion of that mortgage payment, the

cash flow projections show an anticipated monthly net cash flow of $1,579, except for the

four months in which Midwest Properties is to pay U.S. Trustee fees (which reduce the

net cash flow to $929).  At the 341 meeting in Midwest Properties, after it was

established that the projected net cash flow did not take into account the mortgage

payment on 635 S. Main Street, Ms. Isaacson was asked to confirm that the payment on

that property was $2,000 a month.  At that time, Ms. Isaacson asserted that the mortgage

payment had been further reduced to $1,500 a month, a figure that would give Midwest

Properties a $79 net cash flow, at least for eight months of the year.  The U.S. Trustee

has asked Midwest Properties to produce documentary evidence of such reduction, and/or

provide the name of the person at Bayview Bank who agreed to the reduction.  This

information has not yet been provided.  *See* Tr. 114:21-116:8; Ex. D to Starr Dec.

5.  Failure to Produce Documents Reasonably Requested  by the U.S. Trustee

        64.     In its decision dismissing the prior bankruptcy case of Midwest

Properties, this Court found that "Midwest Properties' lack of cooperation with the

UST's request for basic documentation is troubling. . . .  Disclosure is a fundamental

component of the bankruptcy process.  Midwest Properties' lack of candor provides

further reason to question Midwest Properties' ability to reorganize within a chapter 11

framework." 2010 Dismissal Order, at 12.  At the hearing, the Court recognized that

---

12      This can be seen from the fact that the amount listed on the budget in the Initial
MOR for "Secured/Rental/Leases" is $13,223.26, which is exactly the amount
listed as the "total" of Midwest Properties' mortgage payments on its Exhibit 3
introduced at the November 8, 2010 Dismissal Hearing, before it was corrected to
add in the mortgage payment on 635 S. Main Street.  *See* December 2010
Dismissal Order, p. 9 (listing the total monthly mortgage obligation (corrected) on
Exhibit 3 as $15,223.26).

producing standard records to the U.S. Trustee is especially important for these Debtors

because it appears that they conduct a good deal of their business on a cash basis.  *See*

excerpt from Trial Transcript of Nov. 8, 2010, Ex. C to Starr Dec., p. 240:15-24.

        65.    While SIST, Midwest Properties and USA&O did comply with

some of the U.S. Trustee's reasonable document requests, they did not comply with

others.  Attached as Exhibit D to the Starr Declaration is the most recent email from the

U.S. Trustee's counsel to Debtors' counsel, outlining documents that had been requested

numerous times, but which still have not been produced.  Those documents include:

- SIST's rent log;

- bank statements relating to the India Account;

- federal tax form TD F 90-22.1 Report of Foreign Bank and Financial accounts filed with SIST's 2009 federal tax return;

- certificates of insurance for certain of the properties owned by SIST and Midwest Properties;

- minutes of the meetings of SIST's board of directors from January 2010 to the present;

- documents supporting Ms. Isaacson's claim that Bayview Bank had agreed to lower the monthly mortgage payments on the property of Midwest Properties located at 635 S. Main Street, or, if there was no such documentation, then the name of the individual at Bayview who agreed to such reduction.  *See* Tr. 114:21-116:8; and

- documentation regarding a loan of over $500,000 made by the Arendale dental clinic (which is owned by one of the members of SIST's board of directors), including documentation supporting Ms. Isaacson's testimony that such loan had been forgiven.  *See* Tr. 117:16-24.

**H.**      **Failure to Amend Errors in Official Form 26,**
                **the Debtors' Schedules and Statement of Financial Affairs**

        66.    At or before the SIST's 341 Meeting on March 31, 2011, the U.S.

Trustee requested the Debtors to amend certain of their required filings to correct

identified errors, but those amendments have yet to be made. One necessary amendment relates to the Official Form 26, which is to set forth information required by Bankruptcy Rule 2015.3 concerning a debtor's non-debtor subsidiaries. See Ex. E to Starr Dec. It appears that, while SIST served such form on the Office of the U.S. Trustee, it did not file it with the Court. The Form 26 that was served on the U.S. Trustee appears on its face not to be limited to SIST's non-debtor subsidiaries, as required, but rather also includes SIST, Midwest Properties and USA&O. In addition, the Debtors' Form 26 consolidates the financial information about SIST and its subsidiaries, instead of providing such information on an individual basis, as required. The errors on SIST's Form 26 were explained to SIST's representatives during the Initial Debtor Interview on March 31, 2011, and SIST was asked at that time to amend the form. *See* Starr Dec., ¶¶ 11-14. This request was repeated in subsequent emails to the Debtors' counsel. *See* Ex. D to Starr Dec., p. 3. In addition, the Debtors' Form 26 did not supply certain required information, such as financial statements and a statement of cash flows. Such information was stated in the form to be in the process of being prepared, but has yet to be provided.

67.     There were also certain errors in the Debtors' schedules and statement of financial affairs, as Ms. Isaacson testified at SIST's 341 meeting on March 31, 2011 that all three Debtors would be filing amended schedules. *See* Tr. 117:11-15. Such amendments have yet to be made, despite written reminders from the U.S. Trustee's counsel. *See* Ex. D to Starr Dec.

I.          **Failure to Pay U.S. Trustee Fees**

68.     The Debtors have failed to pay frees to the U.S. Trustee for the first quarter of 2011, which were due on April 30, 2011. Based on the MORs filed by

these Debtors, each of them should have paid at least the minimum fee of $325. *See* 28

U.S.C § 1930 (a)(6).


# V.    ARGUMENT

**A.        A CHAPTER 11 TRUSTEE SHOULD BE
APPOINTED  IN EACH OF THE DEBTORS' CASES**

69.    A chapter 11 trustee should be appointed in each of the Debtors'

cases pursuant to 11 U.S.C. § 1104(a).  That section of the Bankruptcy Code provides

that the Bankruptcy Court shall order the appointment of a trustee at any time after the

commencement of the case but prior to confirmation of a plan, on request of a party in

interest or the U.S. Trustee, and after notice and a hearing: [1]

> (1) for cause, including fraud, dishonesty, incompetence, or gross
> mismanagement of the affairs of the debtor by current
> management, either before or after the commencement of the case,
> or similar cause, but not including the number of holders of
> securities of the debtor or the amount of assets or liabilities of the
> debtor;
>
> (2) if such appointment is in the interests of creditors, any equity
> security holders, and other interests of the estate, without regard to
> the number of holders of securities of the debtor or the amount of
> assets or liabilities of the debtor; or
>
> (3) if grounds exist to convert or dismiss the case under section
> 1112, but the court determines that the appointment of a trustee or
> an examiner is in the best interests of creditors and the estate.

---

[1]    A number of courts, including the Court of Appeals for the Third Circuit, have
indicated that grounds for the appointment of a trustee must be established by
"clear and convincing" evidence. *See In re G-1 Holdings, Inc.,* 385 F.3d 313 (3d
Cir. 2004).  However, in light of Supreme Court precedent and the recent addition
of § 1104(e) to the Bankruptcy Code, the better view is that the appropriate
burden of proof should be the "preponderance of the evidence."  *See Tradex
Corp. v. Morse,* 339 B.R. 823, 829-32 (D. Mass. 2006) (citing *Grogan v. Garner,*
498 U.S. 279, 286 (1991)).

11 U.S.C. § 1104(a)(emphasis added).

70.     Subsection (1) addresses current management's pre and post-petition misdeeds or mismanagement, while subsection (2) provides the court with "particularly wide discretion" to appoint a trustee even absent wrongdoing or mismanagement.  *In re Bellevue Place Associates*, 171 B.R. 615, 623 (Bankr. N.D. Ill. 1994), *aff'd, Bellevue Place Associates v. Caisee Centrale Des Banques Populaires*, 1994 U.S. Distr. Lexis 17409 (Dec. 6, 1994)(N.D. Ill. 1994).  Subsection (3) allows a court to appoint a trustee when grounds exist to convert or dismiss the case under section 1112, as is the case here, but the court determines that the appointment of a trustee or an examiner is in the best interests of creditors and the estate.

71.     If a court finds that cause exists, or that appointment of a chapter 11 trustee is in the interest of the parties, an order for the appointment of a trustee is mandatory.  *Official Comm. Of Asbestos Pers. Injury Claimants v. Sealed Air Corp. ( In re W.R. Grace & Co.*), 285 B.R. 148, 158 (Bankr. D. Del. 2002).

72.     The categories enumerated in 11 U.S.C. § 1104(a)(1) "cover a wide range of conduct" and, thus, are best described as illustrative, rather than exclusive. *See In re Marvel Entertainment Corp.*, 140 F.3d 463, 472 (3d Cir. 1998)(quoting *Committee of Dalkon Shield Claimants v. A.H. Robbins Co.*, 828 F.2d at 242).  Fraud, dishonesty, incompetence, and gross mismanagement of a debtor's business affairs are all grounds for appointment of a chapter 11 trustee under 11 U.S.C. § 1104(a)(1).  *See, e.g., In re Sharon Steel Corp.*, 871 F.2d 1217 (3d Cir. 1989); *In re Colby Construction Corp.*, 51 B.R. 113, 116-118 (Bankr. S.D.N.Y. 1985).  The determination of whether cause exists must be taken on a case by case basis, taking into account all relevant factors.

*Sharon Steel*, 871 F.2d at 1225.  Pre-petition conduct alone may provide the basis for a court to appoint a trustee.  *See In re Rivermeadows Assocs., Ltd.*, 185 B.R. 615, 619 (Bankr. D. Wyo. 1995).

1.  Cause Exists to Appoint a Chapter 11 Trustee under § 1104(a)(1)

       73.    Cause for the appointment of a chapter 11 trustee is found both in the lack of honesty of the Debtors, and the incompetence or gross mismanagement of the affairs of the Debtors by current management, both before and after the commencement of the case.  Therefore, a trustee shall be appointed under 11 U.S.C. § 1104(a)(1).

       74.    As set forth in the fact section above, there has been a lack of honesty on the Debtors' part, both in terms of the failure to produce basic documents, such as SIST's rent log and documents concerning the India Account, and providing evasive and conflicting testimony on a number of issue, including ownership of the India Account, where contributions to SIST are deposited, which entities pay for Midwest Properties' real estate taxes, and the amount of the mortgage payment owed by Midwest Properties on 635 S. Main Street.

       75.    Ms. Isaacson's claim of lack of knowledge of the India Account is not credible, given that she is SIST's Chief Executive Officer, Chairperson of the Board, and acting Chief Financial Officer, and has held these positions for many years.  If Ms. Isaacson does in fact lack knowledge about the India Account, that too would support the appointment of a chapter 11 Trustee, as the Debtors need to have someone in control who is knowledgeable about the Debtors' overseas assets.   Similarly, either Ms. Isaacson is not being truthful in her testimony that Bayview Bank voluntarily agreed to lower

Midwest Properties' mortgage payment on 636 S. Main Street, or she is grossly mismanaging Midwest Properties by failing to obtain such an agreement in writing.

76.     The Debtors' lack of honesty can also been seen in the steps the SIST management took to avoid the effect of the order of the Minnesota Bankruptcy Court that dismissed the fourth bankruptcy case of Midwest Oil with prejudice.  As described above, after the entry of such order, Midwest Oil was merged into another SIST subsidiary, Yehud, which then filed a new Bankruptcy case, this time in the Bankruptcy Court for the Southern District of New York, a court that, upon information and belief, had not previously dealt with any of the SIST entities.

77.     The gross mismanagement of the Debtor, as set forth in detail in the Statement of Fact section above, includes: (i) depositing contributions to SIST into the personal bank accounts of SIST directors; (ii) failing to maintain adequate records of all contributions made to SIST; (iii) failing to maintain adequate records of intercompany transactions, including the payment by one or more of SIST subsidiaries of the real estate taxes of Midwest Properties; (iv) failing to maintain adequate records of transfers to the India Account made by means other than through SIST's U.S. bank account; (v) failing to maintain adequate records of SIST's overseas assets, including the India Account; (vi) failing to retain approximately $1 million in positive cash flow a year, and/or failing to cause SIST's subsidiaries to upstream such cash flow to SIST, thereby causing SIST to be cash starved to the point that its properties have gone into foreclosure; and (vii) failing to file a federal income tax returns or pay federal taxes for the tax years between 2005 and 2008.

78.     As to element "vi" above, it is unclear where the approximately $1 million positive net cash flow from 2010 and the estimated $80,000 a month thereafter has gone.  It is not in SIST's bank account, which at the end of April, 2011 had only $1,006.  It does not appear to be in the bank accounts of SIST's subsidiaries, as SIST reported a total of only $127,000 in those  accounts as of December 31, 2010.  *See* SIST Official Form 26.  The funds have not been sent to India to operate the SIST School, other than $24,000 sent in the last sixteen months.  These funds have not been used to pay federal taxes.  Nor have they been used to pay salaries, as SIST and its subsidiaries have no paid officers or employees**.**  The funds do not appear to have been used to pay down secured debt, as evidenced by the fact that SIST and its subsidiaries have had a number of foreclosure actions brought against them.  A chapter 11 trustee is needed to determine where the positive net cash flow is going, and to reorganize the Debtors so that such cash flow is used to pay down the Debtors' secured and unsecured debts.

79.     As to element "vii" above, the Debtors' failure to file federal tax returns and pay federal taxes, there is no question that such a failure constitutes grounds to appoint a chapter 11 trustee based on gross mismanagement under 11 U.S.C. § 1104(a)(1), even if such failures relates solely to pre-petition obligations.  *See, e.g., In re Euro-American Lodging Corp.*, 365 B.R. 421, 426 (Bankr. S.D.N.Y. 2007) ("'Gross mismanagement' includes the chronic failure to pay taxes, particularly where the failure leads to liability for interest and penalties."); *In re Evans*, 48 B.R. 46, 48 (Bankr. W.D. Tex. 1985)(failure to file federal income tax returns for three years in itself constituted gross mismanagement of the bankruptcy estate, especially in light of potential interest and penalties that may be levied against the estate on taxes due and owing); *In re Great*

*Northeastern Lumber & Millwork Corp.*, 20 B.R. 610 (Bankr. E.D. Pa. 1982)(failure to file returns or pay taxes for previous six years was gross mismanagement); *see also In re Berryhill*, 127 B.R. 427, 428 (Bankr. N.D. Ind. 1991) (debtors' cases were dismissed because the debtors violated a court order requiring them to file past-due tax returns for both pre-petition and post-petition periods).

2.  Appointment of a Chapter 11 Trustee Would Be in the Best Interests
    of Creditors and Other Parties in Interest Under § 1104 (a)(2)

80.     Alternatively, a chapter 11 trustee may be appointed under Section 1104(a)(2) of the Bankruptcy Code.  Courts have construed section 1104(a)(2) to provide a "flexible standard" for the appointment of a trustee.  *See, e.g., In re Sharon Steel Corp.*, 871 F.2d at 1226; *see also In re Ionosphere Clubs, Inc.*, 113 B.R. 164 (Bankr. S.D.N.Y. 1990).  Section 1104(a)(2) emphasizes the court's discretion allowing it to appoint a trustee when to do so would serve the parties' and the estates' interests."  *Id.*

81.     Courts have considered the following factors in determining whether the appointment of a trustee is in the best interest of the parties under section 1104(a)(2): (1) the trustworthiness of the debtor; (2) the debtor's past and present performance and prospects for the debtor's rehabilitation; (3) the confidence or lack thereof of the business community and of creditors in present management; and (4) the benefits derived by the appointment of a trustee, balanced against the cost of the appointment.  *See In re Cajun Electric Power Co-Op, Inc.*, 1991 B.R. 659 661-62 (M.D. La. 1995), *aff'd*, 74 F.3d 599 (5th Cir. ), *cert. denied*, 117 S.Ct. 51 (1996);  *Accord In re Ionosphere Clubs, Inc.*, 113 B.R. at 168.

82.     As to the first factor, the Debtors' lack of trustworthiness is demonstrated by the lack of candor in the testimony of their principal, Ms. Isaacson, in the Debtors' failure to produce basic documents reasonably requested by the U.S. Trustee, and in the steps the Debtors' management took to avoid the order of the Minnesota Bankruptcy Court dismissing the bankruptcy case of Midwest Oil with prejudice.

83.     As to the second factor, past and present performance and prospects for the Debtors' rehabilitation, SIST and Midwest Properties are currently running at a negative cash flow, and USA&O has no cash flow or operations. The Debtors have little prospect for rehabilitation under their current management, which does not believe that debtor-in-possession funding is necessary. Moreover, despite having been in and out of bankruptcy since March 2009, the Debtors have yet to propose a plan of reorganization.

84.     As to the third factor, given that the Debtors have a number of properties in receivership and/or foreclosure, the business community and creditors are likely to lack confidence in the present management of the Debtors.

85.     With respect to the fourth factor, balancing the benefits derived from the appointment of a trustee against the cost of appointment, the U.S. Trustee believes that the balance is in favor or appointing a chapter 11 trustee. Based on SIST's schedules and the testimony of Ms. Isaacson, SIST owns certain parcels of real property in which SIST has equity. In addition, certain of SIST's non-debtor subsidiaries, such as those that run gas stations, are profitable. A chapter 11 trustee would have access to documents that would allow him or her to trace where the net cash flow from SIST's

subsidiaries are going, and would also be able to sell non-performing properties, if necessary to fund a plan of reorganization.

3.   Appointment of a Chapter 11 Trustee Under § 1104(a)(3)

86.     A chapter 11 trustee can also be appointed pursuant to 11 U.S.C. § 1104(a)(3).  That section of the Bankruptcy Code provides that the Bankruptcy Court shall order the appointment of a trustee at any time after the commencement of the case, but prior to confirmation of a plan, on request of a party in interest or the U.S. Trustee, and after notice and a hearing, "if grounds exist to convert or dismiss the case under section 1112, but the court determines that the appointment of a trustee or an examiner is in the best interests of creditors and the estate."  11 U.S.C. § 1104(a)(3).  The grounds to convert or dismiss the Debtors' cases are set forth below.  Appoint of a chapter 11 trustee is in the best interests of the creditors of the Debtors' estates, and is preferable to dismissal, even with prejudice, to prevent a repeat of what the Debtors' management did to try to avoid the effect of the Minnesota Bankruptcy Court's order dismissing with prejudice Midwest Oil's case.

87.     Finally, if the Court does not appoint a chapter 11 trustee, the U.S. Trustee requests that an examiner be appointed to promptly investigate the finances and operations of the Debtors and make appropriate recommendations.  The appointment of an examiner would not be as beneficial to the creditors of the Debtors' estates as the appointment of a chapter 11 trustee, because the appointment of an examiner would keep control of the Debtors with their current management.

**B.**      **ALTERNATIVELY, THE DEBTORS' CASES SHOULD**
**BE CONVERTED, OR DISMISSED WITH PREJUDICE**
**FOR A PERIOD OF AT LEAST ONE YEAR**

88.     For the reasons set forth above, appointment of a chapter 11 trustee

is warranted under 11 U.S.C § 1104, and is in the best interest of the Debtors' estates and

their creditors.  If the Court does not appoint a chapter 11 trustee, the U.S. Trustee

submits that this case is ripe for conversion to a case under chapter 7, or for dismissal,

under 11 U.S.C. § 1112(b)(1), which provides:

> Except as provided in paragraph (2) of this subsection, subsection
> (c)  of this section, and section 1104(a)(3), on request of a party in
> interest, and after notice and a hearing, absent unusual
> circumstances specifically identified by the court that establish that
> the requested conversion or dismissal is not in the best interests of
> creditors and the estate, the court shall convert a case to a case
> under chapter 7 or dismiss a case under this chapter, whichever is
> in the best interests of creditors and the estate, if the movant
> establishes cause.

89.     Pursuant to 11 U.S.C. §1112(b)(4), "cause" includes "substantial or

continuing loss to or diminution of the estate and the absence of a reasonable likelihood

of rehabilitation" (§ 1112 (b)(4)(A)); "gross mismanagement of the estate"

(§1112(b)(4)(B)); "failure to maintain appropriate insurance that poses a risk to the estate

or to the public" (§ 1112(b)(4)(C)); "unexcused failure to satisfy timely any filing or

reporting requirements established by [title 11] or by any rule applicable to a case under

[chapter 11 of the Code]" (11 U.S.C. § 1112(b)(4)(F));  "failure timely to provide

information . . . reasonably requested by the United States trustee" (§ 1112(b)(4)(H)); and

"failure to pay any fees or charges required under chapter 123 of title 28," which includes

U.S. Trustee fees (§ 1112(b)(4)(K)).   All of these factors are present here, any one of which would constitute sufficient cause for conversation or dismissal.

90.      Pursuant to Bankruptcy Code section 102(3), the term "includes," which is found in 11 U.S.C. § 1112(b)(4), is not limiting.  11 U.S.C. § 102(3).  Thus, cause for conversion or dismissal may exist beyond the various examples cited in 11 U.S.C. § 1112 (b)(4).   *See In re SGL Carbon Corp.*, 200 F.3d 154, 160 (3d Cir. 1999).

1.      Continuing Loss To, Or Diminution Of, The Estate and
        the Absence of a Reasonable Likelihood of Rehabilitation

91.      It is grounds to convert or dismiss a chapter 11 cases if  there is a "continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation."   11 U.S.C. § 1112(b)(4)(A).   These factors are present for all three Debtors.

92.      "Under the interpretation of § 1112(b)(1) consistently used in bankruptcy courts, [a] negative cash flow situation alone is sufficient to establish 'continuing loss to or diminution of the estate.'"  *Loop Corp. v. United States Trustee (In re Loop Corp.),* 379 F.3d 511, 515-516 (8th Cir. 2004).

93.      As set forth in section IV.B above, SIST had a negative cash flow of $86.76 for April, 2011, which is consistent with what was projected in SIST's Initial MOR, once the income from SIST's non-debtor subsidiaries are omitted.   Because SIST's subsidiaries do not upstream profits to SIST, such profits should not be counted to determine if SIST has a negative cash flow.  This was implicitly recognized by SIST in its April 2011 MOR, which appears not to have included the cash flow of SIST's subsidiaries in the cash flow statement.

94.     Starting in May of 2011, SIST is projected to have a modest positive cash flow, even without including the income from its subsidiaries, but this projection is based on an assumption that there will be an increase in SIST's rental income, which is speculative.

95.     As set forth in section IV.D above, Midwest Properties  reported negative cash flow for April, 2011 and for the partial month of February 2011, with a small positive net cash flow for March, 2011.  Based on the cash flow projections attached to Midwest Properties' Initial MOR, once the mortgage payment for 635 S. Main Street is added in, Midwest Properties' financial condition is identical to its financial condition when this Court dismissed its prior case, in December 2010, due to, *inter alia*, "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation, pursuant to § 1112 (b)(4)(A).  *See* December Dismissal Order, p. 12.

96.      USA&O has no cash flow and no operations.

97.     The Debtors are so short of funds that none of them will be paying their own professional fees in this case.

98.     The second element required to establish "cause" under §1112(b)(4)(A) is the "absence of a reasonable likelihood of rehabilitation." "Rehabilitation," as the term is used in 11 U.S.C. § 1112(b)(4)(A), means "to put back in good condition; re-establish on a sound, firm basis."  5 COLLIER ON BANKRUPTCY § 1112.03(2) (15th ed. 1980) (quoted in *re L.S. Good & Co.*, 8 B.R. 315, 317 (Bankr. N.D. W.Va. 1980)).

99.     Absent the appointment of a chapter 11 trustee, there is not a reasonable likelihood that these Debtors will be rehabilitated.  As to USA&O, its only property is in foreclosure and under receivership.  As to Midwest Properties, in the  2010 Dismissal Order (p. 11), this Court found that Midwest Properties had failed to introduce any documentary evidence to demonstrate that it had a reasonable likelihood of reorganizing, and no documentation has yet been produced to it in this case showing otherwise.  In its 2010 Dismissal Order (p. 11), this Court further found that Midwest Properties had not provided any evidence of locating – or even attempting to locate – a source of funding for the development or maintenance of the properties.  That too has not changed, and Ms. Isaacson testified at the SIST 341 meeting that she did not believe such financing was necessary, dispute that, as of April 30, 2011, SIST had only $1,006 in its bank account, Midwest Properties had only $ 2,168 in its account, and USA&O had no bank account at all.   Based on these facts, rehabilitation appears far from likely, unless a chapter 11 trustee is appointed who can locate where the approximately $1 million in yearly net cash flow has been going.

2.      Gross Mismanagement, Failure to Maintain Insurance, Failure to Satisfy
        Certain Reporting Requirements,  Failure to Timely Provide Documents
        <u>and Information and Failure to Pay U.S. Trustee Fees</u>

100.     There are additional grounds to convert or dismiss each of the Debtors cases under a number of other subsections of 11 U.S.C. § 1112(b)(4).

101.     As to each of the Debtors, there has been gross mismanagement of the estate by the current management, as detailed in Section V.A. above, which is grounds to convert or dismiss under 11 U.S.C. § 1112(b)(4)(B).

102.     SIST and Midwest Properties have failed to produce copies of insurance certificates for all of their properties, despite that such certificates are required to be attached to each Debtors' Initial MOR, and despite numerous requests from the U.S. Trustee's office that they be produced.  *See* Ex. D to Starr Dec.  Therefore, Debtors may do not have insurance on those properties, which poses a risk to the estate or to the public, and is grounds to convert or dismiss under 11 U.S.C. § 1112(b)(4)(C).

103.     As detailed in section IV.H above, each of the Debtors have failed to timely amend their schedules and statements of financial affairs, despite Ms. Isaacson having identified a number of errors in those filings, and being asked a number of times by the U.S. Trustee's office to make those corrections.  The Debtors have also failed to amend Official Form 26, which is to include the information required by Bankruptcy Rule 2015.3 (Reports of Financial Information in Which a Chapter 11 Estate Holds a Controlling or Substantial Interest).  The U.S. Trustee's Bankruptcy Analyst Karen Starr explained the errors in Form 26 to the Debtors' representatives, and Ms. Starr as well as counsel for the U.S. Trustee has requested the Debtors to make those amendments a number of times.  The information required by Form 26 is especially important in this case, as it should assist in identifying the value and profitability of each of SIST's non-debtor subsidiaries. The Debtors' failure to correct this form timely is grounds to convert or dismiss under 11 U.S.C. § 1112(b)(4)(F).

104.     As detailed in section IV.G above, the Debtors have failed to timely to provide documents and other information reasonably requested by the U.S. Trustee, including such basic documents as SIST's rent log and the bank statements from

the India Account.  Such failure is grounds to convert or dismiss under 11 U.S.C. § 1112(b)(4)(H).

105.    As detailed in section IV.I above, the Debtors have also failed to pay fees to the U.S. Trustee for the first quarter of 2011, which is grounds to convert or dismiss under 11 U.S.C. § 1112(b)(4)(K).

3.    Dismissal of Midwest Properties' Bankruptcy Case as a Bad Faith Filing

106.    In addition to the factors listed at section 1112(b), a case may be subject to dismissal for cause if it is not filed in good faith.  *See In re SGL Carbon Corp.*, 200 F.3d 154, 160 (3d Cir. 1999).   The determination of good faith is "committed to the sound discretion of the bankruptcy court or district court and will be reviewed for abuse of discretion." *Id.*

107.    In addition to the grounds set forth in section V.B. above, Midwest Properties' bankruptcy case also should be converted or dismissed because it was not filed in good faith.  The case was filed less than two months after this Court dismissed Midwest Properties' prior case.  There have been no substantive changes in Midwest Properties' financial situation since that time.  Therefore, Midwest Properties did not file its current case in good faith, justifying conversion or dismissal with prejudice for at least one year.

4.    Dismissal of USA&O's Bankruptcy Case as a Bad Faith Filing

108.    In addition to the grounds set forth in section V.B. above, USA&O's bankruptcy case also should be converted or dismissed for the additional reason that it is a single real estate case that appears to have been filed primarily if not exclusively to stay the state court foreclosure and receivership action brought against it

by Southwest Guaranty in Wisconsin, and transfer the issues in that action to this Court. This suggests that the USA&O's filing was not in good faith, and therefore should be converted to a case under chapter 7 or dismissed with prejudice for at least one year.

109.    In *In re Primestone Investment Partners L.P.*, 272 B.R. 554 (D. Del. 2002), the District Court for the District of Delaware, in affirming the Bankruptcy Court's dismissal of the case, set forth a number of factors to consider in conducting a good faith analysis:

 (a) single asset case;

 (b) few unsecured creditors;

 (c) no ongoing business or employees

 (d) petition filed on eve of foreclosure;

 (e) two party dispute which can be resolved in pending state court action;

 (f) no cash or income;

 (g) no pressure from non-moving creditors;

 (h) previous bankruptcy petition;

 (i) post-petition conduct was improper;

 (j) no possibility of reorganization;

 (k) debtor formed immediately prepetition;

 (l) debtor filed solely to create automatic stay; and

 (m) subjective intent of the debtor.

*Id.* at 557 (*citing, inter alia*, *In re SGL Carbon*, 200 F.3d at 165).

110.     The District Court in *Primestone* explained that the focus of the inquiry is whether the petitioner sought "to achieve objectives outside the legitimate scope of the bankruptcy laws" when filing for protection under chapter 11.  *Id.* at 558, *citing, inter alia*, *SGL Carbon*, 200 F.3d at 165.   Therefore, "no single factor is determinative of a lack of good faith in filing a petition."  *Id.*, *quoting In re Tiffany Square Assocs., Ltd.*, 104 B.R. 438, 441 (Bankr. M.D. Fla. 1989).

111.     Nearly all of the factors noted in *Primestone* are present in this case.  This case is a single asset case with only eight unsecured creditors, and one secured creditor (factors "a" and "b" above).  USA&O has no ongoing business and no employees ("c" above).  Upon information and belief, the petition was filed on the eve of a hearing on a judgment of foreclosure, and USA&O filed the petition solely to obtain the benefit of the automatic stay to prevent that judgment of foreclosure from being entered ("d,"  "l," and "m" above). This case involves a two party dispute between USA&O and Southwest Guaranty which can be resolved through the pending receivership action in the Wisconsin state court ("e" above).  USA&O has no cash, no bank account, and no source of income because USA&O's sole asset is in receivership ("f" above).  Upon information and belief, no creditors other than Southwest Guaranty were pressuring USA&O for payment ("g" above).  USA&O is a repeat filer ("h" above).

112.     Lastly, USA&O has yet to introduce any evidence that it has the possibility of reorganizing ("j" above).  However, as recognized by the District Court in *Primestone*, even if one were to assume that USA&O could successfully reorganize if it had possession of its property back from the receiver, that begs the question of whether it is entitled to employ the "considerable powers of Chapter 11 -- the automatic stay, the

exclusive right to propose a reorganization plan, the discharge of debts, etc. -- [to] impose significant hardship on virtually its only creditor." *Primestone*, 272 B.R. at 558 (internal quotations to *SGL Carbon* omitted).

113.    As was the case in *Primestone*, USA&O is "adequately protected by its bargained for contractual rights under state law and . . . it would be inappropriate to arm [USA&O] with the powers of Chapter 11 to disadvantage its sole secured creditor." *Id.*

114.    In these case, "cause" has been established under 11 U.S.C. § 1112(b)(4)(A), (B), (C), (F), (H), and (K), and, with respect to Midwest Properties and USA&O, for the additional reason that their cases were filed in bad faith. Section 1112(b)(1) of the Bankruptcy Code indicates that, if a movant establishes "cause" for conversion or dismissal, unless there are "unusual circumstances" that establish that the requested conversion or dismissal is not in the best interest of the creditors and the estate, the Court "shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interest of creditors and the estate." 11 U.S.C. § 1112(b)(1). There are no such "unusual circumstances" here, and therefore, if a chapter 11 trustee or examiner is not appointed, conversion or dismissal is mandated. If dismissal is granted, the U.S. Trustee requests that the dismissal be with prejudice for at least one year, to prevent the Debtors, who are repeat filers, from immediately filing new bankruptcy cases in this district or elsewhere.

## RESERVATION OF RIGHTS/CONCLUSION

115.     The U.S. Trustee reserves and all rights, remedies and obligations to, *inter alia*, complement, supplement, augment, alter, substitute and/or modify this Motion and to conduct any and all discovery as may be deemed necessary or as may be required, and to assert such other grounds as may become apparent.

**WHEREFORE**, for the foregoing reasons, the United States Trustee respectfully requests that this Court enter an order directing the appointment of  a chapter 11 trustee pursuant to 11 U.S.C. § 1104 in each of the Debtors' cases, or alternatively directing the appointment of an examiner pursuant to 11 U.S.C. § 1104, or alternatively dismissing the cases with prejudice for a period of at least one year, or converting the cases to ones under chapter 7, and granting such other and further relief that is deemed fair, just, equitable and proper.


Dated: May 25, 2011
        Wilmington, Delaware

Respectfully submitted,

**ROBERTA A. DeANGELIS**
**UNITED STATES TRUSTEE**

By:  */s/ Juliet Sarkessian*
Juliet Sarkessian, Esquire
Trial Attorney
United States Department of Justice
Office of the United States Trustee
J. Caleb Boggs Federal Building
844 King Street, Suite 2207, Lockbox 35
Wilmington, DE 19801
(302) 573-6491
(302) 573-6497 (Fax)