# EXHIBIT A-1



W&F
WILCOX & FETZER LTD.

In The Matter Of:

# R.C. Samanta Roy Institute of Science & Technology

R.C. Samanta Roy Institute of Science  Technology

11-10504

March 31, 2011

Wilcox _ Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: depos@wilfet.com
Internet: www.wilfet.com

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| DR. R. C. SAMANTA ROY INSTITUTE OF SCIENCE & TECHNOLOGY, INC., | ) | Case No. 11-10504 (KJC) |
| | ) | |
| Debtor. | ) | |

341(a) Meeting
U.S. Federal Building
844 King Street
Wilmington, Delaware

March 31, 2011
9:30 a.m.

TRANSCRIPT OF ELECTRONIC RECORDING

WILCOX & FETZER
1330 King Street - Wilmington, Delaware 19801
(302) 655-0477
www.wilfet.com

MS. SARKESSIAN: It is March 31st, 2011. We are here for the 341 meeting of Dr. R. C. Samanta Roy Institute of Science and Technology, which we will refer to as SIST, case No. 11-10504 before Judge Carey.

Ms. Ryan, could you introduce yourself and the witness, please, for the record?

MS. RYAN: Laraine Ryan, the attorney for debtor. And the witness is Naomi Isaacson, who is the CEO -- director?

MS. ISAACSON: CEO.

MS. RYAN: CEO of the debtor.

MS. SARKESSIAN: And just for the record, I'm going to list who else is in the room. We have Rebekah Nett, counsel, Bruce Scott, also counsel. Let's see -- I always get her name wrong. Sorry, I had it before and now I've forgotten.

MS. KINDSETH: Naarah.

MS. SARKESSIAN: Naarah Kindseth. Naarah Kindseth, who is not an attorney. And we have our analyst, Karen Starr, okay.

Ms. Isaacson, can you raise your right hand? Do you affirm that the testimony you

are about to give is the truth, the whole truth and nothing but the truth under penalty of perjury?

THE WITNESS: I do.

BY MS. SARKESSIAN:

Q. Let's start with the petition. This is the petition that was filed in the case, and I want to show you the signature on behalf of the debtor. Is that your signature?

**A. It is.**

Q. Okay. Did you review the petition before you signed it?

**A. I did.**

Q. Is it true and correct to the best of your knowledge, information and belief?

**A. Yes.**

Q. Now, if you could turn to page -- the third page -- actually, wait a minute. Let me look at the second page first, okay. Okay. So you've listed as affiliates, related cases, U.S. Acquisition and Oil, and then it's continued on to an additional page, Midwest Oil of Minnesota and Midwest Properties.

**A. That's right.**

Q. Okay. The one from Midwest Oil of Minnesota is -- was this the case in -- because it's an 11, was this the one in Minnesota, that was filed in Minnesota?

**A. Yes.**

Q. Okay. Now I'm looking for the check register.

MS. SARKESSIAN: Karen, do you have a clean copy of the check register? Oh, wait, never mind, I do, I do. I put it behind -- I'm actually going to put some exhibit stickers like we did the last time. So I'm going to mark as Government Exhibit 1 a 6-page document that has the heading "Commerce - SIST Check Report."

BY MS. SARKESSIAN:

Q. I'm going to show that to you. Is that document familiar to you?

**A. Yes.**

Q. Okay. And is this the check register for SIST for the period December 7th, 2009, through February 16th, 2011?

**A. Yes.**

Q. Does this show all of the checks and wire transfers that were made by SIST during this

period of time?

**A. It should.**

Q. Now, I had a few questions. On the first page -- it appears repeatedly, but sort of, I don't know, a third of the way down, check No. 2110, GMAC - 5988. Is that some type of a payment for -- on a loan?

**A. Yes.**

Q. What, what was that loan for?

**A. A vehicle.**

Q. And then a few items below that is a check to GE Capital, and again, there is multiple checks to GE Capital through that. What is that in relation to?

**A. It's another loan.**

Q. Is it also for a vehicle?

**A. No, it's equipment.**

Q. What type of equipment?

**A. It's a sign machine.**

Q. A sign machine? It makes signs? What do you --

**A. It's a large solar printer.**

Q. Oh, okay. Okay. A sign meaning a printed sign. I was imagining like an

6

electric -- I don't know what I was imagining, okay.

And then -- wait a minute. Why am I missing -- hold on a second. It jumps from 1 to 4.

I'm going to mark -- I probably di the -- this is probably -- oh, no, yours has all the pages, okay. Wait a minute. That's so weird. I wonder why mine doesn't. I just want to make sure it has everything; 2, 3, 4. Okay, yours is complete, okay. Now I have one that's complete. Mark that, okay. Take a minute to look at the pages that I missed. See if there is any -- oh, and this appears repeatedly, checks to WE Energies. Is that like a utility payment?

**A. Yes.**

Q. Okay. So there -- starting at page 4 on September 17th of 2010, there are payments -- a few payments to Baylake Bank. Is that in connection with a loan related to a piece of real property, like a mortgage or --

**A. Yes.**

Q. What property is that for?

**A. 214 South Main Street.**

7

Q. Now, prior to that time I don't believe I see any payments. Was -- what's the reason that the payments started in September?

**A. It was a line of credit, and the loan was rewritten in September. And I think the large payment in September was the accrued interest and then it was amortized.**

Q. And on page 5, the third item down is a check to MGFH. What does MGFH stand for, or like what is that, is it a utility payment or --

**A. I'm not sure what the abbreviation stands for.**

Q. Do you know what, what it relates to? I mean is it a lender, is it a utility?

**A. The amount does not look like a lender because it's an even dollar amount. I honestly am not sure.**

Q. Okay. Then if you go down a little farther, there are -- well, there are two wire transfers on the page to NPT. What does NPT stand for?

**A. Based upon the amounts, I would guess that it's attorney's fees or accounting fees.**

Q. But the -- NPT doesn't -- you don't

8

recognize that?

**A. I mean obviously the person entering abbreviated, but...**

Q. The name of the accounting firm. I don't recall what it is but --

**A. It's not that.**

Q. -- it's not that, right?

**A. So maybe it's the law firm, which is Nixon.**

Q. Okay. So do you recall that when we did the 341 from Midwest Properties a few weeks ago and I asked you about the tax payments made by Ms. Nett's law firm on behalf of Midwest Properties, and you indicated that SIST paid Ms. Nett's law firm and then Ms. Nett's law firm paid the real estate taxes? Do you recall?

**A. No, that's actually not what I testified.**

Q. What did you say?

**A. I testified that I wrote the checks personally.**

Q. That was for January of this year.

**A. Right.**

Q. That's correct.

**A. Right.**

9

Q. Let's go back to 2010. For 2010 --

**A. Okay.**

Q. -- your testimony was that SIST gave the money or reimbursed the money to Ms. Nett's law firm to pay for the real estate taxes for Midwest Properties.

**A. Okay.**

Q. Is that correct? Where on the check register does it show any payments to Ms. Nett or her law firm, because I don't see anything that looks like --

**A. It's not on the check register.**

Q. Okay. How was the payment made?

**A. How did we get the money to her account?**

Q. Yes.

**A. Either wire or -- probably a wire, I would think.**

Q. And the wire -- I mean I do see a few wire transfers reflected on this report. So you're saying that there were wire transfers that SIST made that are not reflected on this report?

**A. Okay, so which, which year's taxes are we talking about?**

Q. 2010.

10

**A. You mean the ones paid in 2010?**
Q. That were paid in 2010. We can go bring the documents, but you may recall that Midwest Properties produced statements that showed that they were paid by the Westview Law Center.
**A. Right, I mean she wrote the checks.**
Q. Right. And you indicated that yes, while she wrote the checks, that it was SIST that gave her the money, she wasn't paying out of her own pocket, SIST was reimbursing her or fronting her the money, correct?
**A. Right.**
Q. Okay. So now you're saying you believe that that money was transferred from SIST to Ms. Nett's law firm through a wire transfer, but there are only two wire transfers that I see shown on this check report.
**A. Oh, okay. It didn't necessarily come out of SIST's checking account.**
Q. Where did it come out of?
**A. It could have come out of any of the accounts, for that matter.**
Q. You mean of SIST's subsidiaries?
**A. Right. And part of it could have been**

11

**cash. I don't, you know, recall specifically. Taxes were paid on three occasions, and I don't recall specifically how the money was transferred to her. It could have been a combination of wires, for that matter.**
Q. So when you say that SIST pays something, just in general terms, it doesn't necessarily mean that it's coming out of an SIST bank account, it could be coming out of an account of one of its subsidiaries?
**A. Absolutely.**
Q. Okay. When you testify today, I would ask that you be specific. If I ask you did SIST pay for something, if the answer is it paid for something through one of its subsidiaries, could you just specify that --
**A. Okay.**
Q. -- so it would be clear? Okay, so with respect to the moneys going to Ms. Nett's law firm, you don't recall which subsidiary paid for it.
**A. It wouldn't have been one subsidiary, that is for sure. It would have been probably a multitude of subsidiaries plus SIST funds. I**

12

**mean it would have been an accumulation of funds, not just coming from one account. I mean no single subsidiary would have -- SIST would not have gotten the money from any single subsidiary.**
Q. Well, let me understand this. Are you saying that the different subsidiaries give money to SIST and then SIST would then pay Ms. Nett, or are you saying that these separate subsidiaries would separately pay Ms. Nett like some portion of what --
**A. No, they would give the money -- it's -- ultimately it's through SIST.**
Q. Okay.
**A. SIST is the one that takes the deduction for all of the taxes. SIST is ultimately the owner of all of the real estate.**
Q. Okay. So I'm just trying -- I'm focusing right now on the payment to Ms. Nett, but this actually goes to a broader issue of just me understanding how this works.
So I understand that there's a lot of subsidiaries of SIST and that they generate revenue. Now, is that revenue then paid up to SIST in some fashion?

13

**A. Yes.**
Q. What bank account does that money go to when it's being paid up from the subsidiaries to SIST?
**A. It varies.**
Q. Well, you gave us records of, from 2000 -- from December 2009 through the beginning of 2011 -- I'll show you -- from Commerce State Bank, account number 0001800568, and then that account was closed, you know, shortly after this bankruptcy filing and a new DIP account was created, correct?
**A. Right.**
Q. Okay. So just focusing, let's not talk about what happened post bankruptcy, but prebankruptcy, did SIST have some account, any bank account, other than this account at Commerce, account number 001800568?
**A. Yes, SIST itself has one account.**
Q. Um-hum.
**A. But ultimately, it is the owner of all of the subsidiaries and all of the accounts.**
Q. Okay. So what you're saying is that the subsidiaries have bank accounts in their name,

and SIST could make payments from those accounts?
**A. If it wanted to, yes.**
Q. Okay. Does it do that normally? Does it do that on a regular basis, make, make payments out of the accounts of its subsidiaries on behalf of SIST?
**A. For certain expenses, yes.**
Q. Okay. What types of expenses?
**A. Attorneys' fees or expenses that aren't necessarily specifically SIST expenses. Like, you know, what's paid out of the SIST account is loans that are in SIST's name, utilities that are specifically for properties where the real estate is held only by SIST and so forth, or general office expenses.**
Q. So going back to the real estate taxes of Midwest Property, okay, that's not directly a charge to SIST, correct? It's Midwest Properties.
**A. No, it's SIST's responsibility to pay them.**
Q. Okay. Under the tax sharing agreement, correct?
**A. Correct.**

Q. Okay, that you introduced into evidence before.
**A. Correct.**
Q. Okay. So, I'm just trying to understand this. So SIST has agreed to pay the real estate taxes for Midwest Properties, along with other subsidiaries, but let's just focus Midwest Properties. The time comes to pay the taxes. Is it your testimony that SIST would then look to the account of one or more of its subsidiaries and have those subsidiaries issue checks or wire transfers out of their account to pay Ms. Nett so that she can pay the real estate taxes?
**A. Well, I mean depending on how we're paying them, you know, however they're being paid, the money has to come from somewhere. So either it would be trans -- you know, transfers; if it's at the same bank, it would be wires; it could -- part of it could be cash.**
Q. And do you have records of all of these transactions? If you needed to go and look up, you know, if you wanted to know -- I want to make sure that Ms. Nett got paid and I want to check and see where the money came from. How would you

go about doing that to determine which subsidiary paid the money and did they pay it in cash, did they pay it in wire, did they pay it in check, how would you do that?
**A. Well, she was paid because the checks don't go out until she receives the money.**
Q. Okay.
**A. I mean it's a mutual exchange, but --**
Q. But I mean if you wanted to know -- if you wanted to know what entity was it that paid her, how would you go about to determine that?
**A. It would be a difficult process. I don't -- sitting right here, I don't know that there's any one place that I could look to know exactly how it was paid.**
Q. Do you have a check register for all the subsidiaries as well, separate check registers?
**A. I mean some accounts have -- some subsidiaries have multiple accounts, so, but I would think by account there should be some sort of check register.**
Q. Okay, so each subsidiary would have a check register. If it has one account it would have one check register, if it has two or three

accounts, it would have a check register for each account?
**A. It should.**
Q. So you could go and look at the check register for each one -- the check register or registers for each one of the subsidiaries to determine who it was that paid Ms. Nett, although I understand that would take a while because it would be a lot to look at, correct?
**A. It would take a long time.**
Q. Why would it be that you would have more than one subsidiary paying Ms. Nett for a particular tax payment? Is that right, like one tax payment wouldn't necessarily be paid by one entity, the whole amount, you might break it up? Is that -- am I getting your testimony correct?
**A. Yes.**
Q. Okay. Why would you do that instead of just have one entity pay it?
**A. A determination would be what, what the profits of a particular entity were. And the profits of any given subsidiary belong to SIST.**
Q. I think I'm right about this based on looking at the bank statements and the check

register, but just confirm: The way that SIST does business, it does not have its subsidiaries actually transferring money into SIST's account, for example, profits. Profits at the end of the day, that would not necessarily be transferred from, say, Midwest Properties of Shawano up into SIST's account, but rather, the subsidiaries keep the money in their own accounts. Is that how it works?

**A. Until a need arises that SIST needs to pay and it needs to draw on those funds. So like if I had to pay a $10,000 retainer, profits from any of the entities could be pulled into SIST, or the entity itself might pay it directly. But, you know, for most things, SIST will pull the funds into its account and...**

Q. But when it needs it.

**A. Right. There's no point in transferring it just for the sake of transferring it.**

Q. Well, how about the money that goes to India, is that transferred through SIST? Is SIST actually writing the check or doing the wire transfer?

**A. Well, I mean, historically, yes. Now,**

**not really.**

Q. So at what point in time was SIST transferring money directly from its accounts to India?

**A. At least up until the 2009 bankruptcy.**

Q. And after that -- well, has SIST or any of the subsidiaries transferred money to India since the March 2009 bankruptcy filing?

**A. We send money every month.**

Q. Does that money come out of SIST?

**A. Come out of SIST, meaning?**

Q. Account, SIST's bank accounts.

**A. Sometimes.**

Q. Can you show me on the check register any payments -- this is again from December 2009 through February of this year -- that went to India?

**A. There's none on this particular report. I can't say that there weren't any out of the account, though.**

Q. Well, this check register covers December of '09 through February 11th -- 16th of 2011. So are you saying that during that period there may have been transfers from SIST to India that are

not reflected on this check register?

**A. Well, this is a check report, so I don't know for sure if a check report picks up wires or not.**

Q. Well, there are some wire transfers --

**A. There are some wires on here.**

Q. Well, all right. I have --

**A. I don't know for sure. I mean I, I know we had a large issue with sending money overseas. So historically, our account was at M&I, and all of the wires went from -- went from M&I. After we had a lot of interference and a lot of bank problems, things changed. So up until March of '09, all wires would have come out of SIST's account and gone to India. But after that, things have been difficult.**

Q. Let's go back to what you said about this is a, a check report, and it may not pick up all the wire transfers. How does this check report get generated?

**A. This is a printout of the checks that were printed from this account.**

Q. Does this come from some software that does this?

**A. Yes.**

Q. And you are not sure if that software would pick up all of the wire transfers?

**A. Well, my assumption is that it is, because it picked up the other two. But --**

Q. I can show you the --

**A. -- I mean we produced all the bank statements as well. So anything that's on the bank statements should be on here, I would think.**

Q. So if I show you the bank statements, I mean you can take a moment and look through and see if there are other wire transfers on there that -- I can't find it. You gave me -- now where are they? Okay. Just give me a second to find the bank statements. I've got a bad feeling I may have left them up in my office.

MS. SARKESSIAN: Karen, do me a favor. I put a copy on your chair. There should be a copy somewhere in my office, but just bring the one that's on your chair.

Is this it? Wait, wait, wait, wait. Wait a minute. Hold on a second. Okay. I got it. All right.

BY MS. SARKESSIAN:

22

Q. So this is -- let me give you -- but these are all the 2010 bank statements, okay. I don't need to mark these because they have dates on them. And this goes through December 31st.

Take a moment and tell me if you see any wire transfers on here that you believe would have been going to India. Well, if you see any wire transfers, we can check it. We can cross-check it against the check report then and see if it's the -- the two $10,000 ones are something else.

**A. I see one here --**

Q. Okay. Let's see, this is --

**A. -- for international wire transfer debit.**

Q. Okay, so just for the record, this statement covers May of 2010, and we've got a $6,000 wire on May 12th. So I'm just going to look at the check register for May 12th to see if anything is picked -- no, there's nothing down there, okay. So there are some wire transfers that show on the bank statements that are not reflected on the check report.

**A. But every, every check --**

Q. Every check is reflected.

23

**A. -- every check is reflected on the check report.**

Q. So where there is a wire transfer that says "international," those would be to India?

**A. Yes, any international wires are to India.**

Q. Just point out if you see any other ones, other than that one in May.

**A. Another one in August. Another one in October.**

Q. August is not reflected on the check report. October, no, there's no wire transfer in the check report. Okay.

**A. Anyway, there is more in December. They're through all of these bank statements, but they say "international," so...**

Q. Okay. Now, is it also your testimony that sometimes wire transfers to India are sent by one or more of the subsidiaries?

**A. No.**

Q. So all moneys that are going from the, let's say the SIST family of entities to India are actually sent by SIST through an SIST account, bank account?

24

**A. No.**

Q. No, okay. Why don't you tell me how it works then?

**A. Well, like I explained, M&I had been our bank for 20 years until --**

Q. Let's start with March 2009.

**A. Right.**

Q. Let's forget about the time before then.

**A. Right. But the problem is, there are limited number of banks that can send money overseas, and there have been problems sending money overseas. So no, it does not necessarily come out of SIST's account. It may come out of my account. It may come out of one of the other board members' accounts.**

Q. Okay. So it may come out of your, your personal account or the personal accounts of one of the board members?

**A. Right.**

Q. And I'm sorry, why would -- is your account at Commerce or someplace else?

**A. I have an account at Commerce, yes.**

Q. Is that the account you would use to send money to -- overseas to India?

25

**A. That -- yes.**

Q. Is there some other account you would use?

**A. Well, other board members have other banks.**

Q. Okay. Let's just stick with you. Now, why -- since you're both at the same bank -- both. Since you and SIST have accounts at the same bank, Commerce Bank, why would SIST send money to India through your account, as opposed to using SIST's Commerce account?

**A. We had a problem sending money with it getting lost.**

Q. But it's the same bank. If Commerce Bank is losing money, why would you feel any more secure that it's not going to lose your money?

**A. It was easier to track, that's why --**

Q. Why?

**A. I don't know. Whatever routing service they used or whatever. I mean now the problem I think has been resolved. But like I said, M&I had done it for the last 20 years. Once we were in between there trying to find a bank that could send an international wire, actually have it**

**arrive, you know, within a reasonable amount of time was a challenge.**

Q. Okay. So just so I understand, the reason that funds were being sent from your account --

**A. It only happened on one occasion that came from my account, so it was not a regular occurrence.**

Q. How about other board members, how many occasions did other board members have to send money from their account to India that -- let me end it there. How many times did that occur since March of 2009?

**A. Quite frequently.**

Q. I mean, is that still ongoing? They're still doing that?

**A. Commerce finally, like last month, got their system sort of straightened out. But, yes, I mean throughout that entire time period, there could have been any number of board members that sent the wire.**

Q. So when a board member sends a wire, how does SIST reimburse them for that payment?

**A. What do you mean by how do they reimburse**

**them?**

Q. Well, let's make sure we understand each other. What I'm asking about now is money that SIST is sending overseas. To the extent that there are board members who individually, out of their own pocket, want to contribute money to India, I'm not asking about that.

**A. Okay.**

Q. I'm asking about SIST. So it's my understanding that what you're saying is because of the problems with Commerce Bank tracking the wire transfers, that there were occasions when, instead of SIST sending money through its Commerce account, that one of the other board members, and on one occasion you, sent the money.

**A. Right.**

Q. Correct? So my question is, since the money was coming out of your pocket or the other board members' pockets, but it was supposed to be a transfer of SIST, how did SIST get the money from its account to --

**A. It wasn't a transfer of SIST.**

Q. Okay. So this is -- these, these transfers that you're talking about that were

made by you and the individual board members were not transfers made on behalf of SIST but just transfers you made on behalf of yourself?

**A. Well, they're transfers on behalf of SIST, but they're not SIST's money.**

Q. Okay. And SIST is not going to be refunding you or the other board members?

**A. No.**

Q. Okay. Now, with respect to the tax sharing agreement, and I'm sorry we don't have it in front of us, but if I recall correctly, that agreement is with all of SIST's subsidiaries or is it only the ones that share the same taxpayer ID number?

**A. It's only the ones that share the same taxpayer ID number, that I recall.**

Q. With respect to -- and if I recall correctly, the agreement is that SIST is going to be paying the real estate taxes and other federal taxes on behalf of the subsidiaries with the same tax ID number, correct?

**A. Should there be any.**

Q. Should there be any, okay. So we've already talked about Midwest Properties. How

about with respect to the other of those subsidiaries with the same tax ID number that have real estate taxes, what, what entities are paying those funds? Is it similar to Midwest Properties, is whatever, whatever subsidiary happens to have funds at a given time would be paying the real estate taxes for perhaps one of its sister companies?

**A. Or the parent company if it, if it has the funds.**

Q. Okay. So if SIST has the funds, it might issue a check on behalf of the real estate taxes, but if not, it may come from one of the other subsidiaries, correct?

**A. Correct.**

Q. Okay.

**A. I mean but SIST won't issue a check. It can't issue a check.**

Q. Because it won't be accepted by the local taxing authorities, correct?

**A. That's right.**

Q. Okay. So we don't see any -- I mean I don't see any checks in the check register going to, what is it, the Shawano -- City of Shawano or

county or --

**A. City. Some are city and some are county.**

Q. Okay. So I'm correct that there aren't any checks shown on the check report because SIST -- SIST's checks would not be accepted?

**A. That's right.**

Q. Okay. So when you say that SIST sometimes pays for those real estate taxes itself, how does that get paid if it's not issuing a check?

**A. It would have to transfer the funds to whoever is writing the check. Or sometimes we've done cashier's check to the county, and we tried to do a wire one time, which was a fiasco, so...**

Q. Can you look through the check report and point out any checks here that went to anybody for the purpose of paying real estate taxes?

**A. I'm sorry?**

Q. Okay. So you said that in some occasions to pay the real estate taxes of the subsidiaries SIST might issue a check to some other person for them to pay the taxes.

**A. Right.**

Q. Is that right? Okay. So what I'm saying

is could you point out on the check report any checks that fall into that category?

**A. There's not any on here that I see.**

Q. Now, you are aware, I assume, that Midwest Properties has made a motion to have its case substantively consolidated with SIST, correct?

**A. Absolutely.**

Q. Okay. And in that motion it includes a statement that SIST and Midwest Oil's finances are commingled, correct?

**A. I don't recall specifically, but, okay.**

Q. Is that true?

**A. To a certain degree.**

Q. Well, can you explain to what degree they're commingled?

**A. Because they share -- they have the same federal ID number. They have the same tax return. And other than for the bankruptcy, we didn't historically account for each entity separately. This separate accounting only arose as part of the bankruptcy, because it's a requirement. Everything prior to this bankruptcy mess has always been on a consolidated basis.**

Q. Well, in that respect, is, is there any difference between what you've just described as between SIST and Midwest Properties, is that any different than SIST and the other subsidiaries that share the same tax ID number? Let me rephrase that. That was --

With respect to -- to the extent that funds are commingled, is that equally true as between SIST and the other subsidiaries that share its tax ID number as with Midwest Properties, or is there something different with respect to Midwest Properties?

**A. Midwest Properties is different because it itself is just a real estate holding company. It's not in -- you know, other than renting real estate, it doesn't engage in an active business. It is, it is a real estate holding arm of the company.**

Q. Okay. So are you saying then that its finances are more commingled than the finances of SIST and the other subsidiaries?

**A. It has less of an identity of its own because it doesn't have -- other than the business of renting real estate, it doesn't have**

**any other separate business, per se. And the parent company has guaranteed the obligations of the entity.**

Q. I'm going to give you -- you know what, let's use -- let's use the Rule 26 report because that has -- on the first page of the Rule 26 report we have a list of subsidiaries, correct, of the -- of SIST?

**A. Yes.**

Q. And now, I think we've established -- well, during the IDI, it will just confirm it, that there is a few entities that are not listed here, which I believe you say no longer exist. So one is Midwest Oil of Anoka is not listed and that is because it is no longer in existence as a separate entity?

**A. It was dissolved.**

Q. Okay, when was that dissolved?

**A. A couple weeks ago, three weeks ago.**

Q. Three weeks ago?

**A. Two, three -- I don't recall exactly the date, but fairly recently, within the last month.**

Q. And then Midwest Oil of Minnesota is also not down there for the same reason, that it was

34

dissolved?
**A. That's right.**
Q. Was it also two or three weeks ago?
**A. Yes.**
Q. And those entities, both Midwest Oil of Anoka and Midwest Oil of Minnesota were merged into Yehud-Monosson -- I'm going to spell it, just to -- Y-E-H-U-D - M-O-N-O-S-S-O-N, U.S.A., Inc., correct? They were merged into that entity?
**A. Yes.**
Q. Okay. Now -- and that entity, I'm just going to call it Yehud to make it easier, that's also 100 percent owned by SIST; correct?
**A. It is.**
Q. Okay. Now, when did -- what is the business of Yehud?
**A. Retail.**
Q. What kind of retail?
**A. Convenience store.**
Q. Does it run convenience stores?
**A. Yes.**
Q. Okay, where are they located?
**A. Minnesota.**

35

Q. Okay. More than one?
**A. Two.**
Q. I'm just going to ask you to keep your voice up a little bit for the recorder.
Okay. When -- I'm sorry. When was Yehud -- Yehud is incorporated in New York, correct?
**A. Yes.**
Q. Okay. When did it come into existence?
**A. A few months ago. Six months ago, probably.**
Q. Six months ago?
**A. I don't know exactly, but I mean a few months ago, at least.**
Q. And the merger that took place with Midwest Oil of Anoka and Midwest Oil of Minnesota, did that take place that two or three weeks ago when you said those entities were dissolved?
**A. They would have -- it would taken place at the same time.**
Q. At the same time, okay.
**A. I mean that's what happens when companies are merged.**

36

Q. Which attorney handled the legal work relating to the merger and dissolution?
**A. Some of it was handled by Ms. Nett, some of it was handled by other board members.**
Q. What other board members?
**A. Mr. Scott, myself and other business board members.**
Q. Who are the other board members that you're referring to?
**A. I guess, what's your question?**
Q. My question is which -- what attorneys were responsible for handling the legal work relating to the merger and the dissolution? You indicated some was done by Ms. Nett, some was done by board members. So I'm asking you the name of the board members that did the legal work.
**A. Okay, the legal work would have been done by Ms. Nett, Mr. Scott and myself.**
Q. Are you an officer of Yehud?
**A. I am.**
Q. Are you CEO?
**A. President.**
Q. President, okay. Are there other

37

officers?
**A. There are.**
Q. Who else are officers?
**A. I don't recall the list right now.**
Q. Okay.
**A. It would be in the corporate documents.**
Q. What state is the merger recorded in?
**A. Merger of what?**
Q. The merger of Midwest Oil of Minnesota, Midwest Oil of Anoka and Yehud.
**A. I guess whichever states it would need to be recorded in, so probably --**
Q. I don't want you to --
**A. -- Minnesota, Delaware and --**
Q. I don't want you to guess. If you don't know the answer -- I take it you did not handle the recording of those documents?
**A. No, I didn't do any actual recording. But I, I know it had to be recorded in Delaware and I'm sure it had to be recorded in Minnesota, and I'm sure there was some sort of filing in New York. And possibly Wisconsin, I don't know for sure about that.**
Q. Why Wisconsin? Is one of the entities

incorporated in Wisconsin? Was Midwest Oil a Wisconsin company?
**A. Used to be.**
Q. Okay. Why did Yehud file its bankruptcy case in New York as opposed to filing Delaware as an entity related to SIST?
**A. You know, it had the option to file in New York, and it's easier to file there.**
Q. What's easier about it?
**A. Easier is partly the local counsel rule. And there is an awful lot of, you know...**
Q. I'm sorry?
**A. That's all I'm going to say right now.**
Q. Okay. Did the merger between Midwest Oil of Minnesota and Yehud take place before or after the Minnesota Bankruptcy Court dismissed the bankruptcy case of Midwest Oil of Minnesota with prejudice for one year?
**A. I'm really not sure why we're discussing this right now anyway. But --**
Q. These are all subsidiaries of SIST. They're all -- as you've said, they're all property of SIST. It's all relevant.
**A. So what's the question?**

Q. The question is did the merger of Midwest Oil of Minnesota and Yehud take place before or after the Bankruptcy Court of Minnesota dismissed the bankruptcy case of Midwest Oil of Minnesota with prejudice for one year?
**A. The merger has been discussed for the last six months at least, if not longer.**
Q. When did it take place, is the question?
**A. When it was recorded was after the dismissal.**
Q. Who made the decision to have Midwest Oil of Minnesota merge with Yehud?
**A. The decision was made months ago.**
Q. By who?
**A. By the board.**
Q. The board of SIST?
**A. Right.**
Q. What was the reason for the merger?
**A. Reorganize the company and acquire some other assets in New York, which we were considering at the time.**
Q. Are you no longer considering it?
**A. No. I mean yes, we are, and probahly will once the bankruptcy is resolved.**

Q. When you say that Yehud runs convenience stores, does that also include running the gas station with a convenience store?
**A. Yes.**
Q. Is Yehud going to be running the gas station/convenience stores that Midwest Oil of Anoka and Midwest Oil of Minnesota were previously running?
**A. It is.**
Q. Has Midwest Oil of Anoka ever filed for bankruptcy?
**A. No.**
Q. Now, with -- going back to the, the Rule 26 form that lists all the entities on the first page, with respect to the ones that are corporations that have "Inc." after their name, in that case SIST is the 100 percent stockholder, correct?
**A. Yes.**
Q. And then with respect to the entities that are listed as LLC, SIST is the managing member of each of those, correct?
**A. Right.**
Q. And it's the entities that have LLC after

their names that are -- have the same taxpayer ID number as SIST?
**A. Yes.**
Q. Is that true for all of them --
**A. Yes.**
Q. -- all the LLC's? Okay. And then of course the entities that are separate corporations have separate tax ID numbers, correct?
**A. Correct.**
Q. Are there any other -- you had mentioned that Midwest Properties of -- getting this messed up, sorry. Midwest Properties of Shawano -- that's the one that's currently in bankruptcy now, right, of Shawano?
**A. Yes.**
Q. That's just a real estate holding company. Are there any other of these entities listed here that are also just or primarily real estate holding companies?
**A. Yes.**
Q. Okay, which ones are those?
**A. Midwest Hotels, Midwest Oil of Wisconsin.**
Q. Any others?

A. No.
Q. Are the finances as between SIST and Midwest Hotels and Midwest Oil of Wisconsin similar to as between SIST and Midwest Properties in terms of commingling?
**A. Well, they -- they're commingled to the extent that the parent company has guaranteed the loan, and the reason the parent company has a large amount of unsecured debt is because of the loans of those entities.**
**So when you file on the parent company, especially without consolidation, it creates a very skewed picture of the true finances of the company. I mean we're double-counting the same loan multiple times.**
Q. So when you use the term "commingled," what you mean is the explanation you just gave concerning the guarantee of the loans?
**A. Correct.**
Q. Now, I'd like to go down the list, again looking at the Rule 26 statement, of the different entities and just ask you with respect to each whether SIST has guaranteed any of their loans. I'm just going to start at the top.

Timtza?
**A. No.**
Q. Beit, B-E-I-T?
**A. No.**
Q. Marom Golan?
**A. No.**
Q. Dagul Kishron?
**A. No.**
Q. Midwest Hotels & Motels?
**A. Yes.**
Q. Okay. Midwest Properties of Shawano is yes, correct? We know that, right?
**A. Right.**
Q. Midwest Oil of Shawano, any guarantees there from SIST?
**A. Cross guarantees, yes.**
Q. How are cross guarantees different than regular guarantees?
**A. For example, there was -- what I'm thinking of offhand, there was an obligation of Midwest Oil of Anoka, which is guaranteed by Midwest Oil of Shawano and guaranteed by SIST and guaranteed by everybody else in the book.**
Q. Okay. So with Midwest Oil of Shawano

then, there are certain loans of Midwest Oil of Shawano that are guaranteed by SIST, but are also guaranteed by other affiliates; is that correct?
**A. Correct.**
Q. Okay. Then how about Midwest Oil of Wisconsin, did SIST guarantee any of those loans?
**A. Yes.**
Q. U.S. International Raceway I believe you stated is not in operation?
**A. It is in operation.**
Q. It is, I'm sorry, okay. I must be getting mixed up, okay. So has SIST guaranteed any of those loans?
**A. No.**
Q. U.S. Acquisitions & Oil, SIST has guaranteed certain of those loans, correct?
**A. Yes.**
Q. Midwest Amusement Park, any guarantees?
**A. Cross guarantees again.**
Q. Okay. So SIST has guaranteed some of the loans of Midwest Amusement Park and other affiliates have guaranteed those same loans, correct?
**A. Right.**

Q. Okay. Midwest Ice, any guarantees there?
**A. No.**
Q. What state is that incorporated in?
**A. I'm not even sure.**
Q. Is it an active company?
**A. I couldn't tell you. I mean it was established. Whether or not it's -- actually, I'm sure it is, because we just renewed our license.**
Q. Are you an officer of that company?
**A. I don't remember. But I, I don't know which state it's in. It may be one that's still a Nevada or Wyoming corporation that we haven't transferred to Delaware.**
Q. You said you just renewed the license. The license for what?
**A. There's some sort of license renewal or state renewal or something I saw come across my desk fairly recently that I'm recalling. But I don't -- so I know we're paying fees on it, is what I'm saying, so it must be in good standing.**
Q. Okay. But you don't recall --
**A. I don't recall --**
Q. -- whether it's actually doing any

46

business?

**A. Well, it does business, but I don't -- it doesn't have any loans. It doesn't have any debt, so...**

Q. It makes and sells ice?

**A. Right.**

Q. Who is it that -- at the, at any of the affiliates that would know -- let me strike that.

What person is the most knowledgeable about Midwest Ice, since you don't seem to have a lot of knowledge about it?

**A. I would be the most knowledgeable. I mean I would just have to get out the file.**

Q. Who is running that business? I mean are there employees that make -- can sell ice?

**A. There's volunteers, yes. It's certainly not a hopping business.**

Q. Since you have that in front of you, let me ask you a few more questions on this document. Just turn to the second page. That's your signature that appears?

**A. It is.**

Q. Did you review this before you signed it?

**A. I did.**

47

Q. Is it true and correct to the best of your knowledge, information and belief?

**A. It's the best estimate I could put together.**

Q. And during the IDI our analyst went through some additional information that's required, so we won't go through that now.

On Exhibit A, so under "Current Assets" it lists cash of $127,000 and change. Now, is that in SIST's bank account at Commerce Bank?

**A. Not in SIST's account, no.**

Q. Which account is it in?

**A. All the accounts.**

Q. So you're adding together all the accounts of the affiliates that share the same tax ID number as SIST and that's the total amount in all of their accounts?

**A. I believe it was the balance as of the end of the year in all of the accounts.**

Q. But does that include the separately incorporated --

**A. Yes.**

Q. -- subs? Okay. So then the accounts

48

receivable would also similarly be accounts receivable with respect to SIST and all of its subsidiaries?

**A. Correct.**

Q. Same thing for the inventory?

**A. Right.**

Q. The -- and obviously so the fixed assets, everything on this is --

**A. Is an accumulation of everything.**

Q. -- is consolidated. Okay, it's consolidated with all the subsidiaries.

The second bullet point down there, "no value of business interest is included in the totals," by that do you mean the, like the value of SIST's interest in its subsidiaries was not included?

**A. Well, for example, Marom Golan operates a hotel. It's an operating company. I did not assign -- I have no idea what the value of the company is as an operating company. So I mean, what's included is the real estate, hard assets --**

Q. Hard assets.

**A. -- real estate and equipment, and there's**

49

**nothing in there for whatever value an operating company has as an operating company.**

Q. Understood. The separate corporations that are subsidiaries of SIST that are listed on the first page here, the Timtza, Beit, Marom, and again, I apologize. I'm sure I'm mispronouncing every single name, did they also -- I'd like to get a little history of the federal tax returns with respect to them, because with respect to SIST, it filed for 2004 and then it filed for 2009 and not the years in between. Is that also true with these separate corporations or is it different?

**A. Different.**

Q. Okay. With respect to those separate corporations, what have they filed?

**A. They didn't come into operation till 2009. So the first year they would file a return would be for tax year 2009.**

Q. And has that -- have those been filed yet?

**A. They're in progress right now.**

Q. And that's true for every single subsidiary of SIST that's a separate corporation?

**A. Correct. They are -- we are doing a determination now whether or not they're just going to shrink those back into the nonprofit or do a consolidated return of all the for-profit companies.**

Q. Going back for a moment to the merger between Yehud and Midwest Oil of Anoka and Midwest Oil of Minnesota, can you describe the nature of the merger? Because there's different kinds of mergers. Do you have an understanding about that?

**A. I guess I'm not sure what you're asking.**

Q. Well, exactly what happened as part of the merger? And I'm talking about both entities, Midwest Oil of Anoka and Midwest Oil of Minnesota.

**A. I mean can you be a little more specific or -- I guess I'm not sure what you're --**

Q. Well, was the concept of the merger that the -- all of the assets of Midwest Oil of Anoka and Midwest Oil of Minnesota would be transferred to Yehud, and then the Midwest Oil of Anoka and Midwest Oil of Minnesota after that point would cease to exist?

**A. Yes.**

Q. Do you know what the tax treatment will be for the merger?

**A. No. I'm not an accountant, so --**

Q. Do you have counsel addressing that issue or looking into that issue?

**A. I do.**

Q. Would that be Ms. Nett?

**A. No. She's not a tax attorney.**

Q. Is that Nixon Peabody then?

**A. Yes. We've actually discussed an entire total restructuring of the company, so...**

Q. But was there any attorneys at Nixon Peabody that were actually involved on the corporate end of doing the merger?

**A. No.**

Q. And this was something you said at the, at the IDI, so I just want to put in the record that you -- you were asked by our analyst whether there was any entities -- any additional entities that were merged into Yehud other than Midwest Oil of Anoka and Midwest Oil of Minnesota, and you were not completely sure. You thought there might be another entity; is that correct?

**A. There might have been one other LLC.**

Q. But you don't recall which one that is?

**A. There was Midwest Oil of Oakdale or something like that may have been merged in, I don't recall. We were trying to assess the status of the entity, so...**

MS. SARKESSIAN: Is our machine broken or something? What's going on?

(Discussion held off the record.)

BY MS. SARKESSIAN:

Q. I'm sorry, you said that was Midwest Oil of Ramsey, is that what you said? I'm sorry.

**A. No, Oakdale or --**

Q. Oakdale.

**A. It was one of the Midwest Oil of the Minnesota companies. And I don't remember if we determined that if it was still active we did the merger into it or not. I don't -- we had the discussion, but I don't recall what.**

Q. And you said you believe that that's an LLC, not a separate corporation?

**A. It's not a separate corporation, no. I mean I'd have to just look at the documents. I don't --**

Q. When you determine for sure what that is, we'd ask that you provide us with that information to confirm --

**A. Okay.**

Q. -- if it's Oakdale. But whatever company it was was not active?

**A. No, if it was an active corporation, it was -- I mean an active LLC, we put it in. If there was nothing in it, then we didn't bother.**

Q. Okay.

**A. And I don't recall what the determination was.**

Q. Midwest Oil of Oakdale, does that also run gas stations and convenience stores?

**A. It did, yes.**

Q. And where is that -- what state is that?

**A. Minnesota. It was only Minnesota-related companies that are in Yehud right now.**

Q. These go to the initial operating report. So I'm going to show you the initial operating report that was filed in this case. And that's your signature on the first page, correct?

**A. Yes.**

Q. Did you review it before you signed it?

**A. I did.**
Q. Is it true and correct to the best of your knowledge, information and belief?
**A. It is.**
Q. If you could turn to the second page, please, the budget.
**A. Okay.**
Q. Starting with the line on "Cash Sales," does this relate -- the numbers that are here, do they relate exclusively to rental of real property that is specifically owned by SIST as opposed to --
**A. Yes.**
Q. -- its subsidiaries? Okay. Now, I see that it starts out like for March at 5,750 and then starting in May it goes up to 7,000, in July 8,000, and then eventually by February of -- well, by December of the year it's at 9,000, correct?
**A. Yes.**
Q. Per month. Why the increase over time?
**A. There's some properties that we expect will be rented or we're pretty close on.**
Q. Okay. Now, the line for "Other

Subsidiaries," so in March that's 8 -- well, actually it's the same number for every month, 880,475.25. Is this the estimate of the revenues that would be coming from all of SIST's subsidiaries?
**A. Not coming from. The gross revenues collected by SIST's subsidiaries.**
Q. Now, does this include any estimate with respect to U.S. Acquisitions & Oil and the raceway which is currently under receivership?
**A. No.**
Q. How about the property that Midwest Properties owns that is under receivership, is any, any estimate made with respect to that property?
**A. No.**
Q. Now, I see it's the same number every month. I recall you saying with respect to some of these businesses that there's some factor of seasonality, but that -- is that correct, some of the businesses have some seasonal aspects to them?
**A. All of them have some seasonality to some degree. But for me to project, you know, in the**

**millions of dollars what the figure would be was -- you know, I just took based on last year what the annual gross revenue was and divided it up over 12 months.**
Q. Okay. So for 2010 then was the annual gross revenue something around 10 million?
**A. Yes.**
Q. Now going down -- when you get down to the section on disbursements, though, the section on disbursements, other than the one that says "Subsidiary Expenditures," those just relate to SIST itself?
**A. Yes.**
Q. Now, with respect to the secured rental leases, would this be mortgage payments or contract payments with respect to real property?
**A. Yes. Not real property.**
Q. Oh, okay. For what?
**A. Well, the -- in the first two months there's the payment to GE Capital for that solar printer which I spoke about, which is going to be paid off. After that it's just the mortgage payment on one piece of real property.**
Q. And what piece of real property is that?

**A. 214 South Main.**
Q. Is that the only property that SIST owns that has a mortgage?
**A. It's the only one that has a mortgage payment.**
Q. How about contract payments, are there any other properties with contract payments?
**A. I have to look at the schedules. I don't believe so. I mean with the primary lender, there is no payment.**
Q. That's M&I?
**A. Right.**
Q. Because that loan has matured, correct?
**A. Correct.**
Q. Approximately how much is owed on the M&I one?
**A. 900,000.**
Q. And I assume that that has not been paid, correct? I mean that's still outstanding.
**A. Right, we still owe -- well, I mean they claim we owe 900,000. I'll leave it at that.**
Q. And the insurance again is just for SIST, correct?
**A. Yes.**

Q. And same for utilities. Now, you don't have anything down here for professional fees, correct?

**A. Yes.**

Q. So I take it that SIST is not planning on paying its own professional fees in the bankruptcy?

**A. It will be paid by a subsidiary.**

Q. Well, given that you're projecting SIST having a net cash flow in excess of $80,000 every month, why is SIST itself not paying its professional fees?

**A. SIST itself doesn't have a net cash flow with the revenues of the affiliates. It has it and that's where the funds would come from.**

Q. So the net cash flow shown here, as well as the cash at the end of the month, is not what would be sitting in SIST's bank account, but rather, looking at all of the -- SIST together with all of the subsidiaries on a consolidated basis, you are projecting 80-some-thousand dollars a month in cash flow, correct?

**A. SIST is not a business. It's a school. So it's not -- it's a nonprofit. It's not in the money-making business itself.**

Q. If you just looked at SIST itself, what do you anticipate its net cash flow will be on a monthly basis?

**A. A few thousand a month.**

Q. A few thousand?

**A. Right.**

Q. For 2010 how much, how much money did SIST and its subsidiaries transfer to the school in India?

**A. I have no idea off the top of my head.**

Q. Can you give me an estimate of whether it's, you know, 100 to 200,000 or a million or 10 million?

**A. Well, it's not a million and it's not 10 million.**

Q. Something under a million?

**A. It's under a million.**

Q. Can you get any closer than that in terms of an estimate?

**A. Not really, because I'd have to look at individual transfers as well, so I would be guessing.**

Q. Do you have any schedule that you keep that would document everything going to India, regardless of whether it's SIST or one of its subsidiaries, or would you have to go and look at the records of each individual subsidiary to determine how much money went over to India in 2010?

**A. Well, the subsidiaries don't send wires to India, they can't. The accounts aren't set up that way. So I mean if the wire came from SIST's account, it would be on SIST's bank statement, I would imagine. If it came from one of the board members, then that's a different matter.**

Q. Well, I understand that board members might be making their own contributions, I'm not -- okay. So I think I understand that the subsidiaries don't send wires, the subsidiaries are not directly sending any money to India, correct?

**A. No, they can't.**

Q. Can't, okay. So if you, you wanted to know the total amount that was sent by SIST to India last year, you would look through the SIST bank statements, look for all the international wires and add them up; is that correct?

**A. Sitting right here right now, I would think so. But...**

Q. In 2010 SIST didn't have an account in any other bank where it was sending wires to India, correct?

**A. In which year?**

Q. In 2010, was there any other bank that SIST used to send wires over to India?

**A. I don't recall specifically when M&I closed the accounts. But I would think that would have been -- I think they did that in '09. So I don't believe so.**

Q. So prior to -- well, at some point in time when it was the M&I account, at that point SIST was only using that account to send money to India, correct?

**A. Correct.**

Q. Okay. And then at some point that was closed and then SIST started using the Commerce account to do that?

**A. Correct. We had some other banks in between there, but...**

Q. The other banks in between, were some wires September through those banks as well?

**A. They could have been, yeah. I don't recall.**

Q. Okay, then turning to the certificates of liability and insurance. Now, these, these all have a policy effective date of March 14, 2001. I'm just trying to figure out why everything is the same date. Were they all renewed at the same time?

**A. These properties were all put together on the same policy at the same time. The majority of the, the other certificates, there are a few other smaller policies still floating out there, but now it's primarily just this one large policy, which they put Midwest Properties and SIST properties together on. Everything else -- there's a few other random policies, but the majority of the assets are on the same policy.**

Q. Are there other subsidiaries that have not filed for bankruptcy that own property, correct?

**A. Yes.**

Q. Are those properties also included in this policy No. 4W24158 --

**A. No.**

Q. -- or do they have separate ones?

**A. They're separate ones because they're all specialty properties, gas stations, hotels, those kind of properties have their own -- they're specialty carriers, not -- Wilson is just a general property carrier. Higher risk carriers.**

Q. Okay, I understand that. I will tell you, we still are missing certificates for a number of properties, I can tell you what those --

**A. I sent a large pile, and I could almost be certain there is nothing missing now. I had them fax me so many times.**

Q. Okay. Well, I can see -- okay, so for SIST we don't have N5674 State Highway 47/55. There is a lot on Old Lake Road, a lot on Mill Street, and then 1206 East Green Bay Street. That is property insurance certificates. And then we don't have --

**A. Well, obviously land, vacant land would not have property insurance.**

Q. So the two that are lots don't have property insurance, but how about the other two, the --

**A. Well, 1206 is a gas station, and that definitely has insurance with EMC, I think is the carrier. N5674 is this same policy.**

Q. That's on the same policy as 1206?

**A. And actually, N5674, the certificate is right here.**

Q. Oh, she's right. This is the one that's attached to the -- oh, it's under Midwest Properties of Shawano, that's why we're confused. But that piece of property, the N5674 State Highway 47/55, is that an SIST property or --

**A. It is, but this is, again, is a joint property. It has both names on it. So I think they just printed the wrong insured name. I mean the policy insures SIST and Midwest Properties interchangeably.**

Q. I don't see on here where the certificate mentions SIST.

**A. I mean I can have them reprint the certificate, but I'm telling you it's a joint policy between the two companies.**

Q. Okay, we want to make sure that it covers SIST since SIST is the owner of the property, obviously. Okay, so we do have this.

**A. And 1206 I thought for certain was in that large pile that I sent a couple days ago. And it looks different than these because it's an EMC one.**

Q. All right, we'll take another look.

**A. Actually, it's right here.**

Q. Okay. So it's attached, okay. And that says Midwest Oil of Wisconsin, d/b/a Peoples Express Gas and Mini Mart. Okay, is that also covering SIST?

**A. It's also covering SIST. This policy covers the three gas stations. Two of them are owned by Midwest Oil of Wisconsin, one is owned by SIST, trading as Peoples Express.**

Q. Okay. But that -- the 1206 East Green Bay is owned by SIST, correct?

**A. 1206 is owned by SIST.**

Q. Okay.

**A. But again, the mortgage covers properties, one of which is owned by SIST, two of which are owned by Midwest Oil of Wisconsin.**

Q. Okay. And then liability insurance -- well, let's see. This is liability insurance for 1206 East Green Bay.

MS. RYAN: Restroom break?
MS. SARKESSIAN: Yes, yes.
(Recess.)
MS. SARKESSIAN: Okay, we're coming back after a break. Again, this is the 341 for SIST March 31, 2011.
BY MS. SARKESSIAN:
Q. Ms. Isaacson, could you state in as succinct fashion as possible the reason why SIST filed for bankruptcy this year?
**A. To reorganize its finances.**
Q. I know that obviously SIST filed with a number of its subsidiaries in March of '09, and then that went on to an appeal, and then the stay was lifted in the summer of last year, correct?
**A. May of 2010.**
Q. Why -- as between May of 2010 and the present, why, why did SIST file at the particular time that it did?
**A. We felt it was time we reached some resolution with respect to the affairs of the company, get the company reorganized and move forward.**
Q. Was it related to M&I filing a

foreclosure action?
**A. Not really. We had talked about it for months and just hadn't filed it.**
Q. And M&I did file a foreclosure action a few days before SIST filed for bankruptcy?
**A. I don't know if it was -- it was never served. I think they may have filed it.**
Q. You haven't been served with the --
**A. No.**
Q. -- complaint?
**A. I don't actually even know that it was filed, for that matter.**
Q. You -- we requested SIST's rent log, but as far as we can tell, we did not receive it. Are you under the impression that you sent it to us or --
**A. Yes.**
Q. Okay.
MS. SARKESSIAN: Laraine, did you see a rent log?
MS. RYAN: A rent log for who?
MS. SARKESSIAN: For SIST.
MS. RYAN: A rent log for SIST, no.
MS. SARKESSIAN: Because I -- we

haven't seen it in what we've received.
MS. RYAN: A rent log of --
MS. SARKESSIAN: Of the properties, what, you know.
MS. RYAN: Is that on Schedule A?
MS. SARKESSIAN: No, it wouldn't be on the schedules of the filed schedules. It would be a separate document.
BY MS. SARKESSIAN:
Q. There was one for Midwest Properties that you provided to us. It was -- does -- Ms. Isaacson, does it look similar?
**A. Yes.**
Q. Is it the one page, lists all the properties and every month and then what, you know, what amounts were received? Is that something you might have on that lovely laptop of yours?
MS. RYAN: I have the initial operating one.
MS. SARKESSIAN: No, it's not on the initial operating report. It's not with anything that was publicly filed. It wouldn't be. It's not something that's required to be --

THE WITNESS: I thought it was in the 51-page e-mail.
MS. RYAN: All right, yeah, the -- yeah, I got that --
MS. SARKESSIAN: The first --
MS. RYAN: -- the documents, the tax return and all the other documents?
MS. SARKESSIAN: Well, the tax return, that had the rent log for Midwest Properties at the end.
MS. RYAN: Yeah, Mill Street, Mill Street, El Mariachi.
THE WITNESS: That's Midwest Properties. Well, I guess, I guess --
BY MS. SARKESSIAN:
Q. But you do have a rent log for SIST that looks similar to what was for Midwest Properties?
**A. Yes.**
Q. Okay. So we would just ask that you get that to Ms. Ryan as soon as possible and she can forward that.
**A. Okay.**
Q. But let's go through, let's go through the properties and get as much information as, as

possible. Understanding that the current monthly rent, that this will be your best estimate and then we'll get the rent log.

So for 214 South Main Street, is there a tenant?

**A. No.**

Q. What kind of property is that? Is it an empty lot or --

**A. No, it's commercial.**

Q. How long has it been vacant?

**A. Vacant for 20 years before we purchased it.**

Q. When did you purchase it? What year, approximately?

**A. I'd be guessing, 2004 or '05.**

Q. And it has -- since the time that you purchased it, it also has not had a tenant, correct?

**A. No, we rent -- were in the process of renovating it.**

Q. What type -- what could it be used for in terms of a commercial property?

**A. What we're planning to use it for is a fabric store.**

Q. Is there a particular entity you have in mind for running it? I only ask because you have such a specific use, fabric store.

**A. We haven't set up the legal entity, but we would.**

Q. And that -- so you anticipate that the entity that would be renting 214 South Main Street would be a subsidiary of SIST yet to be formed?

**A. Right. I mean we've done all the homework, made all the connections, received a distributorship. We just have to finish the building without interference.**

Q. Is there a, either a mortgage obligation on that property or a contract payment?

**A. Mortgage.**

Q. That's with Baylake?

**A. Yes.**

Q. Now, that's a separate mortgage than the mortgage that Baylake has with five properties in Shawano, is that separate?

**A. Yes.**

Q. Okay. So sticking with the one that's for 214, what's the monthly payment on that?

**A. It's 5 or $600.**

Q. Okay, 5 or $600. What is the -- do you know what the annual property tax obligation is?

**A. I have no idea.**

Q. Can you provide us with copies of the tax bills or whatever documentation would show how much was owed with respect to that property?

**A. I can try. I already did try, but the city refused to give a printout, so...**

Q. Don't you get in the mail a tax bill?

**A. We got a tax bill and we turned it over with all of our payments and all of this other nonsense to the accountants who apparently gave it to the IRS. And I thought we had a copy and I was not able to locate a copy. So we went to the city and said, you know, can you give us a printout, can you give us anything? And they said, as usual, they're not obligated to give us anything.**

**So that's why you don't have a receipt yet. We'll have to see what we can -- try to get some reprints or something. But they were not being cooperative whatsoever, so...**

Q. Now, since this piece of property is

actually owned by SIST, would SIST, from its own bank account, be paying the real estate tax bills or would it have one of its subsidiaries pay it?

**A. It's such a small property, SIST would probably pay it itself. I mean it's not a small property, but it's a small bill. It's not -- a minimal tax bill.**

Q. The -- with respect to the insurance premiums, I do recall looking at the certificate on this. Was this on a policy with other properties?

**A. It is. It's that massive policy.**

Q. Okay.

**A. So I mean the insurance with respect to this building is probably $20 or something, I mean if it were allocated by value.**

Q. Well, we can use -- you have the monthly, total monthly insurance premiums on the budget that you attached to the initial operating report, so that would include all these properties, right?

**A. Right.**

Q. Okay, so we'll just use that. And same for utilities. Any utilities with respect to --

**A. There's no utilities.**
Q. No utilities, okay. 153 South Main Street, does that have a tenant?
**A. No.**
Q. What kind of property is that?
**A. Commercial. It's for rent, but we rehabbed it to be a housewares store.**
Q. Has that been vacant since SIST purchased it?
**A. It's been vacant for 30 years.**
Q. Do you recall when SIST purchased it?
**A. Around the same time period.**
Q. 2004-2005, something like that?
**A. Would have been open if the city hadn't come in there and shut it down, so...**
Q. What reason did the city give for shutting it down?
**A. Every time we work on the building, the city is in there with one reason or another to stop the work, so that's why it's not open for business right now. Eventually we just put it up for rent. But what we purchased the building for was to operate a housewares store and that's what we renovated it for.**

Q. Has the renovation been complete or is it not finished?
**A. It's pretty close. Needs to be insulated inside, but it's pretty much, for the most part, complete. But every time you start working, you know, you work for two weeks and the city comes and shuts it down, or the city tells the contractor not to work for us, and then we get another one and they start work and the city comes and shuts it down. So, you know, it's kind of an ongoing battle and an ongoing process.**
**So until we get a lawsuit filed against the city for them to stop interfering so we can get the building done and get it open, you know, that's probably the course of conduct that they're going to decide they want to keep doing.**
Q. Was this also a situation where you were intending to create, say, a newly formed subsidiary of SIST to run this housewares store?
**A. Correct.**
Q. Is there a mortgage or a contract payment on that piece of property?
**A. Not anymore.**
Q. Is that one of the M&I properties? I'm

sorry, was that no?
**A. No, it's not.**
Q. So was there a loan that was paid off or --
**A. The purchase was paid off, yes.**
Q. And I'm assuming with all of these that the exact tax obligations you don't know for the reasons that you --
**A. I don't know.**
Q. -- said previously, okay. 143/145 South Main Street, is there -- what kind of property is that, first of all?
**A. Commercial.**
Q. Is there a tenant?
**A. Yes.**
Q. What's the name of the tenant?
**A. There's two tenants. One of them is a Chinese restaurant and they're in 145. 143 is a sign company.**
Q. What's the name of that?
**A. New York Sign.**
Q. I think I saw the name of the restaurant in one of these documents, you just remind me.
**A. Hunan Chinese Restaurant.**

Q. What's the rent from the restaurant?
**A. 1,250.**
Q. And the sign company rent?
**A. It's either 500 or a thousand. I don't recall specifically.**
Q. Okay. When we get the rent log we'll see that. Is there a mortgage on that property or a contract payment?
**A. No.**
Q. Was, was there ever? I mean was it --
**A. It was paid off. That one, M&I may have a lien on that now. They had 17 properties. That might be one of them.**
Q. On the, on the Bay View Bank, the second mortgage that's on five properties in Shawano --
**A. Baylake.**
Q. Excuse me, Baylake, what are the five properties in Shawano that they have a mortgage on?
**A. They should be on the schedules. I mean most of them are not owned by SIST.**
Q. Okay.
**A. They're owned by Midwest Properties. Let me just think.**

Q. Are there any that are owned by SIST?

**A. If I look at the schedules, I could tell you.**

Q. Let me get a clean copy.

**A. I think there might be one of SIST's properties.**

**Baylake has a second against 1214 East Green Bay Street. But it's a Midwest Properties obligation, and Midwest Properties makes the mortgage payment. That's part of the confusion with the cross, cross mortgages, cross collateral and cross guarantees.**

Q. Okay. So, okay. So 1214 East Green Bay Street is actually owned by SIST, but Midwest Properties has the obligation to make the mortgage payment?

**A. It's Midwest Properties' mortgage.**

Q. Okay. But the property is deeded to SIST?

**A. 1214 is SIST's property, but the mortgage that Midwest Properties got was on 500 South Airport, but they took an additional lien against five other properties, one of which is SIST's property.**

Q. Okay, I understand.

**A. That's why a consolidation is going to make it much simpler.**

Q. I'm sorry, which one, the lender is Baylake, okay. Baylake --

MR. SCOTT: Excuse me. For clarification, was that the second mortgage or first mortgage or both?

THE WITNESS: It's the second.

MR. SCOTT: Second, yeah, I heard you say that. I just wondered.

MS. SARKESSIAN: I'm sorry, I'm just taking a moment to jot this down.

BY MS. SARKESSIAN:

Q. Okay, so let's get to the next -- that -- okay. That property has utilities. Are those utilities paid by the tenants or are they paid by SIST?

**A. The Chinese restaurant pays its own utilities.**

Q. The sign company?

**A. They don't pay their own.**

Q. So whatever those utilities are, they're included in what you have the monthly utility bill on the --

**A. Right.**

Q. -- the initial operating report.

**A. Whatever we have to pay is included.**

Q. Okay.

**A. The Chinese restaurant obviously has the majority of the utilities and they pay their own, so I don't know what those bills are.**

Q. Do the tenants pay anything towards the tax or the insurance on the properties?

**A. They don't pay towards the insurance. The agreement with regards to the taxes, they have to contribute a certain dollar amount. It's some odd formula with -- the lease is ancient and it was -- if the taxes were over a certain dollar amount, then they had to pay the difference between what the taxes were when they -- the lease started. I mean they contribute something to it.**

Q. The 128 East Green Bay Street, what kind of property is that?

**A. Commercial.**

Q. Is there a tenant?

**A. Not right now.**

Q. Has there been a tenant since SIST --

**A. Yes.**

Q. -- purchased it?

**A. Off and on.**

Q. What kind of commercial property, what could it be used for?

**A. It's an office-type building with a large storefront. So it could either be used for law office, dental office, medical office, small retail store. Used for -- several years it was rented by Sprint, cell phone store. And then the office space was rented through a realtor.**

Q. How long has it been vacant?

**A. I think since probably a year or more. I don't remember exactly, but it's kind of been off and on. We've had someone for a little while and then they move on.**

Q. Is there a mortgage payment on that building or contract?

**A. There's no mortgage. The contract was paid off. It is additional security with M&I.**

**I guess, for your information, every single piece of real estate here was paid off.**

Q. Okay.

A. I mean the purchase price was paid off and, you know, M&I took a blanket on a lot of assets of Midwest Properties, a lot of assets of SIST. But when we -- the properties that we purchased, they were paid off. They were paid in full.

Q. Well, how about the Baylake mortgage on 214 South Main, is --

A. That was a line of credit used to build the amusement park. So I mean the property itself was paid off many years ago. But in building the racetrack, we spent probably $8 million, so, you know.

Q. Wow.

A. That is why it is a problem for the property. They have killed our business. And, you know, this Delaware court system is terrible. You can't even get a turnover motion heard. So, you know, we're going to push it out till June when the season is over and nothing will be done for the whole year. That's quite a bit of justice.

Q. The line of credit that's on 214 South Main, is that, is that the only piece of property

that's used to secure that line of credit or are there other properties owned by other subsidiaries?

A. No, just that one.

Q. Remind me. The M&I, the M&I initially had various loans to different subsidiaries, is that how it was?

A. No.

Q. Remind me. I know you've told me before, but remind me what -- how that started out, because I know it was restructured at one point.

A. Right. M&I had -- M&I only lent money to SIST. They had lent the money for the purchase of various pieces of real estate and, you know, ultimately a lot of the money went to the amusement park. And then at some point in time, they decided that they, rather than having so many small loans, they were going to put them all together as one loan, so they made one big loan.

Q. When -- before when they had a bunch of small loans and it was loans between M&I and SIST itself?

A. It was always SIST itself, even though the assets may have been owned by Midwest

Properties or the assets may have been owned by whoever. But the only face that they knew was SIST.

Q. And SIST was the sole obligor on those loans?

A. As far as I recall.

Q. Currently, SIST is the only obligor?

A. SIST is the borrower.

Q. The M&I loan, is that guaranteed by any of the subsidiaries?

A. Not, not that I recall, but again, they have a lien against assets of the subsidiaries, so, you know, you call that a guarantee, or do you call it a --

Q. I wouldn't call that a guarantee, but I understand. SIST is the obligor on the note, there are no guarantees by any of the subsidiaries. However, M&I has liens on real property owned both by SIST and the subsidiaries, correct?

A. Right.

Q. And in some instances, the lien of M&I on the properties of the subsidiaries may be a secondary loan, correct, secondary lien?

A. No, M&I would only take first.

Q. We have -- I'll show you the note that you produced to us from M&I Bank. Is this the promissory note that's the current note with respect to the current loan?

A. Yes.

Q. We did not receive any security agreement with that. Is there a security agreement, a document that indicates what security interest M&I has to secure that loan?

A. I don't know that I've seen one. But I could look.

Q. If you don't have the security agreement, how would you know what M&I has a lien on?

A. I mean I know from the '09 proceeding when we had extensive discussion with the bank to figure out what they had liens on or not, we pulled title reports. I mean a lot of the liens we don't even think are valid liens, but that would be something we'd have to resolve as part of an adversary.

Q. I would ask that you look to see if you do have a security agreement, because if there is no security agreement, then your counsel would

want to look into what position she'd want to take as to whether this loan is secured, or there may be, you know, other avenues to explore. So please do look to see if there is a security agreement, and we'd ask that that be produced if you find it.

**A. We can, we can see the difficulty right now with M&I is that M&I is in the process of being acquired by Bank of Montreal, so nobody at M&I has authority to do anything. It's made for a very difficult transition period.**

**And then M&I is hugely caught up in this -- I don't know if you're following the Wisconsin politics, but --**

Q. No, can't say that I do.

**A. There's a huge problem in Wisconsin with them cutting rights to, you know, any public -- collective bargaining rights to all public employees.**

Q. Oh, yes, yes.

**A. Well anyway, M&I is like, their money is union money. So the unions, like the billions of dollars that have invested in M&I, are threatening to pull their money out, so M&I just**

**closes their branches down so they can't pull out their money, so I mean it's a mess.**

MR. SCOTT: And that was because the M&I supported the bank -- supported the governor who passed the law, and so there is a conflict of interest. So the union is threatening M&I to pull their money.

MS. SARKESSIAN: For the record, that was Bruce Scott speaking.

THE WITNESS: So right now, my point is, whatever we're going to do with M&I is going to have to -- we're going to have to try to resolve here, because it's chaos on that front.

BY MS. SARKESSIAN:

Q. Well, I understand it may be difficult getting documents from them, but I'd ask just to look to see if you have either a security agreement or any other loan documentation other than just this note, something that would indicate what the security is for the --

**A. Well, my assumption is, you know, we had -- M&I was our primary lender for decades. And, you know, we would get a property, pay it off. Well, M&I would -- apparently what we found**

**out is they never recorded the satisfactions. And then when they did this consolidation loan, they relied on all the underlying -- I mean there was virtually -- very little paperwork. But they relied on all of the individual loans that they had gotten us to sign throughout the years that had been paid off and wrapped that into this consolidated loan. So collateral which should have been released was never released when the loans were paid off.**

Q. I understand what you're saying. But I'm not interested -- I'm actually -- I don't need you to look for anything that went before this promissory note. Just with respect to at the time that you signed this promissory note, typically there would be a security agreement, other loan documentation you would sign with this. So that's what I'm looking for, not, you know, the earlier loans.

**A. Right. And I don't believe there is much else, but I will check. That's what I'm saying, they -- from what I understand, they -- when I'm speaking with them, they relied on all the earlier documents that had been executed**

**throughout the year -- throughout the years, when they did this wrap-up in this one consolidated note. So I can investigate what else is there, but...**

Q. Okay. Well, I'd ask that you do that. Again, I think that's important for the interest of the estate, for your creditors, you know, for the debtor. Because this is a two-page note, and I don't see any reference to there being -- it being securitized. Now, I have to say I did not look -- you know, I didn't read it with a fine-tooth comb. But I don't have see anything that says "Security," which you would typically see. So, you know, it could very well be in other documents, but if there isn't any other document, that would certainly be relevant to a lot of things.

**A. Okay.**

Q. So now, the next property is 104 Old Lake Road. What kind of property is that?

**A. It's a retail store.**

Q. Is there a tenant?

**A. Yes.**

Q. What's the name of the tenant?