# EXHIBIT A-2



**WILCOX & FETZER LTD.**

In The Matter Of:

# R.C. Samanta Roy Institute of Science & Technology

---

R.C. Samanta Roy Institute of Science Technology

11-10504

March 31, 2011

---

Wilcox _ Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: depos@wilfet.com
Internet: www.wilfet.com

90

1  A. Beit Mamtakim.
2  Q. I'm sorry?
3  A. Beit Mamtakim.
4  Q. Could you spell that?
5  A. B-E-I-T --
6  Q. Oh. okay. I got it. It's one of the
7  subsidiaries?
8  A. Yes.
9  Q. How long has that been renting that. Beit
10 been running the store?
11 A. Well, we've -- various entities have
12 rented and operated since we acquired it in '01.
13 Q. What's the monthly rent?
14 A. 500.
15 Q. So is this -- there's no --
16 A. It pays its own utilities and it pays its
17 own taxes.
18 Q. Okay, so the tenant pays the utilities,
19 tenant pays taxes. Does the tenant pay the
20 insurance or is that SIST pays?
21 A. Tenant pays insurance.
22 Q. Is this a property where there is no
23 mortgage other than an M&I?
24 A. That's right. One of the ones which it's

91

1  our contention there shouldn't be a lien on.
2  Q. So the next property is N5606 State
3  Highway 47/55. What kind of property is that?
4  A. It's a farm.
5  Q. Is there -- was there a tenant on that?
6  A. Somebody rents the land. And we rehabbed
7  the buildings into a -- like our corporate
8  welcome center.
9  Q. The corporate welcome center, is that, is
10 that in use by SIST?
11 A. Yes.
12 Q. So somebody rents the land to --
13 A. Farm.
14 Q. Do they farm the land?
15 A. It's 40 or 80 acres or something.
16 Q. How much do they pay a month?
17 A. 750 or something like that.
18 Q. What's the name -- is it an individual?
19 A. Yes, it's an individual.
20 Q. What's his or her name?
21 A. Dave Villiard.
22 Q. Dave Billiard, with a B?
23 A. V, like Victor.
24 Q. Oh, V, okay. Is there an M&I mortgage on

92

1  that property?
2  A. I think they have a lien on it, yes.
3  Q. Any other lien?
4  A. No.
5  Q. Does the tenant pay any taxes, insurance
6  or utilities?
7  A. No.
8  Q. Next property is N5674 State Highway
9  47/50 -- why do so many things have 47 -- oh,
10 it's State Highway 47 and then is 55 another
11 highway?
12 A. That's the name of the highway. Remember
13 you're talking about Wisconsin, so --
14 Q. The highway name is 47/55, okay.
15 A. I have no idea why it's two numbers.
16 Q. Two running together, okay. All right,
17 so N5674 State Highway 47/55, what kind of
18 property is that?
19 A. Single-family residence.
20 Q. Is there a tenant?
21 A. Not right now.
22 Q. How long has there not been a tenant?
23 A. A few months at least.
24 Q. Back when there was a tenant, what was

93

1  the rent?
2  A. 500.
3  Q. Let me ask also ask about the 128 East
4  Green Bay, which you said there is not a tenant
5  now but there's been tenants in the past. What
6  was like the last rent that a tenant was paying?
7  A. 3,000.
8  Q. So going back to the N5674 State Highway,
9  does M&I have a mortgage on that?
10 A. No.
11 Q. No? Okay. Is there any other mortgage?
12 A. Yes.
13 Q. Okay. What entity has a mortgage?
14 A. Or -- yes.
15 Q. What entity has a mortgage on that?
16 A. Commerce.
17 Q. What's the monthly payment?
18 A. This property doesn't pay it. It's
19 another one of those -- it's a Midwest Properties
20 loan, which is paid by Midwest Properties, but
21 the security is SIST's collateral.
22 Q. Okay. So security is a lien on this
23 5674 State Highway. Is there, is there also
24 security given by Midwest Properties?

24 (Pages 90 to 93)

94

1    A. Yes. It was a few parcels, and this is
2  one of them.
3    Q. Are there any other parcels of SIST that
4  secure this Commerce loan?
5    A. N5696.
6    Q. N5696. Let's see. Okay, I see it, it's
7  on the next page. Okay, but the monthly payment
8  is paid by Midwest Properties of Shawano, right?
9    A. Yes.
10   Q. Next property is N5670 State Highway
11  47/55. What kind of property is that?
12   A. It's one of our warehouse distribution
13  centers.
14   Q. Does that have a tenant?
15   A. Affiliates. A number of them.
16   Q. Do they pay any rent?
17   A. Yes, 2,500.
18   Q. 2,500 a month, okay. Again, I'm sorry,
19  I'd just ask you to keep your voice up a little
20  more, that's why it's going to get --
21   A. Okay.
22   Q. That's why I'm repeating a lot of things
23  that you say, I'm worried it's not being
24  recorded.

95

1    Okay. Is there a mortgage on this
2  property?
3    A. M&I has a lien.
4    Q. And is that it, no other mortgage?
5    A. No other mortgage.
6    Q. Is SIST paying the taxes, the insurance
7  and the utilities, or is an affiliate paying
8  that?
9    A. Affiliates pay them.
10   Q. Which --
11   A. The affiliates pay the taxes. The
12  utilities and the insurance are included, are the
13  bulk, actually, of SIST's obligation.
14   Q. Okay. So insurance and utilities are
15  SIST. Is -- with respect to the taxes, is it one
16  particular affiliate or does it change?
17   A. It changes. But Dagul and Marom pay the
18  bulk of it.
19   Q. Do -- with respect to the warehouse, are
20  the same affiliates using it all the time, or
21  like some parts of the year one affiliate might
22  use it, other parts another might use it?
23   A. It varies. You know, if we -- it kind of
24  depends on what we're doing at the time. You

96

1    know, for a while we were doing a rehab of the
2  hotel, like of a wing, so we needed a good
3  portion of it to store everything from the hotel
4  while we rehabbed that section. So then, you
5  know, rightfully it's that Dagul and Marom's
6  obligation to pay more than others. But...
7    Q. And, okay. So the next property is N5805
8  Oak Drive. What kind of property is that?
9    A. Single family.
10   Q. Is there a tenant?
11   A. Yes.
12   Q. What's the name of the tenant?
13   A. It's two women. Linda Gray and Darlene
14  Sense.
15   Q. Linda Gray, Darlene Sense. Is it one
16  monthly payment or do they pay separately?
17   A. They pay separately.
18   Q. How much does each one pay?
19   A. 250.
20   Q. Does M&I have a lien on that property?
21   A. No.
22   Q. Any other entity?
23   A. No.
24   Q. No, okay, no lien at all.

97

1    A. Oh, yes. Commerce has a lien.
2    Q. Is the Commerce lien related to a loan to
3  Midwest Properties?
4    A. No, this is an SIST loan.
5    Q. What's the monthly payment?
6    A. $300.
7    Q. So that's something that SIST itself
8  pays, correct?
9    A. Yes.
10   Q. Does SIST pay the tax, insurance and
11  utilities, or is any of that paid by the --
12   A. Tenants pay their own utilities. We
13  would carry the taxes and insurance.
14   Q. And 1214 East Green Bay Street, what kind
15  of property is that?
16   A. It's a restaurant.
17   Q. Is there a tenant?
18   A. Affiliates.
19   Q. What's the name of the -- is it more than
20  one?
21   A. Well, we use it as our ice manufacturing
22  place, and for the walk-in storage for the
23  Midwest Oil entities, Midwest Oil of Shawano
24  entities.

98

1  Q. Is there any rent being paid to SIST?

2  A. Not on a regular basis, but, you know, to

3  the extent Midwest Oil of Shawano pays the bulk

4  of the real estate taxes.

5  Q. Midwest Oil of Shawano you said pays the

6  bulk?

7  A. Pays a lot of real estate taxes for SIST.

8  Q. On just this property or does it pay on

9  some --

10  A. No, on a lot of other properties.

11  Q. Midwest Oil of Shawano runs gas stations

12  and convenience stores?

13  A. Yes.

14  Q. Why, why does it in particular pay real

15  estate taxes on a lot of SIST's properties?

16  A. It has the highest profits, highest

17  profit margin.

18  Q. I know that Midwest Oil of Anoka is no

19  longer in existence, but back when it was, did

20  that have a lower profit margin than Midwest Oil

21  of Shawano?

22  A. Higher.

23  Q. It was higher, okay. Back when Midwest

24  Oil of Anoka was in existence, was it paying the

99

1  real estate taxes of SIST?

2  A. Yes.

3  Q. But now that it's no longer in existence,

4  Midwest Oil of Shawano is because --

5  A. Midwest Oil of Shawano has always

6  participated as well.

7  Q. Then on the 1214 East Green Bay Street,

8  the insurance and utilities are paid by SIST?

9  A. Yes.

10  Q. And this is the one where Baylake has a

11  lien but it --

12  A. It's Midwest Properties' loan.

13  Q. Relating to 500 South Airport Road,

14  correct?

15  A. Yes.

16  Q. 303 East Green Bay Street, what kind of

17  property is that?

18  A. It's a -- half of it's retail store, half

19  of it's office.

20  Q. Is any of that rented currently?

21  A. Not right now. It's for rent.

22  Q. When was the last time any part of that

23  was rented?

24  A. All of it was previously rented; part of

100

1  it to the state parole board and part of it to a

2  gift store.

3  Q. How long has it been vacant?

4  A. It's been a while.

5  Q. More than a year?

6  A. Let's see. Yes. I mean I think it -- I

7  think it was vacant probably at the last -- the

8  time of our last filing probably.

9  Q. Okay. So probably since March of '09.

10  A. Again, I'm kind of trying to go from

11  memory, but...

12  Q. Does any entity have a lien on this

13  property?

14  A. I believe M&I does. Let me just check.

15  Or at least thinks they do. Actually, it

16  doesn't -- no. It doesn't -- they're not on here

17  as having a lien, so I don't think they do. But

18  then no, nobody does.

19  Q. 1247 East Green Bay Street, what kind of

20  property is that?

21  A. It's a restaurant.

22  Q. Is that currently rented?

23  A. No.

24  Q. When was it last rented?

101

1  A. It was rented up until the time the city

2  destroyed the building.

3  Q. And when was that?

4  A. 2008.

5  Q. So when you say -- is there still

6  physically a building there?

7  A. The building is there, but --

8  Q. Was it gutted or --

9  A. The city, yes, yes, allowed the building to be

10  gutted while we weren't allowed on the property

11  and allowed the tenant to strip everything from

12  the inside of the building, including cutting off

13  plumbing pipes and --

14  Q. It was gutted by the former tenant?

15  A. Gutted by the former tenant with the

16  assistance of the Shawano Police Department. And

17  will be the subject of an adversary proceeding.

18  Q. Did you make an insurance claim in

19  connection with that?

20  A. No, we couldn't.

21  Q. Why not?

22  A. Because the tenant carried the insurance.

23  Q. Oh.

24  A. And it was intentional, so they wouldn't

102

1    do anything, nor would they cover my injuries.

2       Q. How were you injured?

3       A. Because I went there to see what was -- I

4    was called there in the middle of the night

5    because we had -- were trying to get rid of this

6    tenant, who was $200,000 behind in rent. And we

7    had evicted them, and they were supposed to be

8    leaving.

9       Well anyway, in the middle of the

10   night I happened to be in Shawano one night, and

11   somebody said there's like 20 cars parked around

12   the building. They were still there, hadn't

13   left. And, you know, we were still kind of

14   fighting the legal process over it. So I went to

15   see what was going on.

16      I got there, and within a minute

17   before I even got out of my car, the Shawano

18   police car were there and arrested me for

19   loitering on my own property. And in the

20   process, they dislocated both my wrists,

21   dislocated my shoulders and other things. So...

22      Q. What was the name of the tenant?

23      A. Shaw-Bay.

24      Q. S-H?

103

1      A. Shaw-Bay, was an Indiana Ponderosa

2    Steakhouse franchise operator.

3      Q. You said that the tenant carried

4    insurance, but was SIST a named insured as well?

5      A. We were supposed to be. When we

6    contacted the insurance company, they said it was

7    an intentional act which wouldn't be covered.

8      Q. Okay. So you -- so technically, SIST was

9    on the insurance policy, but the insurance

10   company wouldn't pay it because of the

11   intentional act?

12      A. Correct. That's what I understood from

13   their denial.

14      Q. Does any entity have a lien on that

15   property?

16      A. M&I.

17      Q. No other entity, correct?

18      A. No.

19      Q. The property on Old Lake Road is vacant

20   land?

21      A. It's 25 acres of woods that surrounds the

22   104 -- 104 Old Lake Road, woods and wetlands.

23      Q. I take it there is no tenant?

24      A. No.

104

1      Q. Does M&I have a lien on that?

2      A. No, I believe they released that.

3      Q. Is there any other entity with a lien?

4      A. No.

5      Q. Is there any plan currently to do

6    something with that land?

7      A. Well, we did develop it with respect to

8    the 104 Old Lake Road. It was a nature trail,

9    kind of a nature trail that tourists use during

10   the summertime when they're at the fudge store.

11   There's like picnic tables. It's very

12   picturesque. There is, you know, deer and that

13   whole bit.

14      But that's kind of why we got it.

15   It's -- other than that, you know, other than

16   cutting down all the trees, there's not -- and

17   trying to develop on it, there's really not a

18   whole lot you could do with it. It's heavily

19   wooded.

20      Q. You're not planning. though. to cut down

21   the trees and try to develop anything?

22      A. No.

23      Q. All right. Vacant lot on Mill Street, I

24   take it that there is no tenant there?

105

1      A. No.

2      Q. Is that -- I take it that's not woodland.

3    it's like a city lot?

4      A. It's a city lot next to the Mill Street

5    apartment building, which is owned by Midwest

6    Properties, and we bought it to put up like

7    another eight-unit apartment building. That's

8    the size of a lot, what it's zoned for and so

9    forth.

10      Q. But the building has not begun on that?

11      A. No, we have not put it up.

12      Q. Does any entity have a lien?

13      A. No.

14      Q. Getting towards the end. 1206 -- the end

15   of this list. 1206 East Green Bay Street, what

16   kind of property is that?

17      A. Gas station.

18      Q. Is there a tenant?

19      A. Yes.

20      Q. What's the tenant?

21      A. Currently, Midwest Oil of Shawano.

22      Q. How much does it pay per month?

23      A. Again, that's kind of a gray area.

24      Q. It changes from month to month?

106

1    A. No. I mean the rent between the three
2  gas stations is $15,000 a month, but the mortgage
3  is held by Midwest Oil of Wisconsin. The real
4  estate is held --
5    Q. Wait, wait. Slow down. Wait. We got --
6  you said there was 15,000 a month being paid as
7  rent on three properties?
8    A. The three gas stations.
9    Q. Okay. Three gas stations. One is 1206
10  East Green Bay. Three gas stations.
11    A. The others are owned by Midwest Oil of
12  Wisconsin.
13    Q. Okay. Okay, so out of the 15,000 a
14  month, is any part of that given to SIST?
15    A. A small part.
16    Q. Is it --
17    A. I'd have to look at the rent log to be
18  exact. But it -- it's a small amount. Because
19  the majority of it goes to the mortgage holder,
20  which is Integrity Bank, which has -- you know,
21  which is secured by SIST and U.S. Acquisitions &
22  Oil and Midwest Oil of Wisconsin.
23    Q. The obligation to pay Integrity, is
24  that -- who has that obligation?

107

1    A. The mortgage is actually in the name of
2  Midwest Oil of Wisconsin, but Integrity has a
3  guarantee from SIST, they have a guarantee from
4  U.S. Acquisitions & Oil, and actually, they have
5  a judgment against SIST -- illegally have a
6  judgment against SIST and U.S. Acquisitions &
7  Oil. So, but we're paying on the mortgage. So I
8  guess whatever you want -- it is whatever you
9  want to call it.
10    Q. But it's Midwest Oil of Wisconsin that's
11  paying the mortgage payments?
12    A. Right. And that's who they gave the
13  mortgage to, but they had the guarantees from
14  these other entities, which they took a
15  judgment -- took it in the form of a judgment
16  prior to the last filing, which is totally not
17  legitimate or legal, but we haven't pursued
18  getting it taken off.
19    Q. So --
20    A. So you're going to see the 795, the same
21  795 on U.S. Acquisitions & Oil. That's what I
22  mean, there's so much -- it's the same loan with
23  multiple entities, multiple times.
24    Q. The 795 is the total amount that --

108

1    A. Is owed.
2    Q. -- owed, okay.
3    A. It's a Midwest Oil of Wisconsin
4  obligation, but it's a judgment against SIST and
5  U.S. A and O.
6    Q. I understand that SIST doesn't pay it,
7  but what is the amount of the mortgage, the
8  monthly payment?
9    A. 14,000 something. Around 14,000.
10  Another one of those loans on a five-year am.
11    Q. And who pays the taxes on that property?
12    A. Midwest Oil of Wisconsin and Midwest Oil
13  of Shawano.
14    Q. Midwest Oil of Wisconsin and of Shawano.
15  I mean the two separate entities, right?
16    A. Right.
17    Q. How about the insurance and the
18  utilities, who pays that?
19    A. Midwest Oil of Shawano.
20    Q. All right. Next property, 1247 East
21  Green Bay Street. What kind of property is that?
22    A. It's a lot.
23    Q. A lot. Empty lot?
24    A. Right.

109

1    Q. Okay, so on it there is no tenant, I take
2  it?
3    A. No. It's just a small strip of land
4  between this 1247 restaurant and the next -- the
5  grocery store next door. Nothing you can do with
6  it.
7    Q. Okay. So you have no plans to do
8  anything with it?
9    A. No. I mean it's -- just gives you a
10  little bit bigger backyard, that's all. I mean
11  there's nothing that -- it's not big enough to do
12  anything with it.
13    Q. Is there any mortgage on this?
14    A. No.
15    Q. N5696 State Highway 47/55, what kind of
16  property is that?
17    A. Single family.
18    Q. Is there a tenant?
19    A. Not right now.
20    Q. When was the last time there was a
21  tenant?
22    A. I don't recall. We had a tenant in
23  there, then we totally renovated the property,
24  and I don't recall offhand. Anyway, it's for

110

1 rent now.
2 Q. It's for rent, okay.
3 A. Single-family home.
4 Q. When you were getting rent for it before,
5 do you recall how much it was?
6 A. I don't recall specifically, but for the
7 type of property I would have -- it probably was
8 around 750 or something like that.
9 Q. And I have down here Commerce Bank.
10 A. Actually, this 187 that's on the
11 schedules is wrong. That doesn't belong there.
12 Q. Okay. Let me just look. I'm seeing 183.
13 A. This mortgage -- there's an error on the
14 schedules, which we'll fix in the amended. This
15 number here doesn't belong here.
16 Q. Okay. Just flip to that. Were you
17 looking at Schedule D? No, you're looking at
18 Schedule A.
19 A. I'm looking at A, but there is a 187 here
20 which doesn't belong here.
21 Q. Oh, I see it, okay.
22 Now, looking at Schedule D, though,
23 Commerce is down. Commerce is down for 183 but
24 that's a different property.

111

1 A. Right, that's what I'm saying. That 187
2 is in the wrong -- it doesn't belong there.
3 Q. Okay. So in Schedule D on the N5696
4 State Highway property, you actually have down
5 zero for the amount of the claim.
6 A. Zero is what should be there. This 187
7 is an error.
8 Q. Now, back in the schedules for 2009 it
9 was listed as 187. Why is, why is it -- why
10 should it be zero?
11 A. Because the amount is 183, first of all.
12 This 183,915.25, which is listed under N5606 --
13 Q. Right.
14 A. -- so this 187 should not be there.
15 Q. So the -- is it that Commerce Bank has
16 one loan for 183 and change and has a lien on
17 both the N5606 and N5696 for that same loan, is
18 that how it works?
19 A. It's the same loan and I think there is
20 another Midwest Properties property also.
21 Q. Okay. So if you put down anything other
22 than zero, you'd be counting it twice, in other
23 words?
24 A. Right. I mean already -- I mean within

112

1 the same entity you're counting it multiple
2 times. But the 187 is a wrong figure altogether.
3 Q. So Commerce Bank has a lien, but it's in
4 connection with property owned by Midwest
5 Properties, right?
6 A. Yes.
7 Q. Okay. And Midwest Properties pays that
8 mortgage payment?
9 A. Right.
10 MS. SARKESSIAN: From my perspective,
11 this might be a good time to break for lunch, but
12 if you want I can go down and try to find out
13 sort of what the situation is, what the guards
14 know. You want me to sort of --
15 (Discussion held off the record.)
16 (Recess for lunch.)
17 MS. SARKESSIAN: Okay, we are
18 continuing with SIST's 341.
19 BY MS. SARKESSIAN:
20 Q. You may recall, Ms. Isaacson, that at the
21 last 341 we did, I asked you something -- I asked
22 you if you were aware that the IRS had paid --
23 excuse me, had filed a proof of claim in the SIST
24 matter for something close to $1 million. At

113

1 that time you said you were not aware of it.
2 Have you, have you seen it since that time?
3 A. I think you may have showed it to me
4 then.
5 Q. Well, this is a, this is a copy of the
6 proof of claim, and it's $991,000. Do you have
7 an understanding of -- there is some detail of
8 sorts provided on the back.
9 A. Okay.
10 Q. Other than by way of this proof of claim,
11 have they communicated to you --
12 A. No.
13 Q. -- any claim?
14 A. No. I think the claim will go away once
15 the amended returns are all finalized.
16 Q. Now, by "the amended returns," this is
17 the amendment of the 2003 and 2004 returns?
18 A. Yes.
19 Q. Some -- I do see that the large numbers
20 are related to 2003 and 2004, and then they have
21 some additional amounts for returns that are not
22 filed but they're relatively small.
23 A. Right.
24 Q. When do you expect to be filing the

114

1  amended 2003 and 2004 returns?
2  **A. I would hope within a month or perhaps**
3  **less, but that's my hope.**
4  Q. Sorry, I'll just be a minute. I'm
5  looking for something.
6  Just taking a minute to look over the
7  documents that we asked you for. This is e-mail
8  from me of March 21st to Laraine Ryan.
9  I think we've actually gone over
10 everything that relates to SIST. We are going to
11 double check with respect to the insurance
12 certificates. We're going to take another look
13 to make sure that we have everything, because I
14 think we were a little bit confused with, you
15 know, SIST's name not being on certain of them.
16 So now we're just going to look for the property
17 location. I have down here that we thought we
18 were still missing some with respect to Midwest
19 Properties, but again, we'll take another look at
20 that for the insurance.
21 Okay, I'm now looking at, this is a
22 follow-up for Midwest Properties. You were going
23 to look and see -- you had given testimony about
24 the property at 635 South Main Street where Bay

115

1  View Bank has a lien, and that while that
2  mortgage payment or contract payment, I believe
3  it was, was 4,000, you had got it negotiated down
4  to 1,500. Do you recall that testimony?
5  **A. Yes.**
6  Q. And you were going to look and see if you
7  had anything in writing from Bay View that
8  confirmed that. Have you been able to locate
9  that?
10 **A. I haven't located it yet. I haven't had**
11 **a whole lot of time in the office either in**
12 **Wisconsin, so...**
13 Q. I mean do you recall having gotten
14 something and now you're just looking for it or
15 you're not sure if you received anything?
16 **A. I'm not sure. I had a lot of phone**
17 **conversations, and they have sent a lot of**
18 **letters, but I need to see what the contents of**
19 **all of the letters are.**
20 Q. Who in particular at Bay View were you
21 speaking to?
22 **A. I would have to go back to my notes. I**
23 **don't -- it was like three different people that**
24 **I ended up being transferred around among.**

116

1  Q. Do you remember the particular person
2  that agreed to lower the mortgage payment, who
3  that person was?
4  **A. Not without going back to my notes.**
5  Q. Okay. So we'd just ask that you go back
6  to your notes and look and see who that was and
7  let us know, okay?
8  **A. All right.**
9  Q. The tax bills that we were just looking
10 at where it was in arrears, the receivership
11 property, now that was U.S. Acquisitions & Oil's
12 property, correct?
13 **A. Correct.**
14 Q. Did you find -- we also asked for you to
15 take a look to see if you could find, you know,
16 something indicating that the taxes were
17 delinquent with respect to the receivership
18 property that's owned by Midwest Properties.
19 **A. I just -- I have to look. We have got --**
20 **we get letters like every month about it. And**
21 **then along with a notice that the properties were**
22 **going to tax forfeiture, but I wasn't able to**
23 **locate them quickly. So I just -- I need a**
24 **little more time to find them.**

117

1  Q. Okay, that's fine. If you could, you
2  know, maybe in the next week try to look for
3  this, that would be appreciated.
4  You were going to look to see if
5  there was a lease for East Green Bay. This is
6  one of the Midwest Properties' properties.
7  **A. And I didn't know what you meant by East**
8  **Green Bay. I mean we own many properties on East**
9  **Green Bay Street.**
10 Q. Okay, we'll get the exact address.
11 Then there was some amendments that
12 you were going to make to the statement of
13 financial affairs.
14 **A. On all three cases we'll be filing**
15 **amended schedules.**
16 Q. Okay. Then U.S. -- U.S. Acquisitions &
17 Oil we had asked for the original loan documents
18 or any loan forgiveness documents with respect to
19 Arandel Dental Clinic. That was a loan of over
20 500,000. Have you had a chance to look for that
21 documentation?
22 **A. I haven't located it yet.**
23 Q. And you'll continue to look?
24 **A. Yes.**

118

1    Q. And we also have updated lease agreement
2    with Midwest Amusement Park. You gave us one
3    that expired in December 2008, and you believe
4    that it had been extended.
5        A. It had been extended. It's just if I can
6    find an electronic copy, that's the only --
7        Q. Right.
8        A. -- one that I have.
9        Q. Do any of the lenders that have liens on
10   SIST's property, so I guess that's -- well, it's
11   M&I and then it's Commerce and you name them. Do
12   any of those entities have liens on the rents
13   from the property?
14       A. Not that I know of.
15       Q. Do any lenders have liens on cash
16   collateral of SIST?
17       A. I don't think so, no.
18       Q. I'm going to show you the monthly
19   operating report. This is the first one for the
20   stub period February 22 through February 28th.
21   Now, this is -- you amended this. This is -- I'm
22   sorry, this is the amended version?
23       A. Okay.
24       Q. Was the only -- was -- the original one

119

1    didn't have your signature. Was that the purpose
2    of the amendment or was something else changed?
3        A. Nothing was changed, but somebody who
4    wanted a reconciliation detail, which there is
5    nothing on, so I put that sheet in. And I think
6    one of the pages was apparently missing in what
7    was filed. I don't recall exactly what the
8    e-mail was, but it was an e-mail either from you
9    or Karen.
10       Q. Probably Karen.
11           MS. STARR: I think that was, it
12   didn't have a balance sheet.
13       A. There was a page missing or something.
14       Q. And do you -- you prepared this report
15   yourself, correct?
16       A. Yes.
17       Q. And you will be preparing the other
18   monthly operating reports going forward?
19       A. If the cases are consolidated, I probably
20   will have the accounting firm do them.
21       Q. With respect to the initial operating
22   report, you prepared that?
23       A. Yes.
24       Q. On a monthly, the cash sales that are

120

1    shown here, is this from rents?
2        A. Yes, for the partial month.
3        Q. Right. On the statement of operations,
4    again the middle of the page under "Operating
5    Expenses," there is $103 for management
6    fees/bonuses. What's that for?
7        A. It's actually under "Office Expense."
8        Q. Oh, that makes more sense, all right.
9        A. And --
10       Q. You don't have to explain what that is.
11       A. -- I don't know what it is offhand.
12       Q. That's fine. I thought it was management
13   fees and bonuses. You need a ruler when you look
14   at some of these things.
15           Then going to the balance sheet.
16   Now, the value -- at the top part under "Current
17   Assets," the value that you give to the
18   subsidiaries, is that -- what is that based on?
19       A. The real estate value.
20       Q. Well, it's not any estimate of like the
21   going-concern value?
22       A. No, no.
23       Q. The liabilities that are listed here, now
24   these are just liabilities for SIST, correct, not

121

1    its subsidiaries?
2        A. No, it's all, everything.
3        Q. Right, I'm sorry. I see the additional
4    debt of subsidiaries here.
5        A. But, you know, because SIST guaranteed
6    practically everything, there's, you know, little
7    debt out there that's not included in, you know,
8    included in the SIST figures.
9        Q. Well, the secured debt figure of 2.47, is
10   that just for SIST?
11       A. That's just SIST, but the unsecured,
12   because SIST guaranteed everything and the bulk
13   of it falls under unsecured. So then the other
14   secured debt, which is not guaranteed is the
15   4 million. Most of that is contract payments.
16       Q. That's where it's listed as additional
17   debts of subsidiaries?
18       A. Right. So if it was already included in
19   a guarantee as unsecured of SIST, I didn't
20   include the same debt again as secured of
21   affiliates. I mean I just counted it once.
22       Q. Understood. Then under "Owner's Equity,"
23   the retained earnings prepetition of 9.7 million,
24   that would be -- that would include all of the

122

1   subsidiaries, correct?
2       A. Everything.
3       Q. Everything. Now the retained earnings, I
4   need an understanding here. If we were to take
5   the bank accounts of all of the SIST subsidiaries
6   and add everything together, are we going to get
7   a number that's near $9 million?
8       A. No.
9       Q. Where, where are the retained earnings
10  located?
11      A. The retained earnings are located in its
12  assets.
13      Q. So that would include the real estate?
14      A. Right.
15          MS. SARKESSIAN: Okay, Karen Starr is
16  going to ask a few more questions about this
17  balance sheet.
18          You can use my copy if you want.
19  BY MS. STARR:
20      Q. Okay, I just want to understand this a
21  little bit more. The other assets, subsidiaries,
22  the $23 million, you valued that based on -- you
23  valued the subsidiaries based on their real
24  estate values?

123

1       A. Right.
2       Q. Okay. But when we come down to the
3   liabilities, you also included the debt of the
4   subsidiaries?
5       A. Right.
6       Q. Okay, the forma. Okay, my question, I
7   guess, is okay, if we're combining then all the
8   subsidiaries into this SIST balance sheet, okay,
9   my concern I guess is with the cash, why does the
10  cash only reflect what's on the SIST checking
11  account? Why does that not reflect the cash in
12  all the subsidiary accounts?
13      A. Well, since I had to do the Form 26, I
14  assumed I had to give the value for all of the
15  assets. And on the, that Form 26, I did give the
16  balance of all the cash accounts.
17      Q. Okay, but I mean, this is separate from
18  the Form 26.
19      A. But --
20      Q. It's a totally different type of form,
21  and it's different type of information that we're
22  asking for. The Form 26 is for the non-debtor
23  subsidiaries, and we had spoken about that
24  earlier. That should not include SIST. It

124

1   should not include Midwest Properties. It should
2   not include --
3           MS. SARKESSIAN: U.S. A & O.
4       Q. U.S. A & O.
5       A. Okay.
6       Q. Okay, that's just a form to report on
7   non-debtor subsidiaries. Okay?
8       A. Okay.
9       Q. This is a form to report on the
10  particular debtor that we're talking about in
11  this case, SIST.
12      A. Okay. So then maybe it just needs to be
13  done differently. I mean, it's hard -- I can
14  never know exactly what is wanted, so...
15      Q. Okay. I mean again, I mean it will
16  probably help if you have like separate books and
17  records for each company, so that way you can
18  keep everything separate so when you do the Form
19  26, you know what's being reported on for each
20  individual company, and again when you're doing
21  the monthly operating reports for your debtors,
22  you know what you're reporting on these debtor
23  reports.
24          And that's why when I'm looking at

125

1   this and hearing your explanation, I guess I'm
2   getting confused, because for some of the
3   accounts that are listed, you're combining what's
4   on your subsidiaries, yet for other accounts,
5   you're just putting the SIST numbers.
6       A. Well, I don't know about that. I mean,
7   this is a conglomeration of all the debt and all
8   the assets.
9           MS. SARKESSIAN: But not all the
10  cash. The cash accounts are -- what I understand
11  Karen is saying is, okay, the real estate for all
12  the subsidiaries are included in this balance
13  sheet on the MOR, but you don't have the cash --
14  for the cash it would -- it's just SIST, unless
15  we're misunderstanding.
16  BY MS. STARR:
17      Q. Right, why would you include the real
18  estate for the subsidiaries and the deck for the
19  subsidiaries but not include the cash of the
20  subsidiaries?
21      A. What cash? Where are you talking about?
22      Q. Okay, right now I'm looking at the
23  balance sheet --
24      A. Right.

126

1     Q. -- for the February monthly operating
2 report.
3     **A. Right.**
4     Q. And it was my understanding that when you
5 valued the subsidiaries, that's the value of all
6 the real estate of the subsidiaries.
7     **A. Right.**
8     Q. Okay? And then when you listed the debt,
9 that included both the debt of SIST and the debt
10 that's guaranteed by SIST but is the obligation
11 of other subsidiaries.
12     **A. Right. This, this balance sheet should**
13 **include all the debt and all the assets.**
14     Q. Okay. Why does it not include all the
15 cash?
16     **A. It does include all the cash.**
17     Q. So you're saying if I look at the bank
18 accounts for SIST plus all the subsidiaries,
19 there would only be $3,000 in bank accounts?
20     **A. No, everything for the subsidiaries**
21 **should be under subsidiaries. So equipment,**
22 **cash, and real estate should all -- should all be**
23 **included in that figure.**
24     Q. Okay. So the subsidiaries are valued not

127

1 at just the value of the real estate?
2     **A. Right.**
3     Q. Okay, you're saying, you know, any other
4 property, equipment, the cash, any other assets
5 of subsidiaries is all included in the
6 subsidiaries number?
7     **A. Right.**
8     Q. Okay.
9        MS. SARKESSIAN: So that $23 million
10 number under "Other Asset Subsidiaries," includes
11 cash as well?
12     Q. Some cash, as well as real estate and
13 equipment --
14     **A. Right.**
15     Q. Vehicles, whatever. Okay.
16        MS. SARKESSIAN: Karen, if there's --
17 you know, I want to make sure that the debtor
18 understands what their obligations are concerning
19 both this form and Rule 26. And to the degree
20 that there is something that, you know, going
21 forward needs to be clarified, I mean I'll leave
22 that to you. We don't have to do that all on the
23 record. But -- and, you know, please feel free
24 with any questions, you know, to contact Karen,

128

1 because I understand that the information that
2 we're asking for, you keep your records in a
3 different way and that it may be difficult to
4 provide it. So we just want to make sure that we
5 understand when we get the information exactly
6 what's being covered, because I had the same
7 question about the cash. So I now understand
8 that.
9 BY MS. SARKESSIAN:
10     Q. When you compare -- looking at the 2001
11 statement of financial affairs, you compare the
12 gross revenue from 2009 to 2010, 2010 is close to
13 double --
14        MR. SCOTT: Excuse me. You keep
15 saying "2001." Do you mean 2011?
16 BY MS. SARKESSIAN:
17     Q. I'm sorry. 2011 statement of financial
18 affairs is what I'm looking at. And you have
19 listed the gross revenue for 2009 and 2010. And
20 the 2009 is 5 million and change and 2010 is 10
21 million and change, which is, you know, a
22 significant increase from one year to the other.
23 What was attributable to the large increase from
24 2009 to 2010?

129

1     **A. Increased sales is part of it. And maybe**
2 **the increased price of gas, I don't know if it**
3 **went up in the last year that much or not. But**
4 **otherwise, it's increased sales. I mean to the**
5 **extent it's not attributable to the increase in**
6 **the price in gas, it's increased sales, which I**
7 **know sales have increased. I don't know if**
8 **they've doubled or not.**
9     Q. So when you say increase in sales, do you
10 mean in sales of gas or other products?
11     **A. Both. I mean everything.**
12     Q. Well, like when -- if you're talking
13 about the hotels, has there been an increase in
14 the, you know, number of rooms rented or --
15     **A. Not for hotels significantly. No.**
16     Q. Other than gas, I mean I know we have the
17 fudge shop and we have ice. What are the other
18 products that are manufactured?
19     **A. There's retail, various retail, which,**
20 **you know, they may have smaller increases. But**
21 **the biggest increase in sales is at the gas**
22 **station, increase in gross revenue is at the gas**
23 **stations. So I do know that our sales have**
24 **increased, but if, you know, they've actually**

130

1  doubled or not, I couldn't say offhand. I'd have
2  to look at gallonage.
3      Q. You had mentioned at one of the 341's
4  that one of the subsidiaries makes chain-link
5  fences, is that --
6      A. We -- yes, I mean it's not a business
7  we're actively engaged in now, but --
8      Q. Which company does that?
9      A. It was a company that had previously --
10 it was a company that we previously operated that
11 was using one of the warehouses, I think was
12 the --
13     MR. SCOTT: Excuse me.
14     A. -- the testimony.
15     MR. SCOTT: I just want to interject
16 a clarification. I think when you say "make," we
17 don't manufacture chain link, I don't think.
18     MS. SARKESSIAN: I may be wrong. Was
19 it sell the fences?
20     MR. SCOTT: Sell and install or
21 something, I think.
22 BY MS. SARKESSIAN:
23     Q. Okay. What was the name of the company
24 that did that?

131

1      A. I think, I think we had it under Midwest
2  Amusement Park or something.
3      Q. Actually, I'm doing this a little bit
4  backwards. I'm going to go and ask some of our
5  standard questions I figured might be easier to
6  do it at the end of the day than to do it in the
7  beginning.
8          Okay, so I know you are the CEO of
9  SIST. How long have you held that position?
10     A. Since 2000.
11     Q. Prior to you was there another CEO?
12     A. I don't know that there -- I don't think
13 there was a CEO prior to me.
14     Q. Was SIST in existence prior to 2000?
15     A. Yes, but it didn't need a CEO.
16     Q. When was it created?
17     A. SIST?
18     Q. Um-hum.
19     A. '92.
20     Q. Why did it not need a CEO before 2000?
21     A. It was strictly a -- prior to 2000 it
22 generated its funds by fund-raising only. I was
23 brought on board to oversee business affairs of
24 the company.

132

1      Q. Prior to 2000 did SIST have any
2  subsidiaries?
3      A. No.
4      Q. Who were the other officers of SIST,
5  other than yourself?
6      A. Who are the other board members?
7      Q. No. Are there any other officers or are
8  you the only one?
9      A. Well, there is a president, and the
10 president is Dr. Cohen. The treasurer is Darlene
11 Sense.
12     Q. Any other officers?
13     A. No.
14     Q. And these positions, the president,
15 treasurer and yourself are all non-paid, correct?
16     A. Correct.
17     Q. Does SIST -- sorry. One of those
18 addresses that we looked at you said was SIST's
19 main address. What was that address again?
20     A. P.O. Box 11768, Green Bay, Wisconsin
21 54307.
22     Q. And does SIST actually have, you know,
23 office space there?
24     A. No. We receive our mail in Green Bay, so

133

1  it doesn't end up in the garbage.
2      Q. So that's just a post office box?
3      A. Right.
4      Q. Is there a location where SIST has some
5  computer equipment and the like?
6      A. 1206.
7      Q. You'll have to give me the street name
8  again.
9      A. East Green Bay Street.
10     Q. And that's also where you have records
11 for a number of the other subsidiaries, correct?
12     A. Correct.
13     Q. That's the office and the gas station?
14     A. Correct.
15     Q. Were you appointed as CEO by the board of
16 SIST?
17     A. Yes.
18     Q. I can't recall, you are -- you are --
19 have you been on the board of SIST since 2000?
20     A. Yes.
21     Q. Have you been the chairman since --
22 chairperson since 2000?
23     A. No.
24     Q. How long have you been chairperson?

134

1    A. Probably since '05.

2    Q. I take it you report to the board

3 concerning the business of SIST?

4    A. Yes.

5    Q. There are certain individuals who

6 volunteer to do work for SIST, correct?

7    A. Correct.

8    Q. Can you -- I know these may be the same

9 as what -- I'm sorry, may be the same people that

10 do the same functions for SIST as Midwest

11 Properties, for example. But just, if we could

12 just go through who does what. I have -- I can

13 tell you the names that I have. Sharon Villiard.

14    A. Yes.

15    Q. Is she a volunteer? What does she do for

16 SIST?

17    A. She goes to the bank.

18    Q. Makes deposits?

19    A. Yes.

20    Q. Anything else?

21    A. I mean, she -- not for SIST, no.

22    Q. Okay. Does she have the authorization to

23 sign checks on behalf of SIST?

24    A. No.

135

1    Q. Who, who is the person who has that,

2 person or persons?

3    A. One person, Naarah.

4    Q. Okay. Naarah Kindseth signs checks. And

5 what else does -- if anything, does Ms. Kindseth

6 do for SIST?

7    A. She's the administrator, so she kind of

8 oversees everything.

9    Q. And Darlene, is it "Senseth" or am I

10 getting her name mixed up?

11    A. Darlene Sense?

12    Q. Sense, Darlene Sense. Does she volunteer

13 any of her time to SIST?

14    A. Yes.

15    Q. What does she do?

16    A. She assists with accounting, tenant

17 issues, procuring tenants.

18    Q. Is there anyone else that volunteers time

19 for SIST?

20    A. Well, all the board members volunteer

21 time.

22    Q. What tasks do they do? I don't mean

23 their tasks as board members, but are there

24 things that they do other than attend board

136

1 meetings?

2    A. I mean, everybody helps run the company

3 and run the subsidiaries and, with their other

4 duties as board members.

5    Q. Since the last time we took a 341, has

6 anything changed concerning your employment with

7 other entities, non-SIST entities?

8    A. No.

9    Q. You have -- well, sorry. At the current

10 time you are not a creditor of SIST; is that

11 correct?

12    A. Correct.

13    Q. Have you ever taken any loans from SIST?

14    A. No.

15    Q. We talked about two loans that you made

16 that were on the 2009 schedules, one that was

17 with yourself and one was with Ms. Ballinger.

18 Were there any -- other than those, have you lent

19 other sums to SIST at any other time?

20    A. Probably.

21    Q. Have whatever those amounts were, have

22 they all -- have you forgiven all of that?

23    A. I have.

24    Q. You know that you have personally

137

1 guaranteed certain debts of SIST, it's on the

2 schedules, correct?

3    A. Correct.

4    Q. All right. Does the -- excuse me. Does

5 SIST have any claims against you that you are

6 aware of?

7    A. No.

8    Q. And even though you don't have the title

9 of chief financial officer of SIST, do you, in

10 essence, perform those functions?

11    A. I do.

12    Q. Has SIST ever had a chief financial

13 officer, other than what you've done?

14    A. Yes.

15    Q. Okay. Who, who was that chief financial

16 officer?

17    A. Cal Gronval.

18    Q. I'm sorry, Cal, what was the last name?

19    A. Gronval.

20    Q. G-R --

21    A. -- O-N-V-A-L.

22    Q. Is that a male or a female?

23    A. It's a male.

24    Q. When was he CFO?

138

1    A. From 2000 until maybe around 2006.
2    Q. Is he a board member?
3    A. No, not anymore.
4    Q. He used to be a board member?
5    A. Yes.
6    Q. So what are the circumstances of him no
7    longer being associated with SIST?
8    A. He wanted to do certain things, which the
9    board said that's fine, you can do, but you're
10   not going to do it while you're on the board and
11   have your actions attributed to the board, so...
12   Q. Give me an idea what kind of things
13   you're talking about. Something related to
14   business or his personal life?
15   A. No. It was a personal venture that he
16   wanted to engage in.
17   Q. Was he trying to involve SIST in that
18   venture?
19   A. Well, I mean it was tangentially related
20   to certain things that had happened to SIST.
21   Q. And after he left, that was when you
22   began to assume the functions of the chief
23   financial officer?
24   A. Yes.

139

1    Q. Books and records of SIST you keep,
2    correct?
3    A. Yes.
4    Q. Are they at the 1206 Green Bay -- East
5    Green Bay Street location?
6    A. Yes.
7    Q. Do you have any of SIST records in any
8    other location such as your home?
9    A. Not in my home. I have records that I
10   carry with me when I travel.
11   Q. Other than the records you travel with --
12   you -- excuse me. Other than the records you
13   keep with you when you travel, all of the rest of
14   SIST records are at the 1206 East Green Bay
15   location?
16   A. Right.
17   Q. The directors that are in the U.S., do
18   they get any compensation?
19   A. No.
20   Q. Other than what might be listed on the
21   schedules filed by SIST, are there any other
22   loans that officers -- excuse me -- officers or
23   directors of SIST has made to SIST? Or put it
24   another way: Are there any loans that were made

140

1    by directors of SIST that are not reflected on
2    the schedules?
3    A. No, should be.
4    Q. To your knowledge, have any of the
5    directors ever borrowed any money from SIST?
6    A. No.
7    Q. Does the debtor have any claims against
8    any of the SIST directors, officers or volunteers
9    that you are aware of?
10   A. No.
11   Q. Does SIST use any independent contractors
12   or consultants, other than the accounting firm?
13   A. Not right now.
14   Q. Has it ever used any temporary employees?
15   A. Not SIST itself.
16   Q. Is SIST current on all of its
17   post-petition obligations?
18   A. Yes.
19   Q. SIST has opened a new bank account since
20   filing for bankruptcy, correct?
21   A. Correct.
22   Q. And the account is -- does indicate that
23   it is account for debtor in possession, correct?
24   A. Correct.

141

1    Q. The account that SIST was using prior to
2    the most recent bankruptcy filing has been
3    closed, correct?
4    A. Yes.
5    Q. Any sums coming into SIST since the
6    bankruptcy filing are going into the new account
7    at Commerce Bank?
8    A. Yes.
9    Q. SIST's books are maintained on a cash
10   basis?
11   A. Yes.
12   Q. Debtors' fiscal year is calendar?
13   A. Yes.
14   Q. Does SIST have any accounts receivable
15   for itself? Let's not talk about the
16   subsidiaries. Accounts receivable for itself
17   that are in excess of 90 days?
18   A. No.
19   Q. Other than the rents that come in on
20   behalf of the properties that SIST owns, all the
21   other revenue that SIST gets is from its
22   subsidiaries?
23   A. Contributions.
24   Q. And contributions.

142

1    With respect to Midwest Properties
2 when we were looking over the rent log, you were
3 talking about how, because of the seasonality,
4 where there were some periods of time when a
5 tenant might actually pay rent in advance, and
6 then there are other times when they're paying in
7 arrears. You recall that?
8    **A. Correct.**
9    Q. Does the same thing happen with respect
10 to the properties that SIST owns directly?
11    **A. Not very often.**
12    Q. We'll get a better idea once we see the
13 rent log.
14    Has SIST looked into obtaining any
15 debtor-in-possession financing?
16    **A. No.**
17    Q. Since it's filed for bankruptcy, has SIST
18 looked into refinancing any of its debt?
19    **A. No, I don't think that's necessary.**
20    Q. During the initial debtor interview our
21 analyst went over the obligations for filing
22 monthly operating reports. Did you understand
23 that?
24    **A. I think so.**

143

1    Q. Again, feel free, you know, if you have
2 questions, your counsel can certainly reach out
3 to us.
4    Quarterly fees for the U.S. Trustee
5 has been explained to you?
6    **A. Yes.**
7    Q. Darlene Sense, is she the person who does
8 bank reconciliations for SIST?
9    **A. Yes.**
10    Q. Is there, is there ever a time when SIST
11 will extend funds on a temporary basis to any of
12 its subsidiaries?
13    **A. I mean, yeah, I mean sometimes.**
14    Q. Is that recorded in some fashion?
15    **A. I mean, this is prior to the last**
16 **bankruptcy, so I mean not now.**
17    Q. Okay. So since March of 2009 that has
18 not -- SIST has not extended funds to any of its
19 subsidiaries?
20    **A. No.**
21    Q. Since March of 2000 time -- excuse me.
22 Since March of 2009, to the extent that the
23 subsidiary may be paying -- well, let me step
24 back.

144

1    I thought you said, but let's
2 confirm, that there are times in which a
3 subsidiary may pay -- when a subsidiary may pay.
4 for example, a tax bill that relates to another
5 subsidiary, right?
6    **A. Correct.**
7    Q. When that happens, how is that recorded?
8 I mean is it recorded as a loan? How -- what
9 type of -- what do you write down when that
10 happens?
11    **A. We just write down where the money comes**
12 **from and when we do the tax return, it's all**
13 **wiped off. So, because of the consolidation of**
14 **the financials, it's kind of meaningless.**
15    Q. When you say you record where the money
16 comes from, so say, for example. in an instance
17 where there's taxes owed for Midwest Properties
18 and Midwest Oil of Wisconsin is going to pay
19 them, so would you record something in the books
20 of Midwest Property that these taxes were paid by
21 Midwest Oil of Wisconsin?
22    **A. No.**
23    Q. Would you record anything in the books of
24 Midwest Oil of Wisconsin?

145

1    **A. No. I thought you were talking about**
2 **different -- real estate taxes are the parent**
3 **company's obligation.**
4    Q. Right.
5    **A. So wherever the parent company gets the**
6 **money from, it gets the money from. And**
7 **whoever's taxes are paid with whoever's money are**
8 **paid.**
9    Q. But you don't --
10    **A. We don't keep track of, you know,**
11 **assigning Midwest Oil of Wisconsin paid Midwest**
12 **Properties' taxes, no. SIST gets the money from**
13 **whatever affiliates and the taxes are paid.**
14    Q. And SIST determines which affiliate will
15 pay it based on whoever has the most available
16 income at that time?
17    **A. Right.**
18    Q. So how about things other than real
19 estate taxes, say you have -- is there ever a
20 situation where, say, one subsidiary would pay a
21 mortgage payment on behalf of another subsidiary?
22    **A. No. They're pretty much all**
23 **self-supporting. I mean it would be very rare.**
24 **They're pretty much self-supporting entities that**

146

1  don't need to rely on any other entity to pay
2  their bills.
3      Q. Well, other than the real estate taxes,
4  is there any type of expense or cost where either
5  SIST would be paying something on behalf of a
6  subsidiary or one of the subsidiaries would pay
7  on behalf of another subsidiary?
8      A. Not really. I mean the only other
9  expense is legal and accounting fees, but then
10 one subsidiary's not paying on behalf of another
11 subsidiary, because it's a corporate obligation.
12 One return and -- so, no.
13     Q. Well, who -- so when a check is written
14 to pay for legal or accounting fees or there is a
15 wire transfer, is that typically made by SIST
16 itself or by one of the subsidiaries?
17     A. Typically the money is from the
18 subsidiary.
19     Q. Is it the same subsidiary all the time
20 or --
21     A. No.
22     Q. -- it could be different ones?
23     A. Different.
24     Q. And again, that would be based on

147

1  whatever subsidiary at the time has more
2  available income would be the one paying towards
3  the legal or accounting fees, that would benefit,
4  you know, SIST and all of the subsidiaries?
5      A. Correct.
6      Q. Is there ever an instance in which there
7  are some legal fees or accounting fees that
8  relate to one particular entity and not the
9  others? Maybe a particular lawsuit, say, against
10 one of the subsidiaries that didn't involve SIST,
11 per se?
12     A. Occasionally. I mean we handle most of
13 our stuff in-house nowadays, so...
14     Q. I mean, in other words, you use in-house
15 lawyers to handle it --
16     A. Correct.
17     Q. -- as opposed to other law firms. In the
18 instances where you do have a situation where
19 there were legal fees from an outside law firm
20 and they're really attributable just to one
21 particular subsidiary, would that subsidiary pay
22 those fees itself or would sometimes another
23 affiliate pay?
24     A. Another affiliate may pay.

148

1      Q. Okay. But, so it sounds like the real
2  estate taxes, legal and accounting fees, those
3  are the, the things that we've talked about where
4  you may have a situation where one affiliate
5  would pay on behalf of another affiliate. Is
6  there any other types of charges you can think of
7  where that would occur?
8      A. Well, I mean the real estate taxes,
9  another affiliate would not be paying on behalf
10 of another affiliate.
11     Q. Okay. Well, you said --
12     A. That was, that was a situation where the
13 corporate tax return and real estate taxes are
14 the responsibility of the parent company. So
15 wherever the money comes from, it comes from.
16 But at -- no particular part of that can really
17 be attributed to any entity.
18     Q. All right.
19     A. But if, if there is a lawsuit filed
20 against Midwest Oil of Wisconsin, for example,
21 and we had to hire an attorney, then potentially
22 Midwest Oil of Shawano could be paying the bill.
23     Q. But similarly, just so I understand with
24 real estate taxes, you have a real estate tax

149

1  bill that's a bill of Midwest Properties of
2  Shawano. SIST, under the tax sharing agreement,
3  has the obligation to pay that, correct?
4      A. Correct.
5      Q. But SIST may say Midwest Oil of
6  Wisconsin -- it may take funds from Midwest Oil
7  of Wisconsin to pay the tax bill for Midwest
8  Properties of Shawano, correct?
9      A. Not necessarily, no. I mean they're done
10 in the conglomerate. SIST ensures that $100,000
11 of taxes are paid. And wherever the money comes
12 from, the money comes from. If the money comes
13 from contributions, it comes from contributions.
14 If it comes from affiliates, it comes from
15 affiliates.
16         It is SIST's problem to come up with
17 the money to cover those expenses. But we don't
18 say okay, so this tax bill from Midwest Oil of
19 Wisconsin, well, you know, Midwest Oil of Shawano
20 gave -- contributed $50,000 towards the real
21 estate, the cumulative real estate taxes so we're
22 going to say that it paid Midwest Oil of
23 Wisconsin's real estate taxes. I mean we
24 don't -- that is not what happens.

150

1  Q. But when you say that SIST is responsible
2  for paying the real estate taxes of its
3  subsidiaries, that does not mean that the money
4  is actually coming out of the bank account at
5  Commerce Bank in the name of SIST, correct?
6  **A. No, because SIST owns all the bank**
7  **accounts.**
8  Q. So it could take -- when you say "all the
9  bank accounts," you mean all the bank accounts of
10  the subsidiaries?
11  **A. Right.**
12  Q. So money could be taken by SIST out of
13  the bank account of any of the subsidiaries in
14  order to pay the real estate taxes of any other
15  subsidiary?
16  **A. Right. Or, you know, SIST does receive**
17  **contributions every year. So it is a non-profit**
18  **and technically shouldn't even be paying real**
19  **estate taxes but it does on some of these**
20  **properties. But, you know, some of the funds,**
21  **you know, are always, to some degree,**
22  **contributions.**
23  Q. When the contributions come into SIST,
24  are those deposited into SIST's Commerce Bank

151

1  account?
2  **A. It depends. I mean if we were in**
3  **bankruptcy, they'd have to be. But normally, not**
4  **necessarily, no.**
5  Q. Where would -- when SIST has not been in
6  bankruptcy, where are the funds deposited?
7  **A. Well, if, if the funds were contributed**
8  **during a time that we were covering real estate**
9  **taxes, for example, then they probably would be**
10  **deposited where the checks were written from.**
11  Q. Okay. So somebody contributes $50,000 to
12  SIST. So if at that time Midwest Properties of
13  Shawano owes $50,000 in real estate taxes, or
14  something less than that, you might take a
15  contribution check and deposit it in the account
16  of Midwest Properties?
17  **A. No.**
18  Q. Okay, so explain to me how then that
19  works.
20  **A. Because the City of Shawano will not take**
21  **a check from Midwest Properties, so it's useless**
22  **to deposit it in Midwest Properties. It would be**
23  **deposited wherever the money was written from.**
24  Q. So, for example, if Ms. Nett is writing a

152

1  check off of her account for the real estate
2  taxes, a check that comes in to SIST could be
3  deposited in Ms. Nett's bank account?
4  **A. It could be, but I mean the**
5  **contributions -- no single contribution is going**
6  **to be $50,000. I mean these are smaller, smaller**
7  **amounts of money.**
8  Q. When the contributions come in, are they
9  by check, written to SIST?
10  **A. They may be cash, they may be cashier's**
11  **check, they may be check. I mean it varies.**
12  Q. Well, if it's a cashier's check, though,
13  would it be written to SIST or one of the
14  subsidiaries?
15  **A. It would have to be SIST.**
16  Q. So if you have a check that's written to
17  SIST, what -- I'm trying to understand how you
18  could take a check written -- does SIST then sign
19  the back and say pay to Ms. Nett?
20  **A. If, if that was necessary. But again,**
21  **you know, the contributions that I'm talking**
22  **about come in all throughout the course of the**
23  **year. It's not like at one lump sum somebody**
24  **gives $50,000. So it is smaller dollar amounts**

153

1  **that may be cash, more likely than not.**
2  Q. Okay. But you're saying that frequently
3  that would not -- they would not necessarily be
4  deposited in SIST's account at Commerce Bank. Is
5  that correct? They could be but they might
6  not -- they may be deposited in other places?
7  **A. Well, you know, if we were sending a wire**
8  **to India, for example, they may be deposited in**
9  **the account where we're sending the wire from.**
10  Q. But you said that the only entity that
11  sends a wire to India is SIST.
12  **A. That's right.**
13  Q. Its subsidiaries don't --
14  **A. But a lot of times the board members have**
15  **to send the wires personally.**
16  Q. So --
17  **A. I mean we were under a stay and we were**
18  **not allowed to send funds from the SIST account**
19  **for a year and a half, and you have a university**
20  **full of students, you have people that have to be**
21  **paid, you have expenses that occur every day. So**
22  **thus, the funds have to come from board members.**
23  Q. So if somebody makes a contribution to
24  SIST under that -- in that scenario, the check

39 (Pages 150 to 153)

154

1  might be deposited in the bank account of a
2  particular individual board member who would then
3  wire transfer the money to India?
4      A. Right.
5      Q. Given that SIST is a not-for-profit, how
6  does it keep track of moneys that are being
7  contributed to SIST but are never actually put
8  into the SIST account because of the scenario
9  that we just went through, for example?
10     A. Again, we're talking hypotheticals, and
11 it's not like it occurs on a frequent basis. It
12 occurs during circumstances when, for example,
13 SIST is not allowed to send money. Then, you
14 know, the board members have no choice but to
15 contribute personally to keep the school going.
16     Q. But we're trying -- I mean now that SIST
17 is in bankruptcy --
18     A. Right.
19     Q. -- I've got an understanding of when
20 funds come into SIST, where they are going. And
21 from what you're saying, there are times when
22 they're deposited in SIST's bank account at
23 Commerce Bank, there's times when it never goes
24 into that account, it might go to an individual

155

1  board member, perhaps it goes into accounts for
2  subsidiaries. Is that right? I mean, I don't
3  want to talk in hypotheticals.
4      A. We are talking hypotheticals. I mean I'm
5  being given all of these, you know, strange
6  scenarios which, like, never happen.
7      Q. I don't want to do strange scenarios.
8  Let's just wipe the slate clean. I want to
9  understand.
10     A. If now, if money comes in it goes in the
11 SIST account, period.
12     Q. So prior to the bankruptcy filing, let's
13 say between June of last year when the stay was
14 lifted and when SIST filed the new case, were
15 there times when SIST received a contribution
16 that it was not placed into the SIST bank
17 account?
18     A. Well, it depends on whether you call it
19 an SIST contribution or not. I mean if a board
20 member of their own money is sending money to
21 keep the school going in India, and we never see
22 the money, no, it doesn't go into SIST's account.
23 They may wire money directly. That's what I'm
24 saying.

156

1      Q. Has there been times when SIST has
2  received a check, a contribution check written
3  out to SIST where it did not go into SIST's
4  account?
5      A. No, not that I can think of.
6          MS. STARR: Can I interject here,
7  please?
8          MS. SARKESSIAN: Yes, please.
9  BY MS. STARR:
10     Q. Okay, if a board member is wiring money
11 directly to India --
12     A. Right.
13     Q. -- for the benefit of the school --
14     A. Right.
15     Q. -- the SIST school --
16     A. Right.
17     Q. -- okay, is that still not a contribution
18 to SIST?
19     A. It depends on how they decide to classify
20 it. In most circumstances, no, it's not counted
21 as a contribution because they don't take it as a
22 deduction.
23     Q. Okay. What would it be classified then
24 if it's not a contribution?

157

1      A. I have no idea. I mean if a board member
2  of their own is deciding to support a school
3  overseas and they don't take it as a tax
4  deduction and we don't give a receipt for a
5  charitable contribution, we don't actually even
6  get the money, then I don't know how it
7  becomes -- you know, it is what it is.
8      Q. But as CEO of SIST, how do you classify
9  it on SIST books?
10     A. We just report it to the accounting firm,
11 and whatever they do with it from there they do
12 with it. Because they have to know what money
13 came into India, where the money came from, and
14 5,000 and 1 other questions, which we have to
15 answer, and we do answer. And whatever they do
16 with the numbers from there, they do with them.
17     Q. But as CEO and acting CFO, isn't that
18 your responsibility, to know what money is coming
19 into India and how it's being classified?
20     A. We know what -- when it's time to do
21 taxes, we have to get the records from India and
22 show what came in and what was paid out, and
23 that's what we give them. And then, you know, of
24 course we have to report to them, did SIST send

158

1 the money or where did the money come from.
2 I mean, sending money overseas to
3 India at this day and age is a big hassle and a
4 lot of red tape and a lot of government
5 regulation. So of course it's reported, and
6 reported in 100 and 1 places. And whether or not
7 that actually translates onto SIST's return as a
8 charitable contribution or not, I have no idea.
9 I would have to ask the accounting firm how they
10 classify that.
11 MS. SARKESSIAN: Can I interject?
12 BY MS. SARKESSIAN:
13 Q. As we've established that the account in
14 India that money is being wired to is actually an
15 account belonging to SIST, and if you have a
16 board member that's wire transferring money into
17 that account in India, why would that not be a
18 contribution to SIST?
19 A. I don't know. I mean I would assume it's
20 SIST's account, but again, I would have to find
21 out.
22 Q. It's listed on the 2009 tax return as an
23 account of SIST.
24 MS. NETT: That was just something

159

1 that was talked about today.
2 MS. SARKESSIAN: You think it was
3 mistaken?
4 MS. NETT: No, that you were just
5 questioning about that today. That is an SIST
6 account, that's not something that was --
7 MS. SARKESSIAN: I'm sorry, that's
8 not something that -- it's in the tax return.
9 MS. STARR: But didn't you sign the
10 tax return, and then I am assuming you reviewed
11 the tax return before you signed it?
12 THE WITNESS: I did. I guess I'm
13 not -- the tax return reports that SIST has the
14 potential of having an account overseas.
15 MS. STARR: Not has the potential, it
16 does have the account overseas.
17 THE WITNESS: Okay.
18 MS. STARR: Okay, now reporting
19 requirements that we discussed earlier regarding
20 foreign accounts --
21 THE WITNESS: I know there is some
22 form and some other red tape that has to be
23 filed, which the accounting firm, I'm sure, took
24 care of. But I'm not sure -- I'm not -- I guess

160

1 I'm not sure what -- where this line of
2 questioning is going or what the question -- I
3 mean what you're really asking me.
4 Have I seen a bank statement from the
5 account? No.
6 BY MS. SARKESSIAN:
7 Q. You, as CEO of SIST, you do not know for
8 sure whether SIST has a bank account in India?
9 A. I don't know exactly what the name on the
10 account is, which is what you keep asking me. I
11 have never seen a bank account. A bank
12 statement, I don't even know if they have such a
13 thing.
14 Q. Regardless of whether there's bank
15 statements, there is a bank account in India.
16 A. Well, obviously we're wiring to a bank
17 account, yes.
18 Q. You don't know if that bank account that
19 you're wiring money into belongs to SIST or not?
20 A. Well, SIST uses it, but if SIST --
21 whether or not SIST's name is on it, I don't
22 know. Or whether it's the trust or, I mean --
23 Q. Trust of what? What trust?
24 A. There is a trust.

161

1 Q. What's the trust's name?
2 A. Samanta Roy Trust.
3 Q. What's the relationship between the
4 Samanta Roy Trust and SIST?
5 A. It's part of SIST, as far as I know. I
6 mean we're getting like way out of my realm of
7 knowledge, and I really don't -- you know, this
8 is -- I handle domestic business affairs, and the
9 assets that are concerned here are domestic
10 assets. I mean all this other stuff is really --
11 you know, I'm answering to the best I can, but
12 this is not, this is not what I'm involved with
13 or know extensively about.
14 Q. Has SIST gone by any other name in the
15 past?
16 A. No.
17 Q. Other than the bankruptcy filing in March
18 of 2009, has SIST -- and the current bankruptcy
19 filing, has SIST ever filed --
20 A. No.
21 MS. NETT: And none of the stuff
22 about India ever was addressed in that -- in that
23 case.
24 MS. SARKESSIAN: Just for the record,

162

1   that's Rebekah Nett speaking.
2           MS. NETT: I don't know why -- some
3   so this is kind of all new.
4           MS. SARKESSIAN: SIST has filed for
5   bankruptcy. The whole purpose of SIST, my
6   understanding, is to run a school in India.
7           MS. NETT: I understand, I'm just
8   mentioning that my understanding is in the last
9   piece of the 341 that none of the India business
10  was raised. So...
11          THE WITNESS: It is a whole -- it is
12  a totally new subject, and because SIST doesn't
13  have assets in India --
14          MS. SARKESSIAN: Other than its bank
15  account.
16          THE WITNESS: Okay. But -- okay. I
17  mean, I mean none of -- this Form 26, all of this
18  stuff was nothing that was ever recorded last
19  time around. So I mean this is just like Greek.
20          MS. NETT: It's a relatively new
21  form, and I'm not sure when it came in.
22          THE WITNESS: I mean I've never even
23  heard of it before. You know, I was told about
24  it, you know, in February or whatever.

163

1   BY MS. SARKESSIAN:
2       Q. Since the bankruptcy filing, has the
3   debtor made any payments on prepetition debt?
4       A. No.
5       Q. Has the debtor sold or transferred any
6   assets post-petition other than in the ordinary
7   course of business?
8       A. No.
9       Q. You've received the U.S. Trustee
10  guidelines?
11      A. Yes.
12      Q. The operating guidelines?
13      A. Yes.
14      Q. Are you -- do you understand them?
15      A. I think so. I mean, I'm doing my best
16  with this Form 26 business, but...
17      Q. Are you -- is SIST planning to retain any
18  professionals other than Ms. Ryan?
19      A. Well, I mean, if things are going to be
20  this complicated, we will have to.
21      Q. Sorry, was that the end of your --
22      A. We'll probably have to retain an
23  accounting firm or something, because...
24      Q. Are you considering retaining any

164

1   additional counsel in addition to Ms. Ryan?
2       A. Not unless it becomes necessary. I mean
3   we had a terrible time, which -- terrible time
4   finding anybody to take the case, so I mean the
5   chances of finding somebody to assist her are not
6   very great with the close-minded Bar in Delaware.
7           MS. SARKESSIAN: Ms. Starr has a few
8   additional questions.
9           THE WITNESS: All right.
10  BY MS. STARR:
11      Q. In looking at the tax return, I notice
12  there are salaries and wages listed on the tax
13  return. Now, based on previous testimony, can I
14  assume that they are not salaries and wages paid
15  to any U.S. employees?
16      A. That's right, it's all India staff.
17      Q. Okay.
18      A. And of course you have to keep in mind
19  the exchange rate.
20      Q. Right. Now, the other question I had
21  was, and I believe some of that compensation is
22  paid to board members in India?
23      A. Right.
24      Q. Okay. Now, why is that compensation not

165

1   listed on the tax return in relation to those
2   board members in India? If you look at the -- on
3   the tax return, and it lists all your board
4   members, both in the U.S. and in India, the
5   amount of compensation is zero.
6       A. Because the compensation is paid to them
7   in the capacity that they're employed. You know,
8   whether they're a lecturer or a professor or
9   they're the principal or they're whatever. They
10  don't get a check per se saying, you know, this
11  is for your services as a board member.
12      Q. Okay. It's just my understanding that
13  that schedule, even though it lists all the board
14  members, that schedule does not necessarily
15  relate to just compensation paid as board
16  members. It does relate to compensation paid as,
17  for their services as a teacher or a lecturer or
18  whatever the case may be.
19      A. Well, I wouldn't know, you know.
20      Q. Okay. If I remember correctly from your
21  previous testimony, Professor Doss {ph.} is the
22  head board member in India?
23      A. Well, he oversees the entire school. He
24  is the ex-vice chancellor.

166

1   Q. Okay. Is he any relationship to
2   Dr. Cohen --
3   A. No.
4   Q. -- that you know of? Okay. You
5   mentioned the Samanta Roy Trust earlier as being
6   part of SIST. Do you know what the purpose of
7   that trust is?
8   A. I believe -- you know, we're dealing with
9   a company that is a non-profit here, and over
10  there, I think they call it a trust, rather than
11  a non-profit.
12  Q. Okay. So that --
13  A. It's the same thing, but it's the
14  India -- I don't think they have such a thing as
15  a non-profit in India.
16  Q. So it's not a trust that's set up in the
17  U.S. as we commonly think of a trust, that's more
18  of a charitable organization in India?
19  A. Right. Because we do not receive any
20  government funding or anything in India for
21  running the school.
22  Q. Okay. Okay. now, again we talked about
23  SIST having a board of directors. Does that
24  board have any subcommittees as far as maybe like

167

1   a finance committee or a project development
2   committee or anything along those lines?
3   A. Not officially. I mean there are certain
4   board members that have certain specialties, and
5   they will look into certain issues. But we don't
6   officially have subcommittees.
7   Q. Okay. now you mentioned -- you have
8   engaged an accounting firm to file amended tax
9   returns for 2003 --
10  A. Yes.
11  Q. -- and 2004. Are they also engaged to
12  file the tax returns between 2004 and 2008?
13  A. Right. What the IRS wanted us to do was
14  to go back to the beginning of '03 and do it a
15  little differently, which -- and then go forward
16  from there, because on a non-profit it's a
17  balance sheet which rolls forward.
18  Q. Okay.
19  A. So you have to start from the beginning
20  and then --
21  Q. Right, okay.
22  A. -- you know, build on it.
23  Q. Now, they're currently not doing any
24  other work for you, as far as accounting wise or

168

1   tax wise, other than the tax returns?
2   A. Right. I mean they handle, they handle
3   the tax returns.
4   Q. Okay. Do you have an engagement letter
5   with them, a signed engagement letter?
6   A. Not with the accounting firm, no.
7   Q. Okay. I mean, SIST does not have an
8   engagement letter with the accounting firm?
9   A. No.
10  Q. Do any of the other entities?
11  A. No.
12  Q. So the accounting firm has just agreed to
13  do this work without a signed engagement letter?
14  A. We didn't retain them, the law firm did.
15  Q. Okay. And what law firm was that?
16  A. Nixon.
17  MS. SARKESSIAN: Nixon Peabody?
18  THE WITNESS: Yes.
19  BY MS. STARR:
20  Q. Okay. So when you pay the accounting
21  firm fees, do they go through Nixon Peabody?
22  A. Yes.
23  Q. Okay, so you don't pay the accounting
24  firm directly?

169

1   A. No.
2   Q. Are you still using Nixon Peabody?
3   A. Yes.
4   MS. STARR: Okay. I don't think I
5   have any more questions.
6   BY MS. SARKESSIAN:
7   Q. I'm going to ask a few clarifying
8   questions from what Karen asked.
9   Now, you mentioned the Samanta Roy
10  Trust in India. And then you said something in
11  response to Ms. Starr's question that made me
12  think you were saying that the Samanta Roy Trust
13  is actually the same entity as SIST, it's just
14  called a trust over in India?
15  A. That's what I understand, yes. You know,
16  no separate assets or no separate anything.
17  Q. There's not a separate Samanta Roy Trust
18  that is somehow different than SIST?
19  A. No.
20  Q. I have a feeling I asked you this way
21  back last fall. What's the name of the attorney
22  at Nixon Peabody that you deal with?
23  A. Ken Silverberg.
24  Q. Ken Silver -- what was the end of the --

43 (Pages 166 to 169)

170

1  was it Ken Silver, or was there something --
2  A. Ken Silver, -man or -berg.
3      MS. SARKESSIAN: All right. We're
4  going to conclude now, but we're going to leave
5  this open in that we have a number of other
6  documents we're getting to get, such as the rent
7  log. And also, we did get a large number of
8  documents rather in the last few days. So we did
9  our best to review everything and, but to the
10  extent that we take a closer look we may have a
11  few other questions.
12      We would try, for everyone's
13  convenience, to the extent that we have any
14  further questions, to schedule that on a date
15  that there is another hearing so you won't be
16  making an extra trip out. Are you all planning
17  to come out next Thursday?
18      THE WITNESS: Probably. I mean
19  assuming the hearing is still necessary.
20      MS. SARKESSIAN: Well, I'll talk some
21  more with your lawyer about that then.
22      Okay, well, I think we're concluded
23  for today.
24          - - - - -

171

1          INDEX
2  WITNESS:                    PAGE
3  By Ms. Sarkessian........................  3
   By Ms. Starr............................. 122
4  By Ms. Sarkessian........................ 128
   By Ms. Starr............................. 156
5  By Ms. Sarkessian........................ 158
   By Ms. Starr............................. 164
6  By Ms. Sarkessian........................ 169
7          - - - - -
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

172

1          CERTIFICATE
2
   STATE OF DELAWARE)
3                  )
   NEW CASTLE COUNTY)
4
5      I, Julie H. Parrack, Registered
6  Professional Reporter and Notary Public, do
7  hereby certify that the foregoing record, pages 1
8  to 172 inclusive, is a true and accurate
9  transcript, to the best of my ability, of an
10  electronic recording in the above-captioned
11  matter.
12      IN WITNESS WHEREOF, I have hereunto
13  set my hand and seal this 1st day of May, 2011.
14
15
16
17
18  Julie H. Parrack, RMR-CRR
19
20
21
22
23
24

Wilcox _ Fetzer, Ltd. Registered Professional Reporters          302-655-0477