EXHIBIT B



# United States Bankruptcy Court

In The Matter Of:

# Midwest Properties of Shawano, LLC, 341(a) Meeting
Case No. 10-12481 (KG)

September 28, 2010

Wilcox and Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497

Page 25

1  Q. At any point in the past.
2  A. I'm sure there has been, yes.
3  Q. And what happens in that instance?
4  What's done?
5  A. Well, either we just would have to wait
6  on paying the bill, or we'd borrow the money from
7  a different company.
8  Q. One of the affiliates?
9  A. Right.
10  Q. Does the debtor sometimes also lend money
11  to its affiliates?
12  A. Occasionally it has in the past.
13  Q. And is there -- how are the records kept
14  with respect to transfers going to and from the
15  various affiliates?
16  A. It would have been tracked in QuickBooks.
17  But we really haven't done that for at least, you
18  know, a year and a half or so. Kind of since the
19  first filing, so...
20  Q. So since the first filing then, has there
21  ever been a -- first filing was approximately
22  March of '09, correct?
23  A. Correct.
24  Q. Since then has this debtor had a

Page 26

1  situation where it was not able to pay its bills
2  based on what money it had in the account?
3  A. Not that I know of.
4  Q. Now, are all the books and records for
5  the debtor kept at the 1206 Green Bay Street
6  location?
7  A. For this debtor, yes.
8  Q. And who is -- what is Westview Law
9  Center?
10  A. It's a law firm.
11  Q. Oh. What relationship does it have with
12  the debtor?
13  A. It's -- the principal is one of the board
14  members.
15  Q. What's that person's name?
16  A. Rebekah Nett.
17  Q. And was there an occasion where the
18  Westview Law Center was paying tax bills for this
19  debtor?
20  A. She didn't pay the bills, but she wrote
21  the checks.
22  Q. Where did the money come from to pay the
23  bills?
24  A. This debtor.

Page 27

1  Q. How did this debtor transfer the money
2  to -- did it go to Westview Law or did it go to
3  Ms. Nett individually?
4  A. I think it went to her trust account, and
5  then she wrote the checks because the city won't
6  take our checks.
7  Q. So the debtor -- did it issue a check to
8  Ms. Nett's trust account?
9  A. I don't recall if we did a wire or a
10  check right now.
11  Q. And then Westview Law Center paid the
12  taxes?
13  A. Right.
14  Q. Using that money?
15  A. Correct.
16  Q. The -- is this both the city -- let's
17  see. State of Wisconsin, Shawano County, okay.
18  A. These are city, copies located within the
19  city limits which are paid in three installments.
20  Q. And then --
21  A. And then the ones in the township are
22  these other one -- these are terrible copies.
23  Q. Sorry about that.
24  A. These are township properties, which are

Page 28

1  paid in two installments.
2  Q. Okay.
3  A. So this is the receipt for the second
4  installment paid at the end of July, and shows a
5  zero balance on the account. We paid another
6  installment in January.
7  Q. So Westview's paying both, both the --
8  I'm sorry the city and the county?
9  A. City and the county, correct.
10  Q. So you're saying that if you have a check
11  for taxes that's issued on the account of this
12  debtor, the city will not accept the check?
13  A. The city required that we bring in
14  previously $250,000 in cash, and we didn't want
15  to jump through the hoops of hauling cash to the
16  courthouse again, so we did it this way. And if
17  we give a cashier's check, then they put a hold
18  on it for so many days. So it's not --
19  Q. Who puts a hold on it?
20  A. The city.
21  Q. Why is that a problem?
22  A. It's a problem because we have business
23  licenses that have to be issued, and if you pay
24  the taxes and they put a hold on the cashier's

Page 73

1    Q. In Hotels? I'm sorry, I don't understand
2  what you mean.
3    A. Midwest Hotels would be the other entity.
4    Q. Oh, okay. When you do get a check,
5  though --
6    A. It's deposited.
7    Q. Right. No, but my question is, is it, is
8  it from -- when you get a check, is it always
9  from the same entity or is it one month you could
10 get a check from SIST, and another month you
11 could get it from Midwest Oil?
12   A. Correct. Generally all four of them pay
13 every month, but if one of them is having a down
14 month, then maybe Midwest Hotels would pick up
15 two months, and SIST would skip a month and pay
16 two months later. But there is a set amount that
17 has to come in between the entities, so --
18   Q. And it doesn't matter to the debtors
19 really which -- how they're breaking it up
20 between the different entities?
21   A. Correct.
22   Q. Now, that property, also there is, I see
23 there is a monthly mortgage obligation. I
24 understand that you may -- well, do you know if

Page 74

1  that figure is correct, 3,948?
2    A. That looks right. It's 3900 something.
3    Q. Okay. All right, so that's that. Do you
4  know -- we have a column for the annual property
5  tax obligation. Do you know off the top of your
6  head what those numbers are?
7    A. No. 18,000.
8    Q. For that property, 500 South Airport
9  Road?
10   A. Right.
11   Q. That's 18,000 a year?
12   A. Right.
13   Q. You're not -- the debtor's not currently
14 paying the tax for the property that's in
15 receivership, correct, the 463 North Humphrey,
16 1024 East Fifth Street?
17   A. We aren't. Nobody is paying it.
18   Q. Do you know what that tax obligation is?
19   A. It's about 32,000.
20   Q. 32,000?
21   A. You mean delinquent or what it is per
22 year?
23   Q. What it is per year.
24   A. Oh, per year, I think it's about 15.

Page 75

1    Q. And you think it's delinquent by 32?
2    A. Two years are owed. We get letters like
3  every month from the city and the county about
4  it.
5       MS. SARKESSIAN: Do you want to take
6  like a five-minute comfort break to use the
7  lady's room?
8       THE WITNESS: Sure.
9       (A recess was taken.)
10 BY MS. SARKESSIAN:
11   Q. Okay, so we're back from our short break.
12      I want to -- we were talking about
13 the 500 South Airport Road property. The lease
14 on that was not a written lease. Is there any
15 agreement as to how long that property is going
16 to be leased or is it like a month-to-month?
17   A. Yeah, it would be permanent, probably.
18   Q. Permanent, okay.
19   A. We have nowhere to go with the things
20 that are there, so...
21   Q. But that lease is not scheduled on the
22 debtor's schedules, correct? Do you want me
23 to --
24   A. I don't think so, probably because there

Page 76

1  is no written lease. No, it's not.
2    Q. Are the payments that you receive on that
3  property, does that go in the same rent log that
4  you use for the rest of the properties?
5    A. It does.
6    Q. Does that rent log indicate whether the
7  funds are coming in by check, by cash; if it's a
8  check, by who issued the check?
9    A. Yes.
10   Q. I don't know if I asked you this or not,
11 and if I did I apologize. The job that you have
12 at the dental office, that is a paid position,
13 correct?
14   A. It is.
15   Q. And that's a full-time position, correct?
16   A. Right.
17   Q. So it's like 40 hours a week?
18   A. Right.
19   Q. Okay. We would also like to request --
20 now I'm going to the tax payments that were
21 reflected on the documents that you produced to
22 us today. We would request the bank statements
23 that show payment going from the debtor either to
24 Westview Law Center to pay the taxes, or if the

19 (Pages 73 to 76)

Wilcox and Fetzer, Ltd.   Registered Professional Reporters   302-655-0477

Page 77

1    moneys went to Ms. Rebekah Nett's trust account,
2    whatever, what you indicated that --
3        A. What are you asking for?
4        Q. The bank, bank statements of the debtor.
5        A. Our bank statement or her bank statement?
6        Q. Yes. Well, no. I'm asking -- you had
7    indicated, and tell me if I'm wrong --
8        A. Right.
9        Q. -- that prior to Westview Law Center
10   making the payment, that the debtor would have
11   issued a check, either to Westview or to
12   Ms. Nett's trust account so that she would have
13   the moneys to pay the taxes, correct?
14       A. Right, right.
15       Q. So what we are asking for is the debtor's
16   bank statements for these periods that would show
17   the moneys going from the debtor either to
18   Westview, or whether it was a wire transfer,
19   check, whatever it is, going from the debtor to
20   Westview or Ms. Nett, whoever received the
21   moneys.
22           And it looks to me like the payments
23   start in January of 2010 and go through July, is
24   what it looks like. And I'd like to go back to

Page 78

1    this one we marked as Exhibit 2.
2        A. This one?
3        Q. Yeah, I want to just keep kind of going
4    down one property at a time. So the next
5    property is the 311 East Green Bay Street. Is
6    that property rented?
7        A. Not currently. Had a number of
8    prospects, but...
9        Q. What type of -- is it an apartment
10   complex?
11       A. It's an office building.
12       Q. Office building. And is there any
13   mortgage on that?
14       A. It's just a blanket lien, but no, there
15   is not a mortgage.
16       Q. Blanket lien of M&I?
17       A. Right.
18       Q. Did the debtor purchase that property
19   outright?
20       A. Yes.
21       Q. Where did it get the -- how much --
22   approximately what was the cost of that property?
23       A. 86,000.
24       Q. And did the debtor pay for that property

Page 79

1    itself or did it borrow funds --
2        A. Mortgage from M&I.
3        Q. Mortgage from M&I, okay.
4        A. Several years ago.
5        Q. What's the mortgage payment to M&I a
6    month?
7        A. There isn't. Remember, it's the blanket
8    lien, which has -- in SIS T's name, which has
9    matured, so there is no --
10       Q. It's matured and you're attempting to
11   refinance that?
12       A. Well, they won't do anything till the
13   appeal. M&I won't do anything until the appeal
14   to the Third Circuit issue is resolved.
15       Q. The bankruptcy appeal?
16       A. Right.
17       Q. Okay. So currently, the loan to M&I is
18   full -- it's completely due?
19       A. Right.
20       Q. Okay.
21       A. But they won't rewrite the loan and give
22   a monthly mortgage payment until the Third
23   Circuit issue is resolved. So...
24       Q. Has M&I tried to foreclose during the

Page 80

1    period that the debtor was not in bankruptcy?
2        A. No. They are -- they're secured like 4
3    to 1 or 5 to 1, so they, they know we're not
4    going anywhere.
5        Q. You estimated on 311 East Green Bay
6    Street that if you had it rented, it would bring
7    in about $1,000 a month?
8        A. Yes.
9        Q. Okay. Now, the next property, 2001 North
10   Main Street, is that also unoccupied?
11       A. It is.
12       Q. How long has that been unoccupied?
13       A. I have no idea. We bought it vacant.
14   It's still vacant.
15       Q. Okay. When did you buy it?
16       A. Probably '04. I don't recall exactly.
17       Q. What type of property is it?
18       A. It's a retail storefront. We have a
19   mattress distributor company that wants to go in
20   there. We haven't -- we want more in rent than
21   they're offering, so...
22       Q. What are you looking for in rent?
23       A. We wanted 5,000.
24       Q. What are they willing to pay?

20 (Pages 77 to 80)